**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

**THE AMERICAN HUMANIST**
**ASSOCIATION, INC., et al,**

      **Plaintiffs,**

**v.**                                            **Case No: 5:14-CV-651-Oc-TJC-PRL**

**CITY OF OCALA, FLORIDA, et al,**

      **Defendants.**

---

**REPORT AND RECOMMENDATION**[1]

"Let us pray."  Undoubtedly, these words are spoken thousands of times a day within the City of Ocala – in homes, places of worship, and to open meetings of various organizations and entities, including, as the Mayor says, City Council meetings.  Undoubtedly, these words were spoken on numerous occasions at the Community Prayer Vigil held in downtown Ocala on September 24, 2014.

This case, quite plainly, involves prayer.  Indeed, its central focus is the prayer vigil.  It is about whether assuming, as we must, the Plaintiffs' well-plead facts to be true, the City of Ocala, along with its Mayor and Police Chief, violated the Establishment Clause to the U.S. Constitution by organizing and promoting the prayer vigil, even if it was for a seemingly neutral purpose – i.e., to lower crime.  This is not, to be clear, a case about whether the Mayor or Police Chief (or his officers) can pray in public for our community; it is far more specific than that.  The question is

---

[1] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D. Fla., within fourteen (14) days after service of this report and recommendation.  Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

whether the City, and these public officials who represent each and every member of this diverse community, could organize and promote the vigil (as the Plaintiffs allege) where the focus of the event was prayer, which, as the law has repeatedly recognized, is fundamentally religious.  I submit that doing so, in the manner alleged here by the Plaintiffs, is sufficient for the individual Plaintiffs to state a claim under the First Amendment.

Specifically, Plaintiffs, The American Humanist Association, Inc. ("AHA"), which describes itself as dedicated to advancing and preserving the separation of church and state and the constitutional rights of humanists, atheists, and other freethinkers; Art Rojas, an atheist, member of AHA, and resident, homeowner, and taxpayer in the City; Frances Jean Porgal, an atheist, member of AHA, and resident of Marion County; and Lucinda Hale and her husband Daniel Hale, atheists, members of Ocala Atheists, and residents of Marion County, allege that the Defendants – the City of Ocala and its Mayor, Kent Guinn (in his individual and official capacities); and the Ocala Police Department and its Chief, Greg Graham (in his individual and official capacities)– violated the Establishment Clause of the First Amendment to the United States Constitution[2] insofar as they held and promoted a Community Prayer Vigil in September 2014 on the Downtown Square in the heart of Ocala.  Further, they contend that there is a risk of future events as the Defendants have "ongoing governmental policies, practices and customs of promoting, advancing, endorsing, sponsoring, and affiliating with theistic religion and the monotheistic religion in particular." (Complaint at ¶13).

As such, pursuant to 42 U.S.C. § 1983, Plaintiffs seek nominal damages for the alleged constitutional violation, and prospective declaratory and injunctive relief to prevent these Defendants from organizing and promoting future prayer events.  The Defendants dispute

---

[2] The Establishment Clause provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

Plaintiffs' contentions and move to dismiss the Complaint for lack of standing and failure to state a claim.  That is, they contend that the Plaintiffs have failed to allege an injury, a threat of future harm as to the prospective relief, or even the commission of any constitutional wrong.

Upon due consideration I recommend that the motion be denied as to the individual Plaintiffs' claims for nominal damages against the City, as well as the Mayor and Chief in their individual capacities, but granted in all other respects.  That is, the Plaintiffs' claims against the OPD and the Mayor and Chief in their official capacities are due to be dismissed, as such claims are merely claims against the City; Plaintiffs claims for prospective relief are due to be dismissed, as Plaintiffs fail to show or allege any imminent threat of a future event that might cause them injury; and the organization is due to be dismissed in its entirety for lack of standing.

## I.    BACKGROUND

It is undisputed that a Community Prayer Vigil was held on September 24, 2014 at 6:30 p.m. on the Downtown Square.  There is much dispute, however, about who organized the event – the Plaintiffs say the City, Mayor, and Chief did; while the Defendants contend that civic and church leaders did.  Critically, despite this dispute, at this stage of the proceedings (i.e., a motion to dismiss), these facts do not get fleshed out.  Rather, the well-plead facts alleged by the Plaintiffs are taken as true.  The motion, then, is decided on these facts.

The story begins just prior to the event.  The Complaint alleges that on about September 20, 2014, the OPD posted a letter on its Facebook page that was written on its letterhead and signed by Chief Graham and Narvella Haynes (an individual associated with the New Zion Missionary Baptist Church) that encouraged attendance at the prayer vigil and reveals the OPD's and Chief Graham's involvement in planning, endorsing, and promoting it.  The letter reads as follows:

Blessings to all our citizens, specifically Pastors, Community Leaders, Parents and our precious youth.

We are facing a crisis in the City of Ocala and Marion County that *requires fervent prayer and your presence* to show unity and help in this senseless crime spree that is affecting our communities.

Within the last 30 days we have had numerous shooting that have resulted in two children and an infant being hit by bullets.

Stray bullets do not have respect for addresses, social status, economic status, educational background, political status and the list goes on.  But my point is none of us are exempt from stray bullets.

*I am urging you all to please support a very important "Community Prayer Vigil"* that will be held this coming Wednesday, September 24, 2014 at 6:30 pm to be held at our Downtown Square located in the heart of the City.

Please support peace and this appeal for unity on this very important "Community Prayer Vigil" coming this next Wednesday.  *We need you.*

(Complaint, Exhibit A) (emphasis added).

Then, on about September 21, 2014, AHA sent an email to Chief Graham advising him (as they see it) that his letter urging "fervent prayer" and promoting the Community Prayer Vigil was unconstitutional and demanded that the letter be removed from the police department's Facebook page.  Chief Graham responded that he would not remove the letter.  According to Plaintiffs, Chief Graham and the OPD received other complaints about the letter and their involvement in the prayer vigil.

Mayor Guinn also received complaints about the City's alleged involvement in the Community Prayer Vigil.  In response to an email complaint from Plaintiff Lucinda Hale, Mayor Guinn expressly promoted the event and declared that the Constitution does not prohibit "us" – which, in context, seems to refer to him as Mayor, the City, and OPD – from "having" the prayer vigil.  Specifically, Mayor Guinn's response reads as follows:

There is nothing in the constitution to prohibit <u>us</u> from <u>having</u> this vigil.  Not only are <u>we</u> not canceling it <u>we</u> are trying to <u>promote it</u> and have as many people as possible to join <u>us</u>. We open every council meeting with a prayer.  And we end the prayer in Jesus name we pray.  Our city seal says "God be with us" and we pray that he is and us with him.

(Complaint, Exhibit B)(emphasis added).

Along with these exchanges, which, as Plaintiffs argue, show that the Mayor and Chief organized and promoted the prayer vigil, and that the City was directly involved in its planning and promotion, the individual Plaintiffs personally attended it.  According to Plaintiffs, several representatives of the OPD, dressed in OPD uniforms with OPD patches and badges, served as speakers, some of whom "preached Judeo-Christian religion," while other uniformed personnel put hands in the air and bowed their heads to participate.  All of which simply lends support to the Plaintiffs' theory that it was a City, Mayor, and Police Chief run and promoted event.

## II.    DISCUSSION

The legal discussion of this case will first begin with weeding out the duplicative defendants, and then turn to the Plaintiffs standing and why, on this Complaint, the individual Plaintiffs can only seek nominal damages.  Once the proper parties and relief sought is established, I will address why the individual Plaintiffs have sufficiently alleged a constitutional violation against the City, Mayor, and Chief.

### A.  Official Capacity Claims and the OPD

As an initial matter, the Plaintiffs claims against the Mayor and Chief Graham in their official capacities, as well as the claim against the OPD, are due to be dismissed.

Defendants correctly argue – and Plaintiffs do not dispute – that the claims against the Mayor and Chief in their official capacities are duplicative of Plaintiffs' claims against the City itself.  *See Kentucky v. Graham*, 473 U.S. 159 (1985) (a suit against a government official in their official capacity is treated as a suit against a municipality); *Busby v. City of Orlando,* 931 F.2d

764, 776 (11th Cir.1991); *Brandon v. Holt,* 469 U.S. 464, 471–72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985) (explaining that "a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents").  Thus, because the City has been sued directly, it is proper to dismiss the claims against Mayor Guinn and Chief Graham in their official capacities as redundant and potentially confusing.

Similarly, the claim against OPD is due to be dismissed, and Plaintiffs fail to argue otherwise.  The law of the state in which the district court is located governs whether an entity can be sued in federal court.  *Dean v. Barber,* 951 F.2d 1210, 1214 (11th Cir.1992) (citing Fed.R.Civ.P. 17(b)).  Florida's Constitution empowers municipalities to "perform municipal functions and render municipal services."  Fla. Const. art. VIII, § 2, cl. b.  With these powers, the City of Ocala, a municipality, renders policing services through OPD, which is not a distinct legal entity recognized by Florida's Constitution.  *See id.*  Furthermore, "[w]here a police department is an integral part of the city government as the vehicle through which the city government fulfills its policing functions, it is not an entity subject to suit." *Eddy v. City of Miami,* 715 F.Supp. 1553, 1556 (S.D.Fla. 1989).  Here, OPD is clearly integral to the City's policing functions, since no other police departments exist to police the City.  Therefore, OPD is not a legally distinct entity from the City, and should be dismissed.  The City itself is the proper defendant.

### B.  Standing and Plaintiffs' Claims for Relief

Before reaching the question about whether a constitutional violation is even adequately pled, the Court must first address standing.  That is, whether these Plaintiffs (the individuals and the association) can even bring this suit and for what relief.  *See Elend v. Basham*, 471 F.3d 1199, 1206 (11th Cir. 2006) ("The standing inquiry 'requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of

the particular claims asserted.'") (citations omitted).  I do submit that the individual Plaintiffs can for nominal damages (and associated attorney fees and costs), but nothing more.  We will begin here, then.

A motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(1) for lack of standing is one that attacks the district court's subject matter jurisdiction.  "The plaintiff has the burden to clearly and specifically set forth facts sufficient to satisfy Art. III standing requirements." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 976 (11 th Cir. 2005) (quotations and citations omitted). "If the plaintiff fails to meet its burden, this court lacks the power to create jurisdiction by embellishing a deficient allegation of injury." *Id.*

Article III, § 2 of the United States Constitution limits federal jurisdiction to actual cases or controversies.  In order to satisfy the case or controversy requirement, Plaintiffs must show that they have "standing" to sue.  Specifically, Plaintiffs must show: (1) that they have suffered an injury-in-fact; (2) that there is a causal connection between the injury and the conduct complained of; and (3) that there is a likelihood that the injury will be redressed by a favorable decision.  *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001).  If this can be shown, then at a minimum, the individual Plaintiffs can seek nominal damages for the alleged constitutional deprivation.  *See Amnesty Intern. USA v. Battle*, 559 F.3d 1170, 1177 (11th Cir. 2009) (Section 1983 "allows for recovery of nominal damages where the plaintiff's constitutional rights were violated but the violation did not result in any injury giving rise to compensatory damages.").

Additionally, as to prospective relief, "'[b]ecause injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges . . . a real and immediate – as opposed to a merely conjectural or hypothetical – threat of future injury.'"  *Id.* (quoting *Wooden v. Board of Regents of Univ. System of Georgia*, 247 F.3d 1262, 1284 (11th Cir. 2001).  Indeed, "a

prayer for injunctive and declaratory relief requires an assessment, at this stage in the proceeding, of whether the plaintiff has sufficiently shown a real *and* immediate threat of future harm." *Elend v. Basham*, 471 F.3d 1199, 1207 (11th Cir. 2006) (emphasis added). Without such a showing, none of the Plaintiffs can seek a claim for prospective relief.

For the organization to establish representational standing where, as here, it "brings this action to assert the First Amendment rights of its members" (see Complaint, ¶ 5), it must at least meet these requirements as well, since it can only have standing if its members would otherwise have standing. *Amnesty Intern. USA*, 559 F.3d at 1178. In addition, where this first prong (injury in fact) is met, it must also show that the interests that the organization seeks to protect are germane to the organization's purpose and that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Id.*, *see also Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343 (1977).

Here, the standing issue initially focuses on whether the individual Plaintiffs have adequately alleged that they personally suffered an injury in fact as a result of the remaining Defendants' purportedly unconstitutional actions. An injury in fact "serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem." *United States v. SCRAP,* 412 U.S. 669, 689 n. 14 (1973). Courts have acknowledged that "the concept of injury for standing purposes is particularly elusive in Establishment Clause cases." *Saladin v. City of Milledgeville*, 812 F.2d 687, 691 (11th Cir. 1987). A direct injury, however, even a non-economic one, has been sufficient to satisfy this prong of the analysis. *Id.*; *see also Pelphrey v. Cobb County, Ga.*, 547 F.3d 1263, 1279-80 (11th Cir. 2008).

1. *Nominal Damages*

(a)  Individual Plaintiffs

To have standing to raise a claim for nominal damages, the individual Plaintiffs must have suffered an injury.  In *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 472 (1982), the Supreme Court examined the injury requirement in the context of the Establishment Clause.  There, the Court denied standing to plaintiffs who attempted to challenge the transfer of surplus federal property to a Christian school in Pennsylvania.  The plaintiffs learned about the conveyance through a press release, but none of them lived in or near Pennsylvania.  The Court held that the plaintiffs lacked standing because they failed to identify any personal or direct injury suffered as a result of the allegedly unconstitutional transfer.  The Court explained that it was not enough for the plaintiffs to simply claim that the Constitution had been violated or that they were committed to the separation of church and state; rather, they must identify an injury (even a non-economic one) caused by the conduct, and that it must be more than the psychological consequence that is associated with one's knowledge that a constitutional wrong is occurring or has occurred.  *See Valley Forge*, 454 U.S. at 485-86.

The Court explained that the plaintiffs, who did not live near or even in the same state as the property at issue, failed to allege that the conveyance affected them *directly* in any way.  *Id*. at 486-87.  The Court made it clear, however, that standing can be predicated on a non-economic injury, so long as it is a direct and personal one.  *Id.* at 486-87 & n. 22; *see also School District of Abington Township v. Schempp*, 374 U.S. 203, 224 & n. 9 (a non-economic injury which results from a party being subjected to unwelcome religious statements can support a standing claim, so long as the parties are "directly affected by the laws and practices against whom their complaints are directed").  The Plaintiffs here essentially rely on the direct, personal injury theory to satisfy

this requirement – their communications with the Chief and the Mayor and, more specifically, their presence on the Square when the event occurred.  There are cases that support this argument.

Following *Valley Forge*, the Eleventh Circuit found standing based on non-economic injury in both *American Civil Liberties Union v. Rabun County Chamber of Commerce, Inc.,* 698 F.2d 1098 (11th Cir. 1983) and *Saladin v. Milledgeville*, 812 F.2d 687 (11th Cir. 1987).  In *Rabun County*, the Eleventh Circuit held that the plaintiffs, who were citizens of Georgia, had standing to challenge a large illuminated cross located in a Georgia state park.  The Court found that at least two of the plaintiffs were injured by the cross's presence in the park because it inhibited their ability to use and enjoy the park, where they were forced to located to other camping areas or be subjected to "unwanted religious symbolism", and where one of them had "little choice but to view the cross and suffer from the spiritual harm" associated with that because it was clearly visible from his summer cabin and the road he needed to take to get there.  *See Rabun County*, 698 F.2d at 1107-08.  In reaching its conclusion, the Eleventh Circuit distinguished *Valley Forge* based on the total lack of connection between plaintiffs and the subject matter of that action – i.e., the surplus property to which those plaintiffs had no connection – and the personalized non-economic injury the plaintiffs in *Rabun County* were able to demonstrate.

Likewise, in *Saladin*, the Eleventh Circuit held that the plaintiffs, who lived in and around the city of Milledgeville, had standing to challenge the City's use of the word "Christianity" on the city seal because they came into direct contact with it.   *Saladin*, 812 F.2d at 692.  The court noted that at least three of the plaintiffs regularly received correspondence on city stationery bearing the seal from the City's Water Works, and at least two of the plaintiffs were active in civic organizations which received proclamations from the Mayor's office embossed with the seal and were present at the presentation of the proclamations.  *Id.*  The Eleventh Circuit noted the plaintiffs

alleged injury in that they were offended by the presence of the word "Christianity" on the seal as it represented the City's endorsement of Christianity, and thus, made Plaintiffs feel like "second class citizens" and that "Christianity is the 'litmus test' of being a 'true' citizen of Milledgeville." *Id.* at 693.

More recently, in *Pelphrey*, the court reaffirmed that under a traditional standing analysis for an Establishment Clause claim based on a non-economic injury, a plaintiff must identify a "*personal* injury suffered by them as a consequence of the alleged constitutional error."  547 F.3d at 1279 (emphasis added) (citations omitted).  And further, the court stated that "[a]n actual injury occurs if the plaintiff is subjected to unwelcome religious statements and is directly affected by the laws and practices against which his or her complaints are directed."  *Id.* (citations and quotations omitted).  Under this standard, the plaintiff in *Pelphrey* established an injury in fact where he had direct contact with the complained of practice of the Commission's exclusion of certain religions from offering invocations at its meetings, as well as of the nature of the invocations offered, insofar as he viewed the invocations when he attended the meetings in person and also viewed them on the internet.  *Id.* at 1279-80.

Here, like *Rabun*, *Saladin*, and *Pephrey*, the individual Plaintiffs assert that they came into direct contact with the allegedly unconstitutional conduct – each of the Plaintiffs (two of whom are members of AHA) personally witnessed the prayer vigil, along with the prayers recited at it, including those recited by the officers.  (Complaint at ¶¶6-8, 38).  In addition, in response to Plaintiff Lucinda Hale's concerns about the prayer vigil, Mayor Guinn sent her an email in which he advised that "we are not canceling it we are trying to promote it", and Chief Graham sent Plaintiff Porgal emails in which he advised that the prayer vigil was just one law enforcement strategy, that he had "no intention of canceling the event," and that he was "attempting to bring

our community together to fight crime."  Moreover, like in *Saladin*, Plaintiffs allege that Defendants' actions offended them and had the effect of endorsing Christianity and portraying "those who do not believe and do not participate in such religious exercises as outsiders and second-class citizens."  (Complaint at ¶42).

Accordingly, based on *Valley Forge*, *Rabun County*, *Saladin*, and *Pelphrey*,[3] I submit that the individual Plaintiffs have alleged an injury based on their direct and personal contact with the Community Prayer Vigil (as well as their communications surrounding it) sufficient to satisfy this element of the standing analysis, and sufficient here to confer standing for purposes of nominal damages.[4]  *See also Newman v City of East Point*, 181 F.Supp.2d 1374, 1377-78 (N.D. Ga. 2002) (finding plaintiffs had standing to challenge constitutionality of Mayor's Community Prayer Breakfast where flyers publicizing the Breakfast were distributed by defendants at the City's Christmas party and taxpayer funds were used to print the flyers).[5]

---

[3] I am unpersuaded by Defendants' argument that this case is actually more akin to *Freedom From Religion Foundation, Inc. v. Obama*, 641 F.3d 803 (7th Cir. 2011).  In that case, the plaintiffs challenged the enabling legislation for the National Day of Prayer and President Obama's proclamations issued pursuant to the legislation.  While the Seventh Circuit held that general proclamations cannot confer standing, the instant case is readily distinguishable as it involved an announcement for a prayer event, the alleged organization and promotion of the event, direct communication with two of the Plaintiffs about it, and Plaintiffs presence at the event itself.

[4] As there is no dispute as to the second (casual connection) or third (redressability) prongs of the analysis, no further discussion of those requirements is necessary.  However, based on a review of the complaint they certainly appear to be met.

[5]  While Plaintiff Rojas has standing for nominal damages based on his direct contact with the event and prayer, I do note that his additional taxpayer standing argument appears deficient.  Aside from alleging that he is a "taxpayer of the City of Ocala", as the Defendants point out the Complaint is deficient insofar as he fails to actually allege that City tax monies were spent on the event.  While it can arguably be assumed that tax money was spent (as Plaintiff asks the Court to do), the Court need only accept well-plead allegations and need not embellish a deficient allegation of injury.  *Bochese*, 405 F.3d at 976.  In any event, this analysis is of no help to the other Plaintiffs or their claims.

(b)  Organization

Even though AHA can show that two of its members have established standing for nominal damages, contrary to its simple position that it has standing where its members have standing (see Doc. 9, p. 6), its analysis on organizational standing, along with the allegations in the Complaint, are woefully deficient.  Plaintiffs, who unquestionably bear the burden of establishing standing, must not only show that a member would otherwise have standing to sue in his or her own right, but also that the interests that the organization seeks to protect are germane to the organization's purpose *and* that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  *Hunt*, 432 U.S. at 343; *Amnesty Intern. USA*, 559 F.3d at 1178.

Here, the Plaintiffs complaint does not expressly set forth the claims they seek into separate counts, accompanying specific prayers for relief.  Instead, it incorporates all allegations under a "cause of action" heading and then states how the actions of the Defendants have violated the laws. Next, it again incorporates all preceding allegations, and under a heading for "relief sought" it says that "Plaintiffs" request declaratory judgment, a permanent injunction, and nominal damages.  I assume, based on this generalized pleading, that the organization is asking not only for the prospective relief, but for nominal damages as well.  Typically, though, organizational standing arises in the context of a claim for prospective relief, not nominal damages.  *See Warth v. Seldin*, 422 U.S. 490, 515, (1975) ("[W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly

recognized standing in associations to represent their members, the relief sought has been of this kind.").

This is not to say that courts have not found organizational standing for nominal damages claims; there are a few cases where they have when the issue seems to involve a pure question of law. *See, e.g., Florida Paraplegic Ass'n v. Martinez*, 734 F. Supp. 997, 1001 (1990). More persuasive, and indeed controlling, however, is our Circuit's opinion where they denied organizational standing where, like here, it was unclear "whether this suit meets the third prong: whether it requires the participation of individual members in the lawsuit." *Amnesty Intern. USA*, 559 F.3d at 1178. Indeed, like here, in that case the court noted that "Amnesty has not discussed this prong; it has provided no explanation or reasons why the members are not needed." *Id.* Since Amnesty bore the burden of proof, as AHA does here, the court held it had not established organizational standing. *Id.*[6] I agree with that analysis, and submit that AHA has failed to establish its organization standing here, as to nominal damages.

2. *Prospective Relief*

Where, as here, Plaintiffs seek prospective relief, the Court must assess whether they have sufficiently shown a real and immediate threat of future harm. *Elend v. Basham*, 471 F.3d 1199, 1207 (11th Cir. 2006). In order for an injury to suffice for prospective relief, it must be imminent. *See 31 Foster Children,* 329 F.3d at 1266–67 (noting that standing for declaratory or injunctive relief requires that future injury "proceed with a high degree of immediacy"); *Bowen v. First Family Fin. Servs.,* 233 F.3d 1331, 1340 (11th Cir.2000) (observing that a "perhaps or maybe chance" of an injury occurring is not enough for standing). Because the Court's inquiry is focused

---

[6] *Cf. Minor I Doe et al. v. School Bd. for Santa Rosa County*, 264 F.R.D. 670, 687-88 (N.D. Fla. 2010) (finding no organizational standing where the nature of the First Amendment claim asserted (a chill on speech) required an assessment of individualized and particularized factual circumstances that were not common to all of its members).

on wholly prospective conduct, it follows that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Id.* (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 102 (1983)).  In fact, where the Eleventh Circuit has "found a sufficient imminence of future harm based on a past injury, the plaintiff has alleged with particularity that a future injury would likely occur in substantially the same manner as the previous injury."  *Elend,* 471 F.3d at 1208.

Here, Plaintiffs' allegations fall short.  Fairly read, the Complaint focuses on a past event – the September 24, 2014 Community Prayer Vigil – and actions purportedly taken by Defendants to promote and organize the event.  Significantly, the Complaint is devoid of any allegation that another prayer vigil is scheduled or even that one is likely to be organized.

Further, Plaintiffs bald and speculative contention that Defendants will likely organize another event because they have a "policy, practice, and custom of endorsing and promoting religion in the context of government activity", is insufficient.  (Doc. 9 at 6-7).  Equally insufficient is their argument that a real and imminent threat exists because the Defendants' "support of the Community Prayer Vigil was part of an overall law enforcement-related practice" (Doc. 8 at 19), as it too does not establish or show that there is a real and *immediate* threat of a future constitutional wrong that will injure them.  The mere possibility that another prayer vigil could be scheduled at some point in the future by the Defendants "without any description of concrete plans, or indeed even any specification of when the some day will be – do[es] not support a finding of the 'actual and imminent' injury required by law".  *Elend*, 471 F.3d at 1209 (*quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992)).

Accordingly, because the Plaintiffs (the individual and, therefore, AHA as well) fail to allege any facts to show a real and immediate threat of future harm, their claims for prospective declaratory and injunctive relief should be denied.[7]

### C.  Motion To Dismiss For Failure To State A Claim

Now that I have set forth who can bring a claim (the individual Plaintiffs) and what type of relief they can seek (nominal damages), I must next address whether claims have been plausibly stated against the City and the individual Defendants (Mayor Guinn and Chief Graham).  I submit that they have.  Central to each claim though is whether the Complaint sets forth sufficient facts to establish a constitutional violation – such a determination is necessary in considering municipal liability, and it is the first step in the qualified immunity analysis for the individual defendants.  So this analysis begins here.

Central to any claim under § 1983 is whether the Complaint alleges a constitutional violation.  *See BMI Salvage Corp. v. Manion*, 366 Fed. Appx. 140, 143 (11th Cir. 2010).  Defendants argue that Plaintiffs have failed to allege that the Defendants violated the Establishment Clause.  The Clause, in turn, states that, "Congress shall make no law respecting an establishment of religion."  U.S. Const. amend. I.  The First Amendment, as incorporated through the Due Process Clause of the Fourteenth Amendment, applies to state and municipal governments, state-created entities, and state and municipal employees.  *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1268 (11th Cir.2004); *S.D. v. St. Johns County School District*, 632 F. Supp. 2d 1085, 1090 (M.D. Fla. 2009).  The Establishment Clause applies not only to statutes, but also to

---

[7] The Plaintiffs' footnote in their response (Doc. 9, p.8 n. 5) stating that Plaintiffs should have discovery on this issue does not change my recommendation.  If Plaintiffs sought discovery they should have moved for it – a suggestion in a footnote that it may be necessary does not save this claim.  Further, after the response to the motion to dismiss was filed (January 19, 2015), Plaintiffs apparently did not oppose a *stay* of discovery (see Doc. 11, March 18, 2015), which was granted (Doc. 12).

acts and decisions of individual government actors, "as their conduct bespeaks government conduct." *Id.*

To establish a basis for relief, Plaintiffs' complaint must contain, "a short and plain statement of the claim" showing that they are entitled to relief. Fed. R. Civ. P. 8(a)(2). While particularity is not required under Fed. R. Civ. P. 8, to survive a motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court must view the allegations of the complaint in the light most favorable to the Plaintiffs, consider the allegations of the complaint as true, and accept all reasonable inferences therefrom. *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004). In considering the sufficiency of the complaint, the court limits its "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *Id.* Applying this standard, Plaintiffs' claims survive as to the City as well and the Mayor and the Chief in their individual capacities.

### (1) Constitutional Violation

The Establishment Clause sets forth a principle of government neutrality and prohibits the government from promoting "a point of view in religious matters" or otherwise taking sides between "religion and religion or religion and nonreligion." *McCreary County v. ACLU,* 545 U.S. 844, 860 (2005) (citations omitted). Indeed, as the Supreme Court recognized in *Lee v. Weisman*, 505 U.S. 577, 589 (1992): "The First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State." The Court further explained that: "The design of the Constitution is that preservation and transmission

of religious beliefs and worship is a responsibility and a choice committed to the private sphere, which itself is promised freedom to pursue that mission." *Id.*

Through a series of cases, the Supreme Court has established a framework for analyzing claims under the Establishment Clause.  The primary test was articulated in *Lemon v. Kurtzman* and has come to be known as the "Lemon test."  403 U.S. 602 (1971).[8]  Under the Lemon test, the Establishment Clause is violated if the government's primary purpose is not secular-based, if the principal effect is to aid or inhibit religion, or if there is any excessive government entanglement with religion.  *Id.* at 612-613.[9]

As previously stated with respect to standing, Plaintiffs allege that the City, through its Mayor and Police Chief, as well as the Mayor and Chief in their individual capacities, organized and promoted the Prayer Vigil.  Specifically, and at the risk of being redundant, Plaintiffs allege that the OPD posted on its Facebook page a letter on its own letterhead, signed by its Chief of Police stating that the community was facing a crisis "that requires fervent prayer" and urging community members to attend the Prayer Vigil; that Mayor Guinn sent an email communication in which he refused to cancel the Prayer Vigil and stated "we are trying to promote it;" that the Prayer Vigil was held on the Downtown Square; and that uniformed OPD officials participated in the Prayer Vigil with some officers leading the religious activities.  Additionally, the language used in the Facebook and email communications, such as Mayor Guinn saying that there is nothing

---

[8] The area of legislative prayer (i.e., opening or closing sessions of legislative bodies with prayer), which is <u>not</u> at issue here, is excepted from the traditional Establishment Clause analysis.  *See Marsh v. Chambers*, 463 U.S. 783 (1983); *Pelphrey*, 547 F.3d at 1269.

[9] I note also that while there is no dispute that the Lemon Test is the applicable standard here, some courts have also used an "endorsement test" in evaluating claims under the Establishment Clause – i.e., "if the government is to be neutral in matters of religion, rather than showing either favoritism or disapproval towards citizens based on their personal religious choices, government cannot endorse religious practices and beliefs of some citizens without sending a clear message to the nonadherents that they are outsiders." *S.D. v. St. Johns County School Dist*, 632 F.Supp.2d 1085 (M.D. Fla. 2009).  Under either test, the Plaintiffs' allegations are sufficient.

to prohibit "us" from having the Community Prayer Vigil, and advising that "we" are not canceling it, rather "we" are promoting it, as well as Chief Graham urging attendance ("I am urging all of you to attend"), certainly suggests an ownership (for lack of a better term) of the event, as Plaintiffs allege.

These facts, taken as true, do tend to show a plausible claim that Defendants violated the Establishment Clause by organizing and promoting (or endorsing) the Prayer Vigil.   At the most fundamental level, the Eleventh Circuit has recognized that "prayer is the quintessential religious practice," which implies that no secular purpose can be satisfied.  *Jaffree v. Wallace*, 705 F.2d 1526, 1534-35 (11th Cir. 1983).   Indeed, "[t]he primary effect of prayer is the advancement of ones religious beliefs."  *Id*.  Consequently, the Eleventh Circuit has recognized that the state cannot advance prayer activities without the implication that the state is violating the Establishment Clause.  *Id*.

While Defendants argue that the Prayer Vigil had a secular purpose because it was intended "to support peace" and was "part of an overall law enforcement-related practice"  (see Doc. 8 at 19), "[t]he unmistakable message of the Supreme Court's teachings is that the state cannot employ a religious means to serve otherwise legitimate secular interest."  *Jager v. Douglas County School Dist.*, 862 F.2d 824, 830 (11th Cir. 1989).  The First Amendment prevents the government, in its effort to *protect* religious freedom, for carrying on government sponsored religious activity:

> By the time of the adoption of the Constitution, our history shows that there was a widespread awareness among many Americans of the dangers of a union of Church and State.  These people knew, some of them from bitter personal experience, that one of the greatest dangers to the freedom of the individual to worship in his own way lay in the Government's placing its official stamp of approval upon one particular kind of prayer or one particular form of religious services.  They knew the anguish, hardship and bitter strife that could come when zealous religious groups struggled with one another to obtain the Government's stamp of approval from each King, Queen, or Protector that came to temporary power.  The Constitution was intended to avert a part of this danger by leaving the government of this country in the hands of the people rather than in the hands of any

monarch.  But this safeguard was not enough.  Our Founders were no more willing to let the content of their prayers and their privilege of praying whenever they pleased be influenced by the ballot box than they were to let these vital matters of personal conscience depend upon the succession of monarchs.  The First Amendment was added to the Constitution to stand as a guarantee that neither the power nor the prestige of the Federal Government would be used to control, support or influence the kinds of prayer the American people can say—that the people's religions must not be subjected to the pressures of government for change each time a new political administration is elected to office.  Under that Amendment's prohibition against governmental establishment of religion, as reinforced by the provisions of the Fourteenth Amendment, government in this country, be it state or federal, is without power to prescribe by law any particular form of prayer which is to be used as an official prayer in carrying on any program of governmentally sponsored religious  activity.

*Engel v. Vitale*, 370 U.S. 421, 429-30 (1962).

Accordingly, I submit that the individual Plaintiffs have sufficiently alleged a violation of the Establishment Clause sufficient to survive a motion to dismiss, based on the remaining Defendants' alleged organization and promotion of the Prayer Vigil.  *See e.g., Doe v. Village of Crestwood, Ill*, 917 F.2d 1476 (7th Cir. 1990) (affirming district judge's finding that the Village of Crestwood improperly sponsored a Roman Catholic mass held during a municipal Italian Festival because information published in the Village paper would "lead an objective observer to conclude that the Village itself is the sponsor, or at least a sponsor" of the mass); *Newman v. City of East Point*, 181 F.Supp.2d 1374 (N.D. Ga. 2002) (finding that the City "played more than a *de minimis* part in the promotion" of the prayer breakfast and that "an objective observer would most certainly conclude that the City of East Point has endorsed religion" based on the City using City funds to produce, duplicate and distribute a flyer advertising the Mayor's Prayer Breakfast; distributing the flyer at a City event; and listing other official City events on the flyer with it).[10]

---

[10] Of course, the Mayor, the Chief and the individual police officers would have a First Amendment right as individuals to participate in a community prayer vigil, or other public prayer for that matter, so long as the event was not otherwise in violation of the Establishment Clause.  For example, while the court in *Newman v. City of East Point*, enjoined the City and the Mayor from *organizing, advertising, promoting or endorsing a community prayer breakfast*, the court refused to enjoin the Mayor from participating in the breakfast as it noted that "the Mayor and City Officials, as citizens of the United States, have a First

*(2) Claim Against the City*

In addition to setting forth an apparent constitutional violation, in order to sue the City itself the individual Plaintiffs must also show that the deprivation of their rights was caused by a policy, practice, or custom of the City.  That is, Plaintiffs must show a basis for municipal liability, which I suggest they can do.

In *Monell v. Department of Social Services,* 436 U.S. 658, 98 (1978), the Supreme Court held that local governments may not be held liable for constitutional deprivations on the theory of *respondeat superior*; rather, they may be held liable only if such constitutional torts result from an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law.  *Denno v. School Bd. of Volusia County*, 218 F.3d 1267, 1276 (11th Cir. 2000).  Notably, a municipality may be held liable for a single illegal act (or acts) committed by one of its officers when the challenged act may fairly be said to represent official policy, such as when that municipal officer possesses final policymaking authority over the relevant subject matter.  *Scala v. City of Winter Park*, 116 F.3d 1396, 1397 (11th Cir. 1997).

Here, Plaintiffs attempt to hold the City liable for the Community Prayer Vigil based on the actions of Mayor Guinn and Chief Graham.  Plaintiffs have alleged facts from which it could be inferred that Mayor Guinn and Chief Graham were final policymakers with respect to organizing the Prayer Vigil.  Plaintiffs allege that Mayor Guinn and Chief Graham are responsible for setting and carrying out city policy.  (Complaint at ¶¶10 & 12).  In the letter posted on the OPD

---

Amendment right *as individuals* to participate in the Mayor's Prayer Breakfast as long as it is otherwise not in violation of the Establishment Clause", which the court explained meant that the event was  not endorsed by the City of East Point in any way, "takes place at a non-City facility, does not use City funds, does not use City employees to publicize or organize it and is not presented as being endorsed by the City, then the Mayor and any City Officials can participate in the event."  *Newman*, 181 F.Supp.2d at 1382.

page, Chief Graham urged the citizens to support and attend the Prayer Vigil.  Likewise, in an email Mayor Guinn stated "[n]ot only are <u>we</u> not canceling [the Prayer Vigil] <u>we</u> are trying to promote it and have as many people as possible to join <u>us</u>."  (emphasis added).  Defendants' arguments to the contrary are belied by their motion to dismiss in which they acknowledge that "Defendants' support of the Community Prayer Vigil was part of an overall law enforcement-related <u>practice</u>" (Doc. 8 at 19) (emphasis added); and the attached email in which Chief Graham stated that "<u>I</u> have no intention of canceling the event" and that "<u>I</u> am attempting to bring our community together to fight crime."  (Doc. 8-3 at 1) (emphasis added).

At this stage in the litigation then, and based upon these allegations, Plaintiffs have adequately alleged that Mayor Guinn and Chief Graham had final policymaking power with respect to the Community Prayer Vigil in order to state a plausible claim under § 1983 against the City.  Whether these officials in fact had final policymaking authority involves questions that cannot be resolved on this motion and, as such, the City is not entitled to dismissal from this action on that ground.  Further, even if the Mayor and Chief cannot be said to have final policymaking authority, there are still sufficient allegations to support the Plaintiffs' theory that the City had a practice of endorsing religion: the communications made by the Mayor of the City and its Chief of Police are evidence of the City's apparent involvement in planning and promoting the prayer vigil, and the content of those messages include a proclaimed ability to do it (that is, that the law did prevent them) and an assertion that it was part of a law enforcement strategy or *practice*.  Even though the facts of this case may shake out otherwise – perhaps this was a spontaneous event planned by church leaders in response to crime, as opposed to a City event based on a practice of endorsing religion – we are only at the motion to dismiss stage, and what is alleged is enough.

*(3) Claims against Mayor Guinn and Chief Graham*

Mayor Guinn and Chief Graham both assert that they are protected from suit in their individual capacities by qualified immunity.  Qualified immunity offers complete protection for individual government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

Assuming for purposes of this motion that Mayor Guinn and Chief Graham were engaged in a discretionary function, "the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity."  *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1264 (11th Cir.2004).  To satisfy this burden, the plaintiff must show that: "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.*  As discussed *supra*, the allegations of the Complaint are sufficient to state a claim for a violation of the Establishment Clause.  Thus, the critical question is whether the state of the law gave those officials "fair warning" that their alleged organization and promotion of a Community Prayer Vigil was unconstitutional.  *Hope v. Pelzner*, 536 U.S. 730, 739 (2002); *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002).  We make this inquiry by looking at three sources of law that would provide adequate notice of statutory or constitutional rights: "specific statutory or constitutional provisions; principles of law enunciated in relevant decisions; and factually similar cases already decided by state and federal courts in the relevant jurisdiction." *Harper v. Lawrence County, Ala.,* 584 F.3d 1030, 1037 (11th Cir. 2009).

Here, I submit that the alleged conduct "'lies so obviously at the very core of what the [Establishment Clause] prohibits that the unlawfulness of the conduct was readily apparent to

[them], notwithstanding the lack of fact-specific law.'" *Vinyard,* 311 F.3d at 1355 (*quoting Lee,* 284 F.3d at 1199).  At the most fundamental level, as previously stated, the Establishment Clause sets forth a principle of government neutrality and prohibits the government from promoting "a point of view in religious matters" or otherwise taking sides between "religion and religion or religion and nonreligion."  *McCreary County v. ACLU,* 545 U.S. 844, 860 (2005) (citations omitted).  As "the quintessential religious practice", the state cannot advance prayer activities without the implication that the state is violating the Establishment Clause.  *Jaffree v. Wallace*, 705 F.2d 1526, 1534 (11th Cir. 1983).  No factually particularized, pre-existing case law was necessary for it to be obvious to local government officials that organizing and promoting a Prayer Vigil would violate the Establishment Clause.  *See Rich v. City of Jacksonville*, 201 WL 4403095, at *15-16 (M.D. Fla. March 31, 2010) (finding that lack of factually similar cases was not dispositive where the alleged conduct would clearly violate the Establishment Clause).

Accordingly, the motion to dismiss on the basis of qualified immunity as it pertains to the claims against Mayor Guinn and Chief Graham should be denied at this time.  I note here, as I did above, that the Court is not commenting on the ultimate merits of Plaintiffs' claims – the actual involvement of the Mayor and Chief still needs to be developed.  That they are not entitled to dismissal here on the basis of qualified immunity is based on the totality of the well-plead facts that they organized and promoted a Christian prayer vigil, as state actors.  *See Atheists of Florida, Inc. v. City of Lakeland*, 779 F. Supp. 2d 1330, 1343 (M.D. Fla. 2011).

**D.  RECOMMENDATION**

For the foregoing reasons, I recommend that Defendants' motion to dismiss (Doc. 8) should be **DENIED** as to the individual Plaintiffs' claims for nominal damages against the City of Ocala and the Mayor and Chief of Police in their individual capacities, but **GRANTED** in all other respects.

Recommended in Ocala, Florida on July 2, 2015.

PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy