**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

ART ROJAS, et al.,

               Plaintiffs,

vs.                                              Case No. 5:14-cv-651-Oc-32PRL

CITY OF OCALA, et al.,

               Defendants.

_____

## ORDER

If individuals or religious groups organize a prayer vigil and gather in the Downtown Square in the City of Ocala to pray for an end to violent crime, the First Amendment to the United States Constitution will protect the "free exercise" of their religion.  But what if the government organizes and sponsors the prayer vigil?  That is a problem because under the Establishment Clause of the First Amendment, the government cannot conduct such religious activity.  Yet that is what happened here. While the Ocala Police Chief and his subordinates were no doubt well-intentioned and sincere in sponsoring the Prayer Vigil, their actions violated the First Amendment.

## I.      Introduction

When the City of Ocala experienced a violent crime-spree in the late summer and early fall of 2014, its police department sought to curtail the violence using all available means.  As part of those efforts, Chief of Police Kenneth Gregory "Greg" Graham met with members of Ocala's faith-based community to seek their

assistance.  What resulted was an invitation from Chief Graham to the community, promoted on the Ocala Police Department facebook page and elsewhere, encouraging everyone's attendance at a "Community Prayer Vigil" on September 24, 2014 in the Downtown Square.  The plaintiffs, who are atheists, contacted Chief Graham and Ocala's mayor, Reuben "Kent" Guinn, in advance of the Vigil, advising them of their concern that the City's promotion and sponsorship of a Prayer Vigil would violate the United States Constitution's Establishment Clause.  The plaintiffs were rebuffed, the Vigil took place, and this lawsuit followed.

Efforts to settle the case failed and the parties filed cross-motions for summary judgment (Docs. 52, 53, 54) and responses thereto (Docs. 61, 62, 64, 68).  The Court held argument on the motions on May 26, 2017, the record of which is incorporated by reference.  The parties made further efforts to settle, but those too failed and the Court now issues this decision.

## II.    Undisputed Facts

In September 2014, the Ocala Police Department pursued various means to try to apprehend those responsible for the recent shooting spree that left several children injured.  Graham Dec. I[1] (Doc. 52-1) at ¶¶ 5-6.  The police knew who the shooters

---

[1]"As used herein, "Dec." is a citation to a declaration (Graham prepared two declarations, denoted here as "Dec. I" and "Dec. II"), "Depo." is a citation to a deposition, "Tr." is a citation to a page in a deposition transcript (using the Page ID from the CM/ECF header; some of the transcripts are missing pages so the court reporter's page number and the CM/ECF header page are not always aligned); "Aff."

2

were, but could not persuade witnesses to come forward to testify.  Graham Depo. (Doc. 54-10) at Tr. 21.  Their efforts included meeting with local leaders of the NAACP, who suggested to Chief Graham that the police reach out to the local faith-based community for help in convincing witnesses to cooperate. Graham Dec. I (Doc. 52-1) at ¶ 7.  Heeding that suggestion, Chief Graham held a meeting at the Ocala Police Department on September 17, 2014, with Captain Richard Edwards, the District Commander of the area where most of the trouble was occurring; Officer Mary Williams, who assisted Captain Edwards with community events in the area; Captain Carmen Sirolli, the Captain in charge of the division investigating the shootings; Major Dennis Yonce, the Major to whom Sirolli reported; Hugh Brockington, an Ocala Police Department Chaplain; Edwin Quintana, another Police Chaplain; and Narvella Haynes, a community activist who lived in the area where the crimes occurred and who had previously assisted the police with community outreach.  Graham Depo. (Doc. 54-10) at Tr. 19-21.

The purpose of the meeting was to develop ideas about how "to get the ministers in that area to lean on, talk to, encourage witnesses to come forward" so the police could hold the perpetrators accountable.  Graham Depo. (Doc. 54-10) at Tr. 21. Chaplain Edwin Quintana suggested that a prayer vigil or similar event on Ocala's public Downtown Square might bring the faith-based community together to get the

---

is a citation to an affidavit; "Inter. Resp." is a citation to an Interrogatory Response.

word out and encourage people to cooperate.  Graham Dec. I (Doc. 52-1) at ¶ 10;

Graham Depo. (Doc. 54-10) at Tr. 23.  Chief Graham "thought it was a great idea" and

said "Let's do it."  Graham Depo. (Doc. 54-10) at Tr. 23.  Graham says he then left the

meeting and Quintana and Haynes began planning the Vigil, creating a letter for Chief

Graham's and Haynes' signatures that invited the community to participate in the

Vigil.[2]  Graham Dec. I (Doc. 52-1) at ¶ 10; Haynes Dec. (Doc. 52-2) at ¶¶ 7, 9;

Quintana Dec. (Doc. 52-3) at ¶¶ 5 & 6.  Chief Graham read the letter and directed an

Ocala Police Department Sergeant to post it on the Ocala Police Department's

facebook page, and Haynes and the Chaplains encouraged members of the

community to attend the Vigil.  Graham Dec. I  (Doc. 52-1) at ¶ 11; Graham Depo.

(Doc. 54-10) at Tr. 31, 58; Graham Inter. Resp. (Doc. 54-6) at # 1; Haynes Dec. (Doc.

_____

[2]On September 18 (the day after the meeting), Chief Graham sent an email to Edwards and Quintana (but not Haynes) saying that due to feedback from ministers that Wednesday was not the best night for the Vigil, "[w]e are going to have the vigil on Thursday night instead of Wednesday."  Doc. 54-21 (marked Ex. 5) (9/18/2014 email from Graham to Edwards and Quintana).  But by September 19, the Police Department was preparing for the Vigil to occur on Wednesday, September 24.  See Doc. 54-24 (marked Ex. 8) (9/19/2014 email from Ocala Police Department employee announcing the Prayer Vigil for September 24).  Although Graham and Quintana signed declarations stating that the Prayer Vigil occurred on September 25 (see Graham Dec. I (Doc. 52-1) at ¶ 22; Quintana Dec. (Doc. 52-3) at ¶ 9), it appears they were simply mistaken.  Contemporaneous news stories, emails, and social media postings in the record appear to confirm the Prayer Vigil took place on Wednesday, September 24, 2014, as originally scheduled.  See, e.g., Doc. 54-19 (marked Ex. 3) at Page ID 1389 (9/24/2014 social media posting with photos of the Vigil); Doc. 54-72 (marked Ex. 56) at Page ID 1613, 1617 (9/24/2014 emails from reporters to the Ocala Police Department referencing "tonight's" prayer vigil); Doc. 54-73 at Page ID 1624 (9/24/2014 9:08 p.m. story on Ocala.com about that evening's Prayer Vigil).

52-2) at ¶ 8, Quintana Dec. (Doc. 52-3) at ¶ 7.  Chief Graham agreed that by posting the letter on the Ocala Police Department facebook page, he was "promoting" the Prayer Vigil.  Graham Depo. (Doc. 54-10) at Tr. 50.

Printed on Ocala Police Department letterhead (with the image of the Ocala Police Department badge and words OCALA POLICE DEPARTMENT displayed at the top, and the Department address and phone number at the bottom), the text of the letter read:

> Blessings to all our citizens, specifically Pastors, Community Leaders, Parents and our precious youth.
>
> We are facing a crisis in the City of Ocala and Marion County that requires fervent prayer and your presence to show unity and help in this senseless crime spree that is affecting our communities.
>
> Within the last 30 days we have had numerous shootings that have resulted in two children and an infant being hit by bullets.
>
> Stray bullets do not have respect for addresses, social status, economic status, educational background, political status and the list goes on.  Buy my point is none of us are exempt from stray bullets.
>
> I am urging you all to please support a very important "Community Prayer Vigil" that will be held this coming Wednesday, September 24, 2014 at 6:30 pm to be held at our Downtown Square located in the heart of the City.
>
> Please support peace and this appeal for unity on this very important "Community Prayer Vigil" coming this next Wednesday.  We need you.

The letter was signed with "Blessings and Highest Regards" by Greg Graham, as Chief of Police, and Narvella Haynes.   See Doc. 1, Ex. A.  Here is an image of the letter:



**OCALA POLICE DEPARTMENT**

Blessings to all our citizens, specifically Pastors, Community Leaders, Parents and our precious youth.

We are facing a crisis in the City of Ocala and Marion County that requires fervent prayer and your presence to show unity and help in this senseless crime spree that is affecting our communities.

Within the last 30 days we have had numerous shootings that have resulted in two children and an infant being hit by bullets.

Stray bullets do not have respect for addresses, social status, economic status, educational background, political status and the list goes on. But my point is none of us are exempt from stray bullets.

I am urging you all to please support a very important "Community Prayer Vigil" that will be held this coming Wednesday, September 24, 2014 at 6:30 pm to be held at our Downtown Square located in the heart of the City.

Please support peace and this appeal for unity on this very important "Community Prayer Vigil" coming this next Wednesday.  We need you.

Blessing and Highest Regards,

Greg Graham
Chief of Police

Narvella Haynes

402 S. PINE AVENUE • OCALA, FL 34471-1174 • (352) 369-7000

6

Ocala Police Department staff created a separate flyer about the Vigil which depicts a photo of the gazebo covered stage in the Downtown Square with an image of praying hands in one corner and the Ocala Police Department logo in the opposite corner, and the words "Community Prayer Vigil Wednesday, September 24, 2014 6:30 p.m. Ocala/Marion County is in crisis!  Help Stop The Violence!  Join us downtown on the square."  Doc. 54-22 (marked Ex. 6) at 7.  The Police Chief's letter and an earlier version of the flyer (created before the Ocala Police Department logo was added) were sent to Narvella Haynes by Officer Williams on September 19.  Doc. 54-23 (marked Ex. 7).[3]  Chief Graham stated he was unaware of the existence of the flyer.  Graham Dec. II (Doc. 68-1) at ¶ 4.

Quintana invited several local clergymen to participate in the Vigil and sent an email to the Ocala Police Chaplains (copying Graham) telling them that Chief Graham asked Quintana to ask all the Chaplains to be present at the Vigil and to come wearing their Police Chaplain uniforms.  Quintana Dec. (Doc. 52-3) at ¶¶ 7, 8; Doc. 54-26 (marked Ex. 10) (9/22/2014 email to chaplains from Quintana, copying Graham).[4]  The Ocala Police Chaplain uniform differs from the uniform of a sworn

---

[3]Plaintiffs claim the flyer was distributed to the public by an Ocala police officer but the exhibit they cite in support (Exhibit 6-C) is not in the record.  See Doc. 54 at 5.

[4]At his deposition, Chief Graham, who appeared on his own behalf and as the City's 30(b)(6) representative, testified that he did not recall directing Quintana to have the Chaplains attend and to do so in uniform and thought it more likely that he simply agreed to Quintana's recommendation about that.  Graham Depo. (Doc. 54-10)

officer– the Chaplains wear white shirts instead of blue, the sleeves bear patches that say "CHAPLAIN" above the Ocala Police Department patch, and the Chaplains do not carry weapons.  Quintana Dec. (Doc. 52-3) at ¶ 9; Doc. 54-19 (marked Ex. 3) at Page ID 1386, 1389, 1394, 1396, 1401, 1402 (photos of uniformed Ocala Police Officers and uniformed Ocala Police Chaplains).

The Ocala Police Department supplies and pays for the Chaplains' uniforms. City Inter. Resp. (Doc. 54-5) at # 7.  Chief Graham testified that when the Chaplains are in their police uniforms, the public would perceive them as being connected with the Ocala Police Department.   Graham Depo. (Doc. 54-10) at Tr. 165-66.   The Chaplains have office space in the Ocala Police Department's building.  Id. at Tr. 169. According to the Ocala Police Department Directive, "Ocala Police Department Chaplains are official members of the Ocala Police Department[,]" who are "appointed by the Chief of Police," and are "considered members of the staff of the Chief of Police in a support capacity and report directly to the Chief of Police."  Doc. 52-6 (marked Ex. 2) at 2. "They are issued Police Identifications in the form of an identification card with holder and badge[,]" id., are issued cell phones, and are

_____

at Tr. 13, 37-38.  The City's Interrogatory Responses say that the Ocala Police Department did not ask the Ocala Police Chaplains to have any involvement in the Vigil but they did so of their own initiative.  City Inter. Resp. (Doc. 54-5) at # 8.

authorized to drive Department vehicles.[5]  Ocala Police Department Police Chaplain

Section Manual, 2010, and as reviewed 2015 (Doc. 54-74 (marked Ex. 58)) at 23-24,

36-37.   Chief Graham has the authority to terminate the Ocala Police Chaplains.

Graham Depo. (Doc. 54-10) at Tr. 168.  Although the Ocala Police Chaplains are

volunteers, they are covered by worker's compensation when performing official

Department duties.   Doc. 52-6 (marked Ex. 2) at 2.   All of the Ocala Police

Department Chaplains are of the Christian faith.  Graham Depo. (Doc. 54-10) at Tr.

157.  Chief Graham agreed that although it would be inappropriate for Ocala Police

Chaplains to try to "convert" people in the course of their work for the Ocala Police

Department, "participating in a prayer vigil" would be part of the official function of an

Ocala Police Chaplain.  Id. at Tr. 78-79.[6]

---

[5]In his declaration, Chaplain Quintana states that Chaplains do not wear "police badges,"  Doc. 52-3 at ¶ 9, but the department directive and section manual both state that Chaplains are issued badges.  See Doc. 52-6 at 2,  Doc. 54-74 at 23, 36.  In some of the photos from the Prayer Vigil, some of the Police Chaplains appear to be wearing badges.  See Doc. 54-19 (marked Ex. 3) at Page ID 1386, 1389, 1390, 1394, 1396.  According to the City's Interrogatory Responses, the Chaplains' badges identify the wearer as a Chaplain (as opposed to an officer), but that is not evident from the photos.  See City's Inter. Resp. (Doc. 54-5) at # 7.

[6]In a later declaration, Chief Graham seems to be rejecting a portion of this deposition testimony, saying:

> As I previously testified, I do not consider uniformed [Ocala Police Department] chaplains proselytizing to the general public to be part of their official departmental function.  Nor is it part of chaplains' departmental function to lead general community religious events or activities, such as the Community Prayer Vigil at issue in this case, while in

Soon after the Vigil was advertised, several citizens, including some of the plaintiffs, contacted Chief Graham and Mayor Guinn, expressing concern that a prayer vigil organized by a police department would violate the U.S. Constitution. See, e.g., Doc. 52-9 at 3-4 (9/20/2014 6:03 p.m. email); Doc. 54-51 (marked Ex. 35) at 2 (9/22/2014 5:14 p.m. email).  Initially, Chief Graham's responses tended to take ownership of the Vigil, saying, for example, "I have no intention of canceling the event," Doc. 54-40 (marked Ex. 24) at 4 (9/22/2014 4:05 p.m. email), and "[t]his 'vigil' is not the only strategy that we [the Police Department] are employing to fight crime in Ocala" and explaining that the purpose of the Vigil was for the Police Department to engage the faith-based community to help make the community safer.  Doc. 52-9 at 3 (9/21/2014 2:43 p.m. email).  As the Chief responded to one supporter who wrote to him with the subject line "Stand tall on prayer!":

> Thanks for the encouraging words.  I have been getting quite a few responses from people, mostly from out of our area, who oppose this.  I have no intention on calling this gathering off nor changing my personal belief on the power of prayer.  Take care and I hope to see you on Wednesday.

Doc. 54-55 (marked Ex. 39) (9/22/2014 3:55 p.m. email).

─────────────────────

uniform.
Doc. Graham Dec. II (68-1) at ¶ 6.  To the extent this second statement contradicts, without explanation, Graham's clear answers to unambiguous questions at his deposition, the Court rejects it under the sham affidavit doctrine.  See Van T. Junkins and Assoc., Inc. v. U.S. Industs., Inc., 736 F.2d 656, 657 (11th Cir. 1984); Lane v. Celotex Corp., 782 F.2d 1526, 1529-30 (11th Cir. 1986).

Soon thereafter, however, Chief Graham began to distance himself and his Department from the Vigil, responding that the Vigil was a community event he could not stop and over which he had no control.  For example, on September 23, 2014, he wrote to one citizen with whom he had been corresponding about the meaning of the Establishment Clause, "I think you are misunderstanding my role in this event.  I am not leading the event, I am not speaking at the event, I will be in attendance at the event."  Doc. 54-49 at 5 (marked Ex. 33-B) (9/23/2014 4:07 p.m. email).  He further wrote that he knew the minister who was organizing it and could put the citizen in touch in case he wanted to attend "and say a few words."  Id.  To another citizen, he wrote:

> I am not sure if I have been clear in any of my prior emails to you that this event tonight is a "Community Prayer Vigil" not an Ocala Police Department or City of Ocala Prayer Vigil and as such I have no say in whether it gets canceled or not.  I have indicated to several others that I have no intent on canceling the event and should have expanded my thoughts.  If I were to try and cancel this event I would be violating the Constitution by preventing people from gathering and exercising their right to free speech.

Doc. 54-40 at 6 (marked Ex. 24-C) (9/24/2014 2:48 p.m. email from Graham).  See also Doc. 54-50 (marked Ex. 34) (9/24/2014 1:27 p.m. email from Graham) ("I am not attacking your rights as an American to freedom of religion, I am upholding others['] rights to express themselves . . . this is not a City of Ocala or Ocala Police Department Prayer Vigil, it is a Community Prayer Vigil and as such I have no say in

11

canceling the event").

Although there is no evidence that Kent Guinn, Ocala's Mayor, had anything to do with the planning of the Prayer Vigil, once he learned about it,[7] he readily embraced it as a government-sponsored event, responding to a citizen's complaint about what the citizen perceived to be the Police Chief's endorsement of religion:  "I think this is great.  I'll be sure to praise him [Chief Graham] for it." (Doc. 54-49 (marked Ex. 33) at 3 (9/19/2014 10:55 p.m. email from Guinn to citizen, copying Graham)).  Mayor Guinn wrote to Chief Graham about the Prayer Vigil two days later, stating:  "As I told you I think this is a great idea and have been responding to the atheist groups that are writing me about it.  I put it on my calendar to be there," but telling Graham that next time he does "things like that" to let the Mayor know so he doesn't find out from his "church and random emails."  Doc. 54-25 (marked Ex. 9) at 2 (9/21/2014 12:33 p.m. email from Guinn to Graham).  The next day, Mayor Guinn wrote to a protesting citizen who had urged the Mayor to show leadership in addressing the Chief's violation of the First Amendment, saying,

> I'm proud to stand by my Chief and support him.  Times like this do test leadership and that's why we're leading the community in this prayer vigil.  Yes, we have heard from folks like you who don't understand the constitution.  We are doing absolutely nothing wrong.

---

[7]Mayor Guinn could not recall how he first heard about the Prayer Vigil, but he thought he saw something about it at his church.  Guinn Depo. (Doc. 54-11) at Tr. 71-72.

Doc. 54-51 (marked Ex. 35) (9/22/2014 6:43 p.m. email from Guinn to citizen, copying

Graham).  In responding to another citizen's concern about the upcoming Prayer Vigil,

Mayor Guinn responded:

> Thanks for your interest in our community.  There is nothing
> in the constitution to prohibit us from having this vigil.  Not
> only are we not canceling it we are trying to promote it and
> have as many people as possible to [sic] join us.  We open
> every council meeting with a prayer.  And we end the
> prayer
> in Jesus name we pray.  Our city seal says "God be with
> us" and we pray that he is and us with him.

Doc. 54-44 at 2 (marked Ex. 28-A) (9/22/2014 10:24 a.m. email from Guinn to citizen,

copying Graham and a pastor and employee of Guinn's church (see Guinn Inter.

Resp. (Doc. 54-7) at # 19)).[8]

---

[8]Even after the Vigil, the Mayor continued to applaud the effort, appearing in media
outlets to discuss this lawsuit and the recent Vigil.  See Doc. 61-1 (marked Ex. 64)
(Fox News Insider article, "It's Happening to Me in My Community":  Atheists Sue
Mayor Over Prayer Vigil, Nov. 29, 2014).
   And at his June 2016 deposition the Mayor maintained his position, as reflected
in the following questions:
> Q:    Can the police chief state, on [Ocala Police Department] letterhead, that
>        people should believe in God?
> A:    Yes.
Guinn Depo. (Doc. 54-11) at Tr. 88.
> Q:    [A]s far as you're concerned, if the police chief wants to put out
>        something on letterhead saying that you should believe in God or that
>        you should believe in Jesus, that's fine?
> A:    He can do that.
Id. at Tr. 90.
> Q:    So as far as you're concerned, they [the Ocala Police Department] could
>        have another vigil such as that one next week if they wanted to?
> A:    Sure.

The upcoming Prayer Vigil became a matter of public debate in Ocala, with the citizenry vocalizing opinions both for and against it on social media, in communications to Chief Graham and Mayor Guinn, and in local news outlets. For example, one person wrote on the Ocala Police Department's facebook page: "why are the police asking us to pray? will they arrest us if we don't pray?" Doc. 54-18 (marked Ex. 2) at CM/ECF Page 4. Plaintiffs contacted counsel for The American Humanist Association (now representing plaintiffs here) who urged Chief Graham to remove the Prayer Vigil letter from the Ocala Police Department facebook page on the grounds that it was an unconstitutional government endorsement of religion. Doc. 54-46 at 2 (marked Ex. 30-A) (9/21/2014 10:47 a.m. email from David Niose to Graham). Chief Graham responded that his efforts were upholding the rights of others to assemble and that taxpayer funds were used only to the minimal extent that Graham wrote the letter and printed it on Department letterhead. Doc. 54-46 at 3 (marked Ex. 30-B) (9/21/2014 10:57 a.m. email from Graham to Niose).

Chief Graham testified he would have removed the facebook posting if the Mayor had directed him to do so. Graham Depo. (Doc. 54-10) at Tr. 161. Likewise, Mayor Guinn testified that he had the authority to order Graham to remove the

---

Q:    And the chief could post another letter saying that there is something that requires fervent prayer in the city?
A:    Yes.
Id. at Tr. 134.

facebook posting.  Guinn Depo. (Doc. 54-1) at Tr. 54-55.  Guinn also said he had the authority to instruct that Ocala Police Department Chaplains not lead prayers at the Prayer Vigil or attend in Ocala Police Department Chaplain uniforms, but he did not consider doing any of that because he believed those actions were permitted under the Establishment Clause.  Id.  Under the charter for the City of Ocala, the Mayor is the sole municipal official in authority over the Ocala Police Department and he recommends a chief of police nominee to the City Council, who appoints the Chief. Guinn Aff. (Doc. 53-1) at ¶ 3.

The day before the Prayer Vigil, the weather forecast apparently called for possible rain.  Captain Edwards sent an email to Chief Graham, Ocala Police Chaplain Quintana and Ms. Haynes, copying an Ocala Police Department officer, asking whether they should secure an indoor location as an alternative.  Doc. 54-28 (marked Ex. 12) at 2.  Quintana's suggestion was that the Vigil should take place on the Square with or without rain, "[n]othing should stop, hinder or prevent from [sic] fervent prayer," proposing they "[k]eep it to 15-20 minutes of PRAYER only."  Id. at 3 (capitalization in original).  Captain Edwards sent an email to an Ocala Police Department Major on September 23, saying he would be "mentioning" the Prayer Vigil at an upcoming staff meeting, Doc. 54-29 (marked Ex. 13), and the following day he emailed an Ocala Police Department Captain to say he might not make it to a meeting because he was "working on getting this prayer vigil set up."  Doc. 54-30 (marked Ex.

14).

The Prayer Vigil took place on September 24, 2014 in the Downtown Square in Ocala, a public space where meetings, rallies, assemblies and other public and privately-sponsored events occur.  Graham Dec. I (Doc. 52-1) at ¶ 22; see supra note 2.  Chief Graham and Mayor Guinn both attended the Prayer Vigil, but neither of them addressed the crowd.  Graham Inter. Resp. (Doc. 54-6) at # 1; Guinn Inter. Resp. (Doc. 54-7) at # 15.  Approximately ten people were on the stage during the Prayer Vigil, including four uniformed Ocala Police Chaplains, one off-duty Ocala Police Department employee who was not in uniform, and five faith and/or community leaders.  Graham Inter. Resp. (Doc. 54-6) at # 3.  Not all of those persons spoke from the stage, but a number who did speak were Ocala Police Department Chaplains. Doc. 54-16;  Doc. 54-19 (marked Ex. 3) at Page ID 1386, 1389, 1390.  Chief Graham said he did not know in advance what any of the speakers planned to say, but his recollection is that those who did speak either prayed or sang.  Graham Dec. I (Doc. 52-1) at ¶ 16; Graham Dec. II (Doc. 68-1) at ¶ 5; Graham Depo. (Doc. 54-10) at Tr. 139-40.  He did not hear any non-Christians speak at the Prayer Vigil and the crowd appeared to be predominately Christian.  Graham Depo. (Doc. 54-10) at Tr. 96-99, 144-45.  Mayor Guinn knew most of the Ocala Police Department Chaplains by name, but said he had no recollection as to who spoke.  Guinn Depo. (Doc. 54-11) at Tr. 27-28.

Mayor Guinn estimated that 500-600 people attended the Prayer Vigil.  Id. at Tr. 108.   Chief Graham, who said the Vigil lasted for about an hour, also said "[t]here were a lot of people there," "definitely more than 100."  Graham Depo. (Doc. 54-10) at Tr. 139, 149.[9]  Chief Graham spent his time "engaging people in the crowd, talking to them" and "attempt[ing] to enlist their help with the crime spree."  Id. at Tr. 140; Graham Dec. I (Doc. 52-1) at ¶ 21.   In addition to Chief Graham, other uniformed police officers attended the Prayer Vigil to engage with the crowd and provide security, consistent with the Department's regular practice of having officers present at public downtown gatherings.   Graham Dec. I (Doc. 52-1) at ¶ 26.   The record includes photographs taken at the Prayer Vigil, as well as transcripts from video and audio recordings taken by one of the plaintiffs.  See Doc. 54-19 (marked Ex. 3); Doc. 54-16.  Plaintiffs note that in at least one photograph, a uniformed officer appears to be participating in prayer while sitting on the edge of the stage.  See Doc. 54-19 at Page ID 1392.   While the recorded statements in evidence were not the only speeches given at the Prayer Vigil, there is no dispute that these speeches were religious.[10]

---

[9]Plaintiffs suggest that if this was not a city-sponsored event, the organizer would have been required to seek a permit (which was not issued here), but the record is murky as to the permit requirements.  See Graham Depo. (Doc. 54-10) at Tr. 70-74.

[10]For example, one of the transcripts includes these remarks delivered by a uniformed Ocala Police Department Chaplain:  "Father we thank you for tonight, for the gathering of your children . . . Lord you called us together by your spirit, your spirit

Plaintiffs Lucinda and Daniel Hale, who live in Marion County, had visited the Downtown Square on a number of previous occasions, such as to visit the farmer's market.  L. Hale Depo. (Doc. 54-15) at Tr. 31.  The Hales heard about the upcoming Prayer Vigil when someone told them about the Ocala Police Department facebook posting, which they then viewed.  D. Hale Depo. (Doc. 54-14) at Tr. 7; L. Hale Depo. (Doc. 54-15 at Tr. 9).   The facebook posting discussed the crisis of crime affecting citizens of Ocala and Marion County, and Ms. Hale agreed that crime creates a negative environment for all citizens, but she felt that the message inviting everyone to a Prayer Vigil did not include her or others who do not pray. L. Hale Depo. (Doc. 54-15) at Tr. 17-19.  Mr. Hale engaged in email correspondence with the Mayor in advance of the Vigil, expressing regret for the recent crime spree and applauding the Chief for his attempts to curb crime, but explaining that the Vigil invitation violated the Establishment Clause and suggesting that the City promote a different rally

─────────────────────

of love, and tonight Lord that love can conquer anything– it can conquer evil, it can conquer enemies . . . Your angels are on assignment [from] the kingdom of god.  And your kingdom has come.  And your kingdom is ruling even now.  Behind the scenes amen there are children amen don't feel safe in their communities any more.  Where bullying amen is on every corner amen.  Where people amen are being threatened amen hallelujah from all kinds of things and all kinds of dangers.  Lord we are not afraid, we are not afraid . . ."  Doc. 54-16 at Ex. A.

Another uniformed Ocala Police Department Chaplain included these statements in his remarks (which were interspersed with responses of "Amen" from the crowd): "God healed America. . . . But in order for god to heal America, there must be an intrinsic change from the inside, with each and every one of us, where we go out and watch other people, and help the children that are lost. . . .  God bless America, god heal America."  Doc. 54-16 at Ex. B.

encouraging people to come forward with ideas about how to stop crime. D. Hale Dep. (Doc. 54-14) at Tr. 17-18; 53.

The Hales attended the Prayer Vigil and described it as similar to a Christian tent revival. D. Hale Depo. (Doc. 54-14) at Tr. 29, 47-48; L. Hale Depo. (Doc. 54-15) at Tr. 22-23. Ms. Hale stated she is concerned about alleviating crime, which was the purported purpose of the Prayer Vigil, but she felt unable to participate in any part of what actually transpired. L. Hale Inter. Resp. (Doc. 54-3) at # 8. Mr. Hale did not observe any speaker encourage people to come forward with ideas about how to stop crime. D. Hale Depo. (Doc. 54-14) at Tr. 53. Mr. Hale recalled that at least one speaker was introduced from the stage as an Ocala Police Department Chaplain. Id. at Tr. 43-44. He said he observed uniformed police officers participating in the Prayer Vigil by being part of a circle of people praying, bowing heads, and holding hands. Id. at 29-30. Mr. Hale spoke with Chief Graham at the Vigil, and they discussed the possibility of Hale doing some volunteer work with the Ocala Police Department in the future. Id. at Tr. 35, 54. Mr. Hale feels that it is everyone's responsibility to better the community. Id. at Tr. 54.

Plaintiff Art Rojas, who lives and works in Ocala, attended the Prayer Vigil, which he described as being "essentially a Christian revival" that was "not a comfortable place for non-believers" and caused anyone present to feel "some pressure to participate and show approval," lest they be seen as "publicly opposing

the police." Rojas Inter. Resp. (Doc. 54-1) at # 14, 15. Rojas said he attended the Vigil to see if there was going to be a violation of the Establishment Clause. Rojas Depo. (Doc. 54-12) at Tr. 31. Rojas wishes for his community to be more inclusive, and hopes that future events involving his government will include all of Ocala's citizens, not only Christians. Rojas Depo. (Doc. 54-12) at Tr. 37. Rojas thought that the Police Department should represent everyone, but by involving itself in the Prayer Vigil it did not represent him. Id. at Tr. 25-26.

Frances Jean Porgal attended the Vigil and, like Mr. Hale, recalled that at least one speaker was introduced from the stage as an Ocala Police Department Chaplain.[11] Porgal Depo. (Doc. 54-13) at Tr. 32. Porgal observed that "police representatives spent no time discussing the crimes that had recently occurred," or "requesting assistance" from the community, or urging people to come forward with information; instead, speakers prayed, preached, and sang. Porgal Inter. Resp. (Doc. 54-2) at # 8.

The day after the Prayer Vigil, congratulatory emails circulated within the Ocala Police Department, thanking the Chief, Captains, Officers, Chaplains, and Ms. Haynes for their efforts regarding the Prayer Vigil. See Doc. 54-32 (marked Ex. 16).

---

[11]Ms. Porgal, who was a resident of Marion County, was a plaintiff in this case until she passed away in January 2017. See Doc. 69. She was subsequently terminated as a party. See Doc. 72. Though no longer a plaintiff, Ms. Porgal's uncontested sworn observations recounted here are relevant evidence about material facts in this case which the Court may consider as part of the summary judgment record.

Captain Edwards sent an email to Ms. Haynes, Chaplain Quintana, copying Chief Graham and Officer Williams, thanking everyone for helping and "allow[ing] the PRAYER VIGIL to take place[,]" remarking that "[t]here was opposition but Isaiah 54:17 says 'No weapon that is formed against thee shall prosper; and every tongue that shall rise against thee in judgment thou shalt condemn.'" Id. at 2 (capitalization in original; additional emphasis omitted). Edwards suggested a meeting to discuss the next steps including another possible vigil, and closed with, "'Romans 8:28 'And we know that all things work together for good to them that love God, to them who are the called according to his purpose.'" Id. at 2 (emphasis omitted). Chaplain Quintana replied to Captain Edwards, saying "God bless you Captain for organizing" the Prayer Vigil, and saying he (Chaplain Quintana) was honored that Captain Edwards invited him. Id. at 4.

Sometime thereafter, Chief Graham told Ms. Porgal about an anti-bullying rally scheduled for the Downtown Square where the Prayer Vigil had occurred. Ms. Porgal and the Hales attended and participated by carrying signs discouraging bullying in schools. D. Hale Depo. (Doc. 54-14) at Tr. 55; L. Hale Depo. (Doc. 54-15) at Tr. 31-32. Chief Graham testified that going forward, he would not permit the Chaplains to participate in public events while wearing their Ocala Police Department uniforms if the event involved leading prayers, not because it was necessarily inappropriate, but to keep from getting sued. Graham Depo. (Doc. 54-10) at Tr. 164-68. Subsequent

21

public prayer events have been held in Ocala, at least one of which was organized and sponsored by a church.  Id. at 74; Doc. 54-76 at 5.

Two months after the Prayer Vigil, plaintiffs filed suit under 42 U.S.C. §§ 1983 and 1988(b) and are now seeking nominal damages, attorneys' fees, and costs against the City of Ocala, and Mayor Guinn and Chief Graham in their individual capacities, for their alleged violations of the Establishment Clause of the First Amendment.[12]   See Docs. 1 and 22.   The parties' cross-motions for summary judgment are now before the Court.

## III.    Standard of Review

"A district court must grant summary judgment 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Atheists of Fla., Inc. v. City of Lakeland, 713 F.3d 577, 589 (11th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)).   In making this assessment, the court "view[s] all facts and reasonable inferences drawn therefrom in the light most favorable to the non-moving party." Id. (quotation, citation, and alteration omitted). Conclusory statements are insufficient to create a disputed issue as to a material fact. Carter v. City of Melbourne, 731 F.3d 1161, 1167 (11th Cir. 2013) (citation omitted). "Issues of fact are 'genuine' only if a reasonable jury, considering the evidence

_____

[12]Some additional parties and claims (including a claim for injunctive relief) were previously dismissed.  See Doc. 22.

presented, could find for the nonmoving party." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).  "The principles governing summary judgment do not change when the parties file cross-motions for summary judgment."[13]  T-Mobile S. LLC v. City of Jacksonville, 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008).

## IV.    Discussion

### A.    Standing

Chief Graham and the City argue that plaintiffs lack standing to bring this case.[14]  At issue here is Article III standing, which requires that plaintiffs show (1) they "have suffered an 'injury-in-fact;'" (2) there is a "causal connection between the injury and the [defendants'] conduct;" and (3) the injury will "likely" "be redressed by a favorable decision."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (quotations and citations omitted).   In an Establishment Clause case, a "non-economic injury which results from a party's being subjected to unwelcome religious statements" may be sufficient to demonstrate an "injury in fact" resulting from the defendant's conduct "so long as the parties are 'directly affected by the laws and

---

[13]To the extent the City and Chief Graham argued in their papers and at the hearing that plaintiffs have admitted defendants' statement of undisputed facts by failing to specifically refute each and every statement, the Court disagrees.  Plaintiffs point to disputed facts throughout their briefs (but argue the facts in dispute are immaterial) and also note where they believe defendants have misstated the evidence.

[14]Mayor Guinn does not challenge plaintiffs' standing.

practices against whom their complaints are directed.'" <u>Saladin v. City of Milledgeville</u>, 812 F.2d 687, 692 (11th Cir. 1987) (quoting <u>Sch. Dist. of Abington Twp. v. Schempp</u>, 374 U.S. 203, 224 n.9 (1963)).  Yet, a party must show more than a mere psychological suffering "produced by observation of conduct with which one disagrees." <u>Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.</u>, 454 U.S. 464, 485 (1982).  A "spiritual stake in First Amendment values" is not enough to show injury to support standing.  <u>ACLU v. Rabun Cty. Chamber of Commerce, Inc.</u>, 698 F.2d 1098, 1103 (11th Cir. 1983).  However, where a party is forced to choose between being "subjected to unwelcome religious exercises" and being "forced to assume special burdens to avoid them," that party has suffered an injury in fact sufficient to support standing.  <u>Valley Forge</u>, 454 U.S. at 486, n.22; <u>see Saladin</u>, 812 F.2d at 693 (holding plaintiffs who were City residents bore "more than an abstract interest" in having City remove word "Christianity" from its city seal, demonstrating an injury in fact).

In <u>Rabun County</u>, a group of Georgia residents, motivated by their spiritual beliefs or commitment to the separation of church and state, challenged the placement of a large illuminated cross in Georgia's Black Rock Mountain State Park. 698 F.2d at 1101, 1107-08.  The Eleventh Circuit found that, notwithstanding the plaintiffs' motivations in bringing suit, two of the plaintiffs demonstrated an injury in fact sufficient to create standing because they were residents of Georgia (albeit living

more than 100 miles from Black Rock State Park), made use of the state parks, and their use of Black Rock was affected by "the physical and metaphysical impact of the cross." Id. at 1107-08.  Thus, they faced a "special burden" of having to use other parks, or using Black Rock, but being subjected to unwelcome religious symbolism if they did so.  Id. at 1108.  The Eleventh Circuit also stressed that the severity of the plaintiffs' injuries was irrelevant; so long as they demonstrated some direct stake in the outcome, as opposed to a mere interest in the matter, they had shown an injury in fact.  Id. (quoting United States v. SCRAP, 412 U.S. 669, 689, n.14 (1973)); see also Pelphrey v. Cobb Cty., 547 F.3d 1263, 1279-80 (11th Cir. 2008) (finding plaintiff had standing to challenge invocation at planning commission meetings where he attended three meetings and watched other meetings on the internet).

The Court found plaintiffs had standing when it ruled on defendants' motion to dismiss.  See Doc. 22, adopting Report and Recommendation, Doc. 14.  The factual development of the case since then further supports that determination.   The undisputed facts reveal that the Hales are residents of Marion County who have attended events in the Downtown Square in Ocala.  They saw the Ocala Police Department facebook page and attended the Prayer Vigil because they wanted to observe, but also because they have interest in being a part of the community and are concerned about crime.  They attended the Prayer Vigil but were unable to participate in any of the activity because the speakers only invited the audience to pray and sing.

The Hales have more than a mere interest in the matter.  They have demonstrated an injury in fact.  Similarly, Art Rojas lives and works in the City of Ocala.  He saw the Ocala Police Department facebook page and attended the Prayer Vigil.  He wants his community to be inclusive of all its residents, not just Christians.  Like the Hales, Rojas has more than a mere interest in the matter and has demonstrated injury in fact.

Having demonstrated injury in fact, the causal connection and redressability prongs of standing are easily satisfied here.  Plaintiffs' injuries are causally connected to the Prayer Vigil which they contend was sponsored by the City of Ocala and its Chief of Police.  If proven, an award of nominal damages for conduct that violated the Establishment Clause would redress their injuries.  See, e.g., Amnesty Int'l, USA v. Battle, 559 F.3d 1170, 1177-78 (11th Cir. 2009) (explaining that § 1983 allows for the recovery of nominal damages when constitutional rights are violated but do not result in injury giving rise to compensatory damages); Covenant Media of S.C., LLC v. City of North Charleston, 493 F.3d 421, 428 (4th Cir. 2007) (holding that unconstitutional application of the law created a claim redressable by nominal damages); Rabun County, 698 F.2d at 1104, n.10 (explaining that the causal connection requirement was not at issue and, if the plaintiffs suffered an injury from the presence of the cross, it would be redressed by its removal); Saladin, 812 F.2d at 690, n.5 (noting other standing prongs were not at issue).  Chief Graham and the City have not argued

otherwise here.

Further, none of the prudential considerations which might counsel toward "judicial constraint" are present– plaintiffs's complaint falls within the zone of interests protected by the Establishment Clause, the issue raised here is not abstract such that it is more appropriately addressed by the legislative branch, and plaintiffs are asserting their own interests.  See Saladin, 812 F.2d at 690, 690 n.5 (discussing prudential concerns and finding them clearly satisfied).

The Seventh Circuit's decision in Freedom From Religion Foundation, Inc. v. Obama, 641 F.3d 803 (7th Cir. 2011), upon which the City and Chief Graham rely in challenging plaintiffs' standing, does not compel a different result.  Among other legal deficiencies, the plaintiffs in that case were unable to show how a presidential proclamation calling all the nation's citizens to pray or give thanks in accordance with their own faiths and consciences caused them to suffer any special burden, or any burden at all.  Id. at 805-08.  The circumstances here were different– the citizens of the City of Ocala and Marion County were called to join a Prayer Vigil whose stated purpose was "to show unity and help in this senseless crime spree that is affecting our communities."  Doc. 1 at Ex. A.  Plaintiffs are citizens of that community and have expressed their interest in being united as a community and in alleviating crime; they

thus bore the requisite special burden.[15]

The City and Chief also argue that plaintiffs would have suffered no injury had they simply ignored the facebook page and opted not to attend the Prayer Vigil. But being forced to choose between avoiding the religious message and being involved members of their community was exactly the Hobson's choice creating plaintiffs' injury. See Rabun County, 698 F.2d at 1106-08, 1107 n.17 (explaining that plaintiffs' options to use state parks were restricted by placement of the cross, thereby creating individualized injury as a consequence of the challenged action); see also SCRAP, 412 U.S. at 689, n.14 ("The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation.") (quoting Kenneth Culp Davis, Standing: Taxpayers and Others, 35 U. Chi. L. Rev. 601, 613 (1968))); Am. Humanist Ass'n, Inc. v. Douglas Cty. Sch. Dist. RE-1, 859 F.3d 1243, 1252 (10th

_____

[15]Moreover, the Seventh Circuit's Freedom From Religion decision reads Supreme Court precedent somewhat differently than the Eleventh Circuit, which is, of course, binding on this Court. See Freedom From Religion, 641 F.3d at 810-11 (Williams, J., concurring) (questioning whether the majority opinion's interpretation of Supreme Court precedent strays too far from rule adopted by every other circuit to have considered the matter, including the Eleventh).

The Court likewise rejects the City and Chief Graham's position stated in oral argument that Newdow v. Bush, 391 F. Supp. 2d 95 (D.D.C. 2005), (which is not binding on this Court in any event) stands for the proposition that only repeated exposure to unwanted religious activity can give rise to standing. Id.(finding Newdow lacked standing to challenge prayer at presidential inauguration and his claims were moot).

Cir. 2017) (finding parent had standing to assert Establishment Clause claim against school board where school sent one flyer and one email asking parents to consider donating to school club's mission trip).  Plaintiffs have standing.

### B.    Establishment Clause

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."   U.S. Const. amend. I.   In so stating, "the First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."  Epperson v. Arkansas, 393 U.S. 97, 104 (1968).  Incorporated through the Due Process Clause of the Fourteenth Amendment, the First Amendment "applies to state and municipal governments, state-created entities, and state and municipal employees." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1268 (11th Cir. 2004) (citations omitted).

"[T]he Establishment Clause was intended to afford protection" against "the three main evils" of "sponsorship, financial support, and active involvement of the sovereign in religious activity."   Lemon v. Kurtzman, 403 U.S. 602, 612 (1971) (quotation and citation omitted). Still, "[i]n every Establishment Clause case, [the court] must reconcile the inescapable tension between the objective of preventing unnecessary intrusion of either the church or the state upon the other, and the reality that, as the [Supreme] Court has so often noted, total separation of the two is not

possible." Lynch v. Donnelly, 465 U.S. 668, 672 (1984); see also Van Orden v. Perry, 545 U.S. 677, 690 (2005) (plurality opinion) (explaining in a case where a Ten Commandments monument had been in place for forty years on government property with other monuments and historic markers that "[s]imply having religious content or promoting a message consistent with religious doctrine does not run afoul of the Establishment Clause") (citations omitted).

"The Establishment Clause like the Due Process Clauses is not a precise, detailed provision in a legal code capable of ready application." Id. at 678.  Thus, "Establishment Clause challenges are not decided by bright-line rules, but on a case-by-case basis with the result turning on the specific facts." Glassroth v. Moore, 335 F.3d 1282, 1288 (11th Cir. 2003); see also Selman v. Cobb Cty. Sch. Dist., 449 F.3d 1320, 1323 (11th Cir. 2006) ("Knowledge of the particular facts and specific circumstances is essential to a determination of whether the governmental acts in question are religiously neutral.").

In Lemon, the Supreme Court enunciated the three part test which is the controlling standard for Establishment Clause jurisprudence:  "First, the [government activity] must have a secular . . . purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion;" and third, "the [government activity] must not foster an excessive government entanglement with religion."  403 U.S. at 612-13 (quotation and citations omitted).  "[I]f even one of these three principles is

30

violated, the challenged governmental action will be found to violate the Establishment Clause." Rabun County, 698 F.2d at 1109. The factors used to assess the effect of government action are similar to those used to assess whether entanglement is excessive. Agostini v. Felton, 521 U.S. 203, 232-33 (1997). Nonetheless, "while the Court has folded its traditional 'excessive entanglement' inquiry into its 'primary effect' analysis, the substance of its Establishment Clause jurisprudence remains fundamentally unaltered." Holloman, 370 F.3d at 1285; see also McCreary County v. ACLU, 545 U.S. 844 (2005) (reaffirming validity of Lemon test and not citing Agostini). Although they have cited cases for certain propositions that used other tests, the parties all agree the Lemon test applies to this Establishment Clause case.

Lemon's purpose prong is viewed objectively, taking into account "the traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act." McCreary, 545 U.S. at 862 (quotations and citations omitted). This consideration should include "the implementation of government action," knowledge about "the specific sequence of events" leading to the action, and "the history and context of the community and forum in which" the action occurs. Id. at 866 (reviewing cases). Where a predominantly religious purpose is found, it is often because "the government action itself bespoke the purpose," leaving the court to draw the "commonsense conclusion" from the

"openly available data" that the purpose was religious.  Id. at 862-63 (citations omitted).  Thus, although a government official's "stated reasons will generally get deference, the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective."  Id. at 864.

In applying the Lemon test's purpose prong to a case involving prayer in public school, the Eleventh Circuit explained that:

> [P]rayer is the quintessential religious practice [which] implies that no secular purpose can be satisfied.  The primary effect of prayer is the advancement of ones['] religious beliefs.  It acknowledges the existence of a Supreme Being.  The involvement of [the defendant school district] in such activity involves the state in advancing the affairs of religion.  The Supreme Court and this circuit have indicated that such prayer activities cannot be advanced without the implication that the state is violating the establishment clause.

Jaffree v. Wallace, 705 F.2d 1526, 1534-35 (11th Cir. 1983) (citations omitted); see also Karen B. v. Treen, 653 F.2d 897, 901 (5th Cir. Unit A Aug. 1981) (rejecting officials' statements of secular purpose because "prayer is a primary religious activity in itself" and its observance in a public school classroom has an "obvious[ ] religious purpose").

In a more recent school prayer case, the Eleventh Circuit reaffirmed the point of Jaffree and Treen, stating that "[b]ecause prayer is 'a primary religious activity in itself,' a teacher or administrator's intent to facilitate or encourage prayer in a public school is per se an unconstitutional intent to further a religious goal."  Holloman, 370

32

F.3d at 1285 (quoting Treen, 653 F.2d at 901).   In Holloman, the Eleventh Circuit explained that notwithstanding the teacher's goal of teaching compassion, the consequences of instituting that goal through prayer ran afoul of the purpose prong in the Establishment Clause analysis. Id. at 1285-86. "'The unmistakable message of the Supreme Court's teachings is that the state cannot employ a religious means to serve otherwise legitimate secular goals.'" Id. at 1286 (quoting Treen, 653 F.2d at 901).

But this is not a school prayer case[16] and, under the Establishment Clause, "detail is key."   McCreary, 545 U.S. at 867.  Thus, the Court must "look to the record of evidence showing the progression leading up to" the Prayer Vigil along with the event itself to determine its purpose.[17]   McCreary, 545 U.S. at 868.  Given that the

---

[16]Nor is it a legislative prayer case.  See Order (Doc. 22) (adopting Report and Recommendation (Doc. 14) (noting that this is not a case about legislative prayer, which is an exception to the Establishment Clause analysis, citing Marsh v. Chambers, 463 U.S. 783 (1983) and Pelphrey v. Cobb County, 547 F.3d 1263, 1269 (11th Cir. 2008))).  See also County of Allegheny v. ACLU, 492 U.S. 573, 603 n.52 (1989) ("Legislative prayer does not urge citizens to engage in religious practices, and on that basis could well be distinguishable from an exhortation from government to the people that they engage in religious conduct."), abrogated on other grounds by Town of Greece v. Galloway, 134 S. Ct. 1811 (2014).

[17]Throughout this analysis, the Court views the conduct as a continuum of action, from the meeting at which the Prayer Vigil was first suggested to the Prayer Vigil itself.  To the extent the City and Chief Graham have parsed the evidence such that the facebook post and the Prayer Vigil are analyzed separately and each in a vacuum, the Court does not find support for that approach in the allegations of the complaint, or in the law.

facebook page posting by the Ocala Police Department asked Ocala's citizens to join in "fervent prayer"– an undisputedly religious action, and that the Prayer Vigil consisted of chaplains offering Christian prayers and singing from the stage[18] with responsive audience participation, a reasonable observer would find that the Prayer Vigil had a religious purpose.  That the Chief's original purpose in convening the group was to combat crime, that the facebook letter discussed the recent crime spree, and that uniformed police officers, including the Chief, may have engaged various members of the crowd for that secular purpose, does not derogate from the overall religious nature of the event.  The "openly available data support[s] a commonsense conclusion that a religious objective permeated" the Prayer Vigil.  McCreary, 545 U.S. at 863, 869 (finding "reasonable observer could only think" posting of a particularly religious version of Ten Commandments, allegedly displayed to educate about founding of legal documents, had religious purpose where other foundational documents were only included as a result of litigation and where pastor spoke at the dedication ceremony delivering religious message).

The Court next considers whether the "principal or primary effect" of the Prayer Vigil was "one that neither advance[d] nor inhibit[ed] religion."  Lemon, 403 U.S. at 613. "The effect prong asks whether the practice under review in fact would convey

_____

[18]The only song Chief Graham recalled hearing at the Prayer Vigil was "God Bless America."  Graham Depo. (Doc. 54-10) at Tr. 140.  Ms. Porgal recalled that the words were changed to "God Heal America."  Porgal Depo. (Doc. 54-13) at Tr. 35.

a message of endorsement or disapproval [of religion] to an informed, reasonable observer." Glassroth, 335 F.3d at 1297 (quotation, citation, and alteration omitted). The effect is analyzed without regard to the government's actual purpose. Wallace v. Jaffree, 472 U.S. 38, 56 n.42 (1985) (quoting Lynch, 465 U.S. at 690 (O'Connor, J., concurring)).

Though held in a public space (Ocala's Downtown Square), the event here–a prayer vigil– can hardly be thought to be anything other than an endorsement of religion.  The content of the facebook letter (inviting the community to come join in fervent prayer), the name of the event ("Community Prayer Vigil"), the nature of the speakers' remarks (Christian prayers and songs), the participation from the crowd (responding in religious colloquy with speakers, holding hands in circles, bowing heads), all bespeak the religious effect of the activity, which was to promote prayer. See Holloman, 370 F.3d at 1286 (finding teacher's conduct failed Lemon's "effect" prong because the effect of her call for students to pray promoted the "quintessential religious practice" of praying, "endors[ed] religious activity, [and] encourag[ed] or facilitat[ed] its practice") (quotation and citation omitted); Gilfillan v. City of Philadelphia, 637 F.2d 924, 930-31 (3d Cir. 1980) (finding city's expenditures to create platform from which Pope would celebrate a Mass and deliver a sermon to over 1,000,000 people had religious effect, notwithstanding that Pope would be celebrating Mass and delivering a sermon even if city had not provided the platform);

Hewett v. City of King, 29 F. Supp. 3d 584, 635 (M.D.N.C. 2014) (finding mayor's delivery in his official capacity of religious messages at privately sponsored annual public commemorative events which featured Christian prayer practices had effect of City endorsement of Christianity); see also Milwaukee Deputy Sheriffs' Ass'n v. Clarke, 588 F.3d 523, 528-29 (7th Cir. 2009) (finding sheriff's invitation to religious group to speak at mandatory employee meetings gave appearance of state endorsement of religion in violation of Establishment Clause); cf. Am. Atheists, Inc. v. Port Auth. of N.Y. & N.J., 760 F.3d 227, 243-44 (2d Cir. 2014) (finding reasonable observer would know Ground Zero Cross held such historical significance to the story of the 9/11 recovery that its inclusion with hundreds of other artifacts at government museum had effect of ensuring historical completeness and not of promoting religion).

The last prong of the Lemon test asks whether the government activity "foster[ed] an excessive government entanglement with religion."  403 U.S. at 613 (quotation and citations omitted).  "For the First Amendment rests upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere." McCollum v. Bd. of Ed., 333 U.S. 203, 212 (1948).  "Entanglement is a question of kind and degree," Lynch, 465 U.S. at 684.  Compare Gilfillan, 637 F.2d at 931-32 (finding city failed entanglement test based on city's joint planning with Archdiocese for Pope's visit and divisiveness engendered in the community as evidenced by lawsuits), and Hewett, 29 F. Supp. 3d

at 635 (finding excessive entanglement based on mayor's delivery of religious messages while in his official capacity), with Lynch, 465 U.S. at 684 (finding no excessive entanglement where there was no evidence of contact with church authorities concerning content or design of creche exhibit, and city bore no maintenance costs).  Even without more, an invitation by a city police department encouraging the community's attendance at a Prayer Vigil entangles the government with religion. Given the additional involvement of the Ocala Police Department Chaplains in organizing and participating in the event while wearing their Ocala Police Department uniforms, the entanglement was excessive.  Indeed, it is apparent that without the Chief's invitation, the involvement of police officials in planning the event, and the Ocala Police Department Chaplains' participation, there would not have been a Prayer Vigil at all.

Having failed each of Lemon's three prongs, the Prayer Vigil would appear to violate the Establishment Clause.  Even the City and Chief Graham agreed at oral argument that a government entity or actor may not organize and hold a prayer vigil without violating the Establishment Clause.[19]  But they say that is not what happened here.  Rather, they contend the Prayer Vigil was a community-sponsored activity, not

_____

[19]For his part, the Mayor does not admit that the government couldn't host a prayer vigil if it chose to do so, but he has confused the law that applies to legislative prayer with that applicable in most other Establishment Clause challenges, including this one.  See Doc. 53 (Mayor's brief).  The Mayor maintained this erroneous position at oral argument.

a government-sponsored event.  And for their part, plaintiffs don't disagree that it would be perfectly appropriate for the community or any non-government segment thereof to organize and hold a prayer vigil in the public Downtown Square.[20]  What this case turns on, then, is:  Whose Prayer Vigil was this?

While a more typical Establishment Clause case might focus on whether a statute or government activity has run afoul of the <u>Lemon</u> test, some, like here, hinge on whether the activity at issue belongs to the government at all.  In <u>Adler v. Duval County School Board</u>, 250 F.3d 1330 (11th Cir. 2001), the Eleventh Circuit, sitting <u>en banc</u> to review its prior decision on remand from the Supreme Court, considered whether the school board violated the Establishment Clause when its policy permitted high school seniors to decide whether (or not) to have a student speaker of their choosing at graduation who could then deliver whatever message the student wanted without review or monitoring from any school officials.  250 F.3d at 1332.  In reinstating its earlier opinion, the Eleventh Circuit again determined that even though the graduation itself was a school-sponsored event, and the school board policy authorized a student message, the policy did not violate the Establishment Clause because school officials could not dictate that there would even be a student message

---

[20]Indeed, as Chief Graham suggested in his emails to some of the plaintiffs, the City would abridge the First Amendment rights of its citizens if it denied them use of the public Downtown Square for prayer.  <u>See</u> <u>Fowler v. Rhode Island</u>, 345 U.S. 67 (1953) (striking city ordinance which prohibited making any public religious or political address in city parks).

and, if there was, school officials had no control over who would deliver it or the content of the message.  Id. at 1341-42.  Thus, the speech was not "state-sponsored" and therefore could not violate the Establishment Clause.  Id. 1342; see also Holloman, 370 F.3d at 1287 ("While purely private prayer by students is constitutionally protected, prayer that is led, encouraged, or facilitated by school personnel is constitutionally prohibited").

In another case raising the question of state sponsorship, Doe v. Village of Crestwood, 917 F.2d 1476 (7th Cir. 1990), a city employee, who was also a member of a club involved with an annual village-sponsored Italian festival in a public park, invited a Roman Catholic priest to deliver a mass during the festival.  917 F.2d at 1477-78.  Reviewing the district court's injunction to stop the mass, the Seventh Circuit noted, "everything turns on who is putting on this mass." Id. at 1479.  Looking at the slim record available on the emergency motion for stay, the court considered that a city employee selected and recruited the priest, and advertisements and other publicity for the event referred to "us" and "our" (meaning the village) and did not mention that anyone other than the village was sponsoring the mass. Id.  From this, the Seventh Circuit determined that the record supported the district court's finding that the mass was sponsored by the government in violation of the Establishment Clause.  Id.

Similarly, in Newman v. City of East Point, 181 F. Supp. 2d 1374 (N.D. Ga. 2002), the plaintiffs sought to enjoin the city and its mayor from holding the mayor's annual prayer breakfast. Id. at 1380. The city argued it was not promoting or endorsing the event, it was privately paid for and was not going to be held on city property. Id. at 1376. But plaintiffs demonstrated that in the past, city resources had been used to organize, promote, and pay for the mayor's prayer breakfast. Id. at 1380. This evidence included a letter from the mayor on city letterhead advising clergy about the breakfast and inviting them to participate in the planning and soliciting donations for the event; memoranda from the mayor to a city employee requesting reimbursements related to the prayer breakfast; and the inclusion of the event in a city-produced community flyer about other city-led events. Id. The court determined plaintiffs' showing was sufficient to secure an injunction prohibiting the city and the mayor in her official capacity from organizing, advertising, promoting, or endorsing the breakfast or using city resources to do so.[21] Id. at 1381-82; see also Marrero-Mendez v. Calixto-Rodriguez, 830 F.3d 38, 45-46 (1st Cir. 2016) (holding that police commander's initiation of prayer with two commanding officers during official

_____

[21]The court denied plaintiffs' request to enjoin the mayor's prayer breakfast from taking place at all, and the request to enjoin the mayor or city officials from attending, finding they had a right as citizens to attend and the defendants had provided assurance the event would not use city facilities, funding, or resources, and would not have the appearance of being endorsed by the city. Newman, 181 F. Supp. 2d at 1382.

meeting of police officers could not be anything but state-sponsored prayer and "only the plainly incompetent or those who knowingly violate the law" could deny that "a religious practice . . . conducted by a state official at a state function [is] state sponsorship") (quotations and citations omitted); cf. Hewett, 29 F. Supp. 3d at 620-23 (determining  that (usually Christian) flags attached to city flag pole flown in public park pursuant to a lottery program were private speech, notwithstanding that they had some elements of being public speech, because purpose was to allow individual citizens to honor veterans in manner of their choosing).

From these cases and others, it is apparent that for purposes of the Establishment Clause, whether an activity "belongs to" or is "sponsored by" the government turns on the degree to which a government entity or official initiated,[22] organized,[23] facilitated,[24] promoted,[25] provided space for,[26] paid for,[27] supervised,[28]

---

[22]Village of Crestwood, 917 F.2d at 1479; McCreary, 545 U.S. at 869; Marrero-Mendez, 830 F.3d at 45.

[23]Newman, 181 F. Supp. 2d at 1380.

[24]Holloman, 370 F.3d at 1287, 1288.

[25]Newman, 181 F. Supp. 2d at 1380; Village of Crestwood, 917 F.2d at 1479.

[26]Newman, 181 F. Supp. 2d at 1376; Village of Crestwood, 917 F.2d at 1479.

[27]Newman, 181 F. Supp. 2d at 1380.

[28]Holloman, 370 F.3d at 1287; Santa Fe Ind. Sch. Dist. v. Doe, 530 U.S. 290, 310 (2000).

participated in,[29] regulated,[30] censored,[31] led,[32] endorsed,[33] encouraged,[34] or otherwise controlled[35] the activity.[36]  Applied here, these factors strongly indicate government sponsorship.  Nonetheless, defendants disclaim any official role in the Prayer Vigil. Because each had different involvement, the potential liability of each defendant must be addressed separately.

### 1.   Chief Graham

Chief Graham contends that he had little involvement and no control over the Prayer Vigil.[37]  He claims that although he called the meeting of selected police

_____

[29]Holloman, 370 F.3d at 1287; Marrero-Mendez, 830 F.3d at 45.

[30]Adler, 250 F.3d at 1337.

[31]Adler, 250 F.3d at 1333.

[32]Holloman, 370 F.3d at 1287.

[33]Newman, 181 F. Supp. 2d at 1380; Holloman, 370 F.3d at 1288.

[34]Holloman, 370 F.3d at 1287, 1288; Santa Fe Ind. Sch. Dist., 530 U.S. at 308.

[35]Adler, 250 F.3d at 1341.

[36]This list of factors is not intended to be exclusive.  See, e.g., Hewett, 29 F. Supp. 3d at 620-23 (looking at government versus private speech factors established in Sons of Confederate Veterans, Inc. v. Comm'n of Dep't of Motor Vehicles, 288 F.3d 610, 618 (4th Cir. 2002) (purpose of program, degree of editorial control, identity of speaker, and who bears ultimate responsibility), as factors to consider in determining whether flags were government or private speech).

[37]Chief Graham contends that plaintiff Rojas "understood and has conceded" that Chief Graham had no control over whether to cancel the Vigil, but that seems to be a misreading of Rojas' deposition testimony. See Brief (Doc. 52) at 7; Rojas Depo.

42

department employees, chaplains, and a community organizer to discuss how to involve the community in solving the crime spree, he left the meeting once the idea of a Prayer Vigil was raised; others planned the Prayer Vigil without his further input; while he signed the facebook letter, he did not draft it; he viewed the Prayer Vigil as a community effort between Ms. Haynes and volunteer chaplains to bring out the citizenry; he was copied on emails about the event only because it is routine to do so for any public event and not because he was involved; he explained to various citizens by email that it was not a City event; he did not direct any officers or chaplains to attend; City funds weren't used to organize or host the Prayer Vigil; he did not know

---

(Doc. 54-12) at Tr. 25-26, 28-29 (testifying that if the Chief could not cancel the Vigil, he could at least stop the police chaplains from being involved). Moreover, the Establishment Clause focuses on the constitutionality of the government's action from the perspective of a reasonable observer (who is not necessarily the plaintiff). Additionally, there is no such concern with the Hales, the two other plaintiffs here. See, e.g., D. Hale Depo. (Doc. 54-14) at Tr. 19-22; Doc. 54-42 (marked Ex. 26) (Chief Graham's email correspondence with D. Hale); L. Hale Depo. (Doc. 54-15) at Tr. 25, 28-31, 49-50; Doc. 54-41 (marked Ex. 25) (Chief Graham's email correspondence with L. Hale). The City and Chief Graham tried to suggest that Ms. Hale knew Chief Graham could not cancel the Vigil because he told Ms. Porgal that (see Brief, Doc. 52 at 4) and Ms. Hale testified that Ms. Porgal "probably at least gave me the gist" of Chief Graham's communications with Ms. Porgal (Doc. 54-15 at Tr. 13). But this is hardly enough to import Ms. Porgal's knowledge of any of Chief Graham's particular statements to Ms. Hale. Moreover, when responding to the direct question of whether she believed they (the Chief and Mayor) had the power to cancel the Vigil, Ms. Hale testified: "I believe that they did. I believe they still do, should it occur again. And I believe that if it had been otherwise, they would have put that in writing. They would have taken [the] letter down immediately and have said, sorry, folks, that was a mistake; this is being held by these [other] people. Contact them for information." Id. at Tr. 49.

who the speakers would be; he encouraged a member of the atheist community to contact a participating minister if he wished to speak at the event; the speakers did not include any uniformed police officers; and Chief Graham did not speak to the crowd from the stage but instead attended to talk to citizens about crime and was present along with a few other officers for security purposes.

But plaintiffs point to strong evidence supporting their position that Chief Graham had significant involvement in the Prayer Vigil, from its conception through its conclusion.  For starters, the Chief initiated the meeting at the police department at which the plan for the Prayer Vigil was hatched and he pronounced it "a great idea."  Graham Depo. (Doc. 54-10) at Tr. 23.  The facebook posting which invites the community to come to the Prayer Vigil is written on Ocala Police Department letterhead and is signed by Chief Graham in his capacity as Chief of Police.  The letter states in part, "We are facing a crisis in the City of Ocala and Marion County that requires fervent prayer and your presence . . . I [Chief Graham] am urging you all to please support a very important 'Community Prayer Vigil.'"  Doc. 1, Ex. A.  Chief Graham agrees that he read the letter and directed that it be posted on the Department's facebook page.  He further agreed that in doing so, he was promoting the Prayer Vigil.  The record also shows that Chief Graham sent an email suggesting the date for the Prayer Vigil be moved to accommodate local ministers; he sent multiple emails to citizens in reference to the Prayer Vigil that suggested his

involvement, using words such as "we" and "I," and he did not direct these inquirers to contact someone else to complain; nor did he disabuse the Mayor or other supporters in his emails as to whose Prayer Vigil it was.  Chief Graham said he did not know what the speakers would say, yet he received an email from Quintana recommending the Vigil consist of "PRAYER only."  When the speakers are chaplains and the platform is a prayer vigil, a reasonable observer would understand the content of the program would be prayer.

Chief Graham also permitted Captain Edwards and others to work on the Vigil while on City time.  Additionally, although the Ocala Police Department Chaplains are volunteers, they are similar to employees in that they are covered by worker's compensation, have office space at the Police Department, are issued police badges, receive paid uniforms (which they wore to the Prayer Vigil), and are considered members of the Ocala Police Department who are subject to the authority of Chief Graham, who appoints them.  When Chief Graham was copied on an email to the Chaplains advising them that the Chief wanted them to attend the Vigil and to wear their uniforms, Chief Graham did not follow up to correct what he now claims was not really his directive.  Of the ten people on the stage at the Prayer Vigil, four were uniformed Ocala Police Department Chaplains, and another was an off-duty Ocala Police Department employee who was not in uniform (but who may have announced

45

to the crowd that he was indeed a police officer).[38]  And Chief Graham agreed that participating in a prayer vigil would be part of an official function of an Ocala Police Department Chaplain.

In reaching its decision, the Court relies only upon undisputed material facts–i.e., those disclosed by the contemporaneous documents, such as the emails which show Chief Graham's knowledge and involvement, his deposition testimony, and that of the plaintiffs, to the extent it is undisputed.  Defendants' briefs are filled with bold statements such as, "[O]nce the idea of a community vigil was raised . . . Chief Graham left the meeting and had no further involvement with the Vigil, except to coordinate the presence of uniformed officers (including himself) at the Vigil to maintain safety and engage citizens, as is usual for public events held downtown[,]" Doc. 52 at 27, and "[t]he only other action attributable to Graham in relation to the Vigil is his expression of support for the event through the Facebook post." Id.  But such rhetoric, belied by the undisputed facts, is no impediment to granting summary judgment.  Likewise, many of the statements made in Chief Graham's declarations (both of which post-date his deposition) seem very lawyerly and designed to "walk back" his deposition testimony; but to the extent these statements contradict Chief

_____

[38]See Doc. 54-31 (marked Ex. 15), which apparently is a draft of Captain Edwards' remarks (sent to himself), in which he greets the crowd, explaining he is there in many capacities, including as a police officer and a child of God, and, like the audience, is calling on God through prayer, hoping to end senseless shooting and violence in the city.

Graham's deposition testimony without explanation or are conclusory, the Court need not consider them.  See supra note 6.   Also, while defendants do point to some discrepancies in the evidence, they are about immaterial matters.  In the end, the Court, fairly applying the undisputed facts as described supra, pp. 2-21, and drawing all reasonable inferences in Chief Graham's favor, must ask this question:  Has Chief Graham shown a genuine issue of material fact that would preclude a finding that his actions violated the Establishment Clause?  The answer is "no."

In making this assessment, the Court notes that the facts here are distinguishable from cases upon which Chief Graham relies.  For example, in Allen v. Consolidated City of Jacksonville, 719 F. Supp. 1532 (M.D. Fla. 1989), the city passed a resolution and established a committee which, if it so decided, could call for a day of "non-denominational voluntary prayer, meditation, personal commitment or other appropriate solemn dedication" to focus attention on the city's illegal drug problem.  Id. at 1533.  The committee (chaired by a Jacksonville lawyer) was authorized by the City's resolution to encourage individuals to participate by involving religious organizations, public and private schools, private businesses, local government offices and the media.  Id.  The committee set a date for the "anti-drug day" and plaintiff filed a motion for a temporary restraining order and preliminary injunction to enjoin any activities on the grounds that the city's involvement violated the Establishment Clause.  Id.  In denying plaintiff's motion, the court found plaintiff

47

had no standing, but alternatively ruled that the city's only acts were to pass the "broad" and "general" resolution and appoint the committee, which did not expose anyone to prayer, did not involve prayers at any particular venue, did not include group prayer at any public forum or by any public official, and did not involve use of city funds to host or promote any activities. Id. at 1534. The facebook letter here is simply not parallel to the city's broad and general resolution in Allen; and the Prayer Vigil, through its planning and execution, stands in contrast to Allen, where the record was "silent as to any specific events planned". Id.

Adler is likewise distinguishable in that the Court found there was a "total absence of state involvement in deciding whether there [would] be a graduation message," let alone whether it would be a prayer. 250 F.3d at 1342. This, by contrast, was a Prayer Vigil planned by the Ocala Police Department and announced to the community on the City of Ocala Police Department's facebook page. And in Lynch, a case about a holiday display that included a creche erected by the City on private property, the Supreme Court looked to the city's forty year history of public holiday displays in determining that no Establishment Clause violation occurred, likening it to the display of religious paintings in government supported museums. 465 U.S. at 671, 683. This case is not about a long-standing passive holiday display and Lynch's result is not determinative here. Looking at the "particular facts and specific circumstances" of this case, Selman, 449 F.3d at 1323, and construing "all

reasonable doubts about the facts" in Chief Graham's favor, <u>Eternal Word Television Network</u>, 818 F.3d at 1138, the Court is left with but one conclusion:  Chief Graham's actions violated the Establishment Clause.

Chief Graham argues that even if he is deemed to have violated plaintiffs' rights under the Establishment Clause, the case against him should not go forward because he is entitled to qualified immunity.  "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Dalrymple v. Reno</u>, 334 F.3d 991, 994 (11th Cir. 2003) (internal quotations and citations omitted).  Where it applies, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."  <u>Lane v. Franks</u>, 134 S. Ct. 2369, 2381 (2014) (quotation and citation omitted).

"To even be potentially eligible for summary judgment due to qualified immunity, the official must have been engaged in a 'discretionary function' when he performed the acts of which the plaintiff complains."  <u>Holloman</u>, 370 F.3d at 1263-64 (quotation and citation omitted).[39]  This term "include[s] all actions of a governmental

_____

[39]Some authorities refer to the exercise of "discretionary authority" as opposed to "discretionary function," but there does not appear to be any material difference and the Court will use them interchangeably.  <u>See, e.g.</u>, <u>Crocker v. Beatty</u>, 886 F.3d 1132, 1137 (11th Cir. 2018) (discretionary function); <u>Moore v. Pederson</u>, 806 F.3d 1036, 1042 (11th Cir. 2015) (discretionary authority); <u>Maddox v. Stephens</u>, 727 F.3d 1109,

official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994) (quotation and citation omitted).  The government official bears the burden of showing that an act was within the official's discretionary authority.  Holloman, 370 F.3d at 1264.  Both prongs of the test are analyzed from a position of generality, putting aside the fact that the action "may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances."  Id. at 1266.  For these purposes, the Court will assume that Chief Graham acted within his discretionary authority here.

Thus, the burden shifts to the plaintiffs to demonstrate why qualified immunity should not apply.  Id. at 1264.  This requires plaintiffs to show "that a reasonable jury could interpret the evidence in the record as showing that [Chief Graham] violated a constitutional right that was clearly established at the time of the acts in question."  Id. at 1267.  As explained above in the Establishment Clause analysis, a reasonable jury could determine from the evidence in the record that Chief Graham violated the Establishment Clause, thereby satisfying the first prong of the analysis.

The next question is whether that right was "clearly established" at the time, such that the state of the law gave Chief Graham "fair warning" that his involvement

_____

1120 (11th Cir. 2013) (discretionary authority).

in the Prayer Vigil was unconstitutional. Hope v. Pelzner, 536 U.S. 730, 739-41 (2002). It is well established that "prayer is the quintessential religious practice." Jaffree, 705 F.2d at 1534. "[B]y definition" all public prayers serve religious purposes. Jager v. Douglas Cty. Sch. Dist., 862 F.2d 824, 830 (11th Cir. 1989) (citing Jaffree, 705 F.2d at 1534); see also Engel v. Vitale, 370 U.S. 421, 425 (1962) ("[W]e think that the constitutional prohibition against laws respecting an establishment of religion must at least mean that in this country it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government."). Additionally, the Supreme Court has explained that the government "may not promote or affiliate itself with any religious doctrine or organization." County of Allegheny, 492 U.S. at 590. The Supreme Court has further held that government "sponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherents 'that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.'" Santa Fe Ind. Sch. Dist., 530 U.S. at 309-10 (quoting Lynch, 465 U.S. at 688 (O'Connor, J., concurring)). As the Eleventh Circuit explained ten years before this Prayer Vigil, "[e]ncouraging or facilitating any prayer clearly fosters and endorses religion over nonreligion, and so runs afoul of the First Amendment." Holloman, 370 F.3d at 1288. By these authorities, all of which

well-predate the actions here, a reasonable fact-finder could find that it was clearly established that a government-sponsored prayer vigil would violate the Establishment Clause.  Chief Graham is not protected by qualified immunity and his motion for summary judgment is therefore due to be denied and the plaintiffs' motion for summary judgment as to Chief Graham is due to be granted.

### 2.    Mayor Kent Guinn

The evidence reveals that Mayor Guinn had nothing to do with planning the Vigil, promoting it to the community, or participating in it in any official way.  He attended the Prayer Vigil as a citizen.  Yet, when the Mayor learned about the upcoming Prayer Vigil, he wholeheartedly endorsed it, and continued to do so up to and following the event.  This was in the face of many vocal complaints that the Vigil would and did violate the Establishment Clause.  To those citizens and others, he declared that he would not stop the Vigil.  Moreover, both the Mayor and Chief Graham testified that the Mayor had the authority to tell Chief Graham to take down the facebook page, but Mayor Guinn refused.  Nor did he tell the Chief not to permit the police chaplains to participate, which the Mayor also said he had the authority to do.  Additionally, the Mayor responded to citizens in a manner that reflected that the Vigil was a government-sponsored event, repeatedly referencing that "we" are holding this Vigil and telling one person that "[t]here is nothing in the constitution to prohibit us from having this Vigil."  Doc. 54-44 (marked Ex. 28) (9/22/2014 10:24 a.m. email

from Guinn to citizen, copying Graham) (emphasis added).   To another who complained about the Chief's apparent violation of the Establishment Clause, the Mayor responded that not only would he not stop it, he intended to praise the Chief for his efforts.  Doc. 54-49 (marked Ex. 33) at 3 (9/19/2014 10:55 p.m. email from Guinn to citizen, copying Graham).

Yet there is not enough evidence to show that the Mayor himself had sufficient connection to the Prayer Vigil to hold him liable for it.  He was certainly an ardent cheerleader, but a reasonable observer, taking into account the creation, planning, and execution of the Vigil would find the Mayor was not a part of it.  The Mayor did, however, have authority to direct the Chief to take down the facebook page and to order that the Chaplains not participate in the Prayer Vigil, but he refused to take these measures.  It is true, as plaintiffs contend, that the failure to intervene to stop a constitutional violation can itself create liability.  But the circumstances in which that doctrine arises are generally excessive force cases.  See Jones v. Cannon, 174 F.3d 1271, 1286 (11th Cir. 1999) (noting that § 1983 liability may arise for failure to intervene when another officer uses excessive force, but not finding authority to extend the doctrine to prevent a false affidavit); de Veloz v. Miami-Dade Cty., 255 F. Supp. 3d 1222, 1233-34 (S.D. Fla. 2017) (finding no Eleventh Circuit or Supreme Court authority for failure to intervene theory of liability outside of excessive force context), appeal docketed, No. 17-13059 (11th Cir. Jul. 5, 2017).  Based on the facts

53

of this case, the Court would be hard-pressed to hold the Mayor liable for an Establishment Clause violation based solely on his failure to intervene to prevent it.

Even assuming the Mayor committed an Establishment Clause violation by failing to intervene to stop the Prayer Vigil, his duty to do so was not clearly established.[40]   The Mayor is protected by qualified immunity based on the lack of authority that would warn the Mayor that he could be liable for failing to intervene to prevent the Chief's violation of the Establishment Clause.  The Mayor is due to be granted summary judgment and the plaintiffs' motion seeking summary judgment as to the Mayor is due to be denied.[41]

### 3.    The City of Ocala

The City contends it is due to be granted summary judgment because there is no basis to find municipal liability.  Although local governments cannot be found liable on a theory of respondeat superior, in <u>Monell v. Department of Social Services</u>, 436 U.S. 658, 694-95 (1978), the Supreme Court determined they may be held to answer

---

[40]By so publicly failing to intervene, the Mayor did, in a sense, ratify the Chief's actions.  The Court has considered whether this alone might subject him to liability but again finds a lack of authority that would warn the Mayor of this possibility.  However, as noted below, the Mayor's ratification can certainly be considered in assessing the City's liability.

[41]This ruling is based on an evidentiary record of undisputed facts (drawing all reasonable inferences in plaintiffs' favor), which explains why it differs from the Court's ruling on the same question presented by the Mayor's motion to dismiss, which considered only the allegations of plaintiffs' complaint.  <u>See</u> Docs. 1, 14, 22.

when a constitutional tort results "from an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." Denno v. Sch. Bd. of Volusia Cty., 218 F.3d 1267, 1276 (11th Cir. 2000) (citing Monell, 436 U.S. at 694). "[A] municipality may be held liable under 42 U.S.C. § 1983 for a single illegal act committed by one of its officers . . . [provided that] the challenged act may fairly be said to represent official policy, such as when that municipal officer possesses final policymaking authority over the relevant subject matter." Scala v. City of Winter Park, 116 F.3d 1396, 1397 (11th Cir. 1997); see also Cooper v. Dillon, 403 F.3d 1208, 1222 (11th Cir. 2005) (rejecting argument that city could not be liable based on single incident of statute's enforcement).

"Whether an official has final policymaking authority" that may subject the government to liability "is a question of state law," Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994) (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988) (plurality opinion)), which is to be decided by the court as a matter of law. Jett v. Dallas Ind. Sch. Dist., 491 U.S. 701, 737 (1989). Both Chief Graham and Mayor Guinn have authority under state law that could subject the City of Ocala to liability, assuming they were acting within their respective realms of authority at the time; no party has argued otherwise. See Fla. Const., Art. VIII § 2(b) (establishing municipalities and their powers, which include conducting a municipal government);

Charter, City of Ocala, Fla., Pt. I, Subpt. A, Art. II, § 2.08 (police officers are responsible to the chief of police who is responsible to the mayor), Pt. I, Subpt. A, Art. III, § 3.03(b) (mayor shall have charge and control of the police department); Code of Ordinances, City of Ocala, Fla., Ch. 2, Art. IV, Div. 10, § 2-371 (police chief shall be elected by city council upon mayor's recommendation and has supervision over police officers and support personnel who shall act under his instructions); Guinn Dec. (Doc. 53-1) at ¶¶ 2, 3; City of Ocala and Graham's Answer (Doc. 38) at ¶ 12 (admitting that Chief Graham is in charge of day-to-day operations of the Ocala Police Department including carrying out policy, managing and supervising staff, and ensuring department activities comply with applicable law); see also Cooper, 403 F.3d at 1222 (explaining that in addition to powers granted by Florida's constitution and local laws, "there are other indicia in state law that police chiefs in Florida have final policymaking authority in their respective municipalities for law enforcement matters") (citing various state statutes);  Davis v. City of Apopka, No. 17-11706, ___ F. App'x ___, 2018 WL 1750557, *2-3 (11th Cir. Apr. 12, 2018) (holding a Florida city's police chief was final policymaker under state and local law) (citing Florida Constitution, city ordinances, and Cooper, 403 F.3d at 1222).

While the City paints this as a fleeting incident that could not possibly be deemed official policy so as to subject it to liability, in fact, the events here took place over the course of eight days, beginning with Chief Graham's calling the meeting and

culminating with the Prayer Vigil.  During that time and as further described above, both Chief Graham and Mayor Guinn took many actions in their official roles in very public ways to initiate, organize, facilitate, promote, encourage, endorse, and otherwise sponsor the Prayer Vigil (all in the face of vocal opposition which pointed out the violation), easily subjecting the City of Ocala to liability for violating the Establishment Clause.[42]  The City of Ocala's motion for summary judgment is due to be denied and the plaintiffs' motion for summary judgment as to the City of Ocala is due to be granted.

### D.    Plaintiffs' claim for punitive damages.

Although not pled in their complaint, plaintiffs argue in their summary judgment motion that they are entitled to seek punitive damages.  See Doc. 54 at 33-35.  Chief Graham objects.[43]  See Doc. 68 at 24-25.

The cases upon which plaintiffs rely for permitting a punitive damages claim to go forward without a specific request are distinguishable.  In Scutieri v. Paige, 808

––––––––––––––––––––

[42]Even though the Mayor is protected by qualified immunity and he therefore cannot be held liable in his individual capacity, his conduct as Mayor (as well as Chief Graham's) is relevant in determining the City's liability.

[43]Punitive damages are not available against a municipality under 42 U.S.C. § 1983 (and plaintiffs do not contend otherwise). See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981).  The Mayor did not address the punitive damages issue in his opposition brief.  However, as the Court is granting his motion for summary judgment, his lack of opposition is of no moment.  Thus, this issue pertains only to Chief Graham.

F.2d 785 (11th Cir. 1987), the Eleventh Circuit determined the jury should have been given a requested instruction on punitive damages despite plaintiffs' failure to include punitive damages in their complaint's request for judgment because the complaint (a civil wiretapping case with egregious facts) alleged defendants acted "intentionally and maliciously, wantonly, willfully, in bad faith, with gross and reckless disregard" for plaintiffs' rights, and further alleged that defendants' conduct "was so flagrant and wanton as to justify an award of punitive damages."  808 F.2d at 791 n.2.  The plaintiffs' prayer for relief included a request for statutory damages and the statute at issue provided for punitive damages.  Id. at 791.  Additionally, the defendants had listed plaintiffs' entitlement to punitive damages as an issue to be decided in the case and they did not object when plaintiffs included it in their pretrial stipulation.  Id. at 791-92.  Also, the plaintiffs had unsuccessfully sought leave to amend their complaint before trial to add a punitive damages claim to their ad damnum clause.  Id. at 791.  In Guillen v. Kuykendall, 470 F.2d 745 (5th Cir. 1972), the plaintiff's complaint (which alleged the defendant shot the plaintiff) alleged "malice and unwarranted excessive actions," which was sufficient to permit the jury to consider exemplary damages under Texas law. 470 F.2d at 748.

Here, in contrast with both of those cases, the only allegation in plaintiffs' complaint that could even possibly support a punitive damages request is the single sentence, "Each of the individual Defendants, in their individual capacities,

intentionally or recklessly violated Plaintiffs' well-settled constitutional rights under the Establishment Clause."  Complaint (Doc. 1) at ¶ 47.  The paragraphs of allegations detailing defendants' actual conduct do not make hint of any particular egregiousness. And plaintiffs' request for relief was specific, asking for declaratory judgment and a permanent injunction (both described in very detailed terms), nominal damages, attorneys' fees, expenses and costs, and "such other relief as this Court deems just and proper."  Id. at ¶¶ 50-51.  The single conclusory statement referencing an intentional and reckless violation is not enough to put Chief Graham on notice and the Court finds it is insufficient to support raising a punitive damages claim at this late stage.[44]  See Cioffe v. Morris, 676 F.2d 539, 541-42 (11th Cir. 1982) (explaining that an unpled issue may be tried only with consent of the opposing party).

## V.     Conclusion

The Court is granting the Mayor's motion for summary judgment and denying plaintiffs' cross-motion.  The Court is denying Chief Graham and the City's motion for

---

[44]Plaintiffs did not move for leave to amend their complaint, and the deadline to seek such leave passed five months before plaintiffs first mentioned punitive damages in their summary judgment motion.  Any request for leave to amend to add a punitive damages claim at this point would have to be supported by a showing of good cause under Federal Rule of Civil Procedure 16(b)(4).  Plaintiffs have not even suggested what that might be and, as the facts which plaintiffs now argue would support such a claim have largely been known since before they filed suit, it is unlikely they could show good cause for the untimely request.  See Factory Direct Tires Inc. v. Cooper Tire & Rubber Co., No. 3:11-cv-255-RV/EMT, 2013 WL 12099993 (N.D. Fla. Sept. 23, 2013) (distinguishing Scutieri and denying request for leave to amend complaint to add punitive damages).

summary judgment and granting plaintiffs' cross-motion as to the Chief and the City. In so doing, the Court considered whether it should instead deny plaintiffs' motion for summary judgment as to the Chief and the City and conduct a non-jury trial (no remaining party requested a jury trial). However, the Court determined that holding a non-jury trial was not required:  based on the undisputed facts, plaintiffs have demonstrated as a matter of law that the Chief and the City of Ocala violated the Establishment Clause.

In sum, under the Establishment Clause of the First Amendment to the United States Constitution, the government cannot initiate, organize, sponsor, or conduct a community prayer vigil.  That is what happened here.  Yet, the same event in private hands would be <u>protected</u> by the First Amendment. <u>See</u> <u>Bd. of Ed. of Westside Comm. Schs. v. Mergens</u>, 496 U.S. 226, 250 (1990) (opinion of O'Connor, J.) ("[T]here is a crucial difference between <u>government</u> speech endorsing religion, which the Establishment Clause forbids, and <u>private</u> speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." ) (emphasis in original).  In this way, the rights of all citizens– religious and non-religious– are preserved.

Accordingly, it is hereby

**ORDERED**:

1.      Defendant Mayor Kent Guinn's Motion for Summary Judgment (Doc. 53) is **GRANTED**.

2.      The City of Ocala and Chief Greg Graham's Motion for Summary Judgment (Doc. 52) is **DENIED**.

3.      Plaintiffs' Motion for Summary Judgment (Doc. 54) is **DENIED** as to their claim against Mayor Kent Guinn and is **GRANTED** as to their claims against the City of Ocala and Chief Greg Graham.

4.      The Court will award each plaintiff one dollar ($1.00) in nominal damages from each of the two liable defendants (for a total nominal damages award of six dollars ($6.00)), which sums will be included in the Court's final judgment.

5.      As the prevailing parties, the Court will also be entering an award of attorneys' fees and costs in plaintiffs' favor under 42 U.S.C. § 1988.[45]  No later than **June 25, 2018**, plaintiffs shall file a motion for attorneys' fees and costs.  Assuming

---

[45]Although he has also prevailed in this litigation, defendant Mayor Kent Guinn is not entitled to recover his attorneys' fees and costs because a prevailing defendant may only recover fees in a civil rights case under 42 U.S.C. § 1983 if the case was "groundless, . . . frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith."  Christiansburg Garment Co. v. Equal Emp't Opportunity Comm'n, 434 U.S. 412, 421 (1978); see also Fox v. Vice, 563 U.S. 826, 833 (2011) (explaining that defendants are protected against "burdensome litigation having no legal or factual basis").  That is not the case here.

they oppose the motion, no later than **July 20, 2018**, the City of Ocala and Chief Graham shall file their response.  The Court hereby refers the attorneys' fees and costs motion to the Magistrate Judge for a Report and Recommendation.

      6.    The Clerk is directed to withhold entry of judgment as to any party until the Court has resolved plaintiffs' request for attorneys' fees and costs.

      **DONE AND ORDERED** at Jacksonville, Florida this 24th day of May, 2018.


TIMOTHY J. CORRIGAN
United States District Judge


s.
Copies:

Honorable Philip R. Lammens
United States Magistrate Judge

counsel of record

62