**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION**

| | | |
|---|---|---|
| ART ROJAS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | |
| | ) | **5:14-cv-00651** |
| CITY OF OCALA, FLORIDA, | ) | |
| | ) | |
| Defendant. | ) | |

**CROSS-MOTION FOR SUMMARY JUDGMENT**

By undersigned counsel, Defendant, the City of Ocala, opposes Plaintiffs'
motion for summary judgment, Doc. 145, and pursuant to Fed. R. Civ. P. 56
respectfully moves for summary judgment on the Establishment Clause claim set
forth in Plaintiffs' complaint. Doc. 1.

**MEMORANDUM OF LAW**

**I.      Statement of Facts**

Plaintiffs identify the material undisputed facts in this case by stating in a
single sentence that it "incorporate[s] the 'Undisputed Facts' from this Court's
[Vacated] Order of May 24, 2018 (Doc. 88, at 2-22)." Pl. Br. (Doc. 145) at 2. The
problem with this is twofold: First, vacated decisions "are officially gone. They
have no legal effect whatever. They are void. None of the statements made in
either of them has any remaining force. . ." *United States v. Sigma Int'l., Inc.*, 300
F.3d 1278, 1280 (11th Cir. 2002). Second, the City respectfully suggests that not all

facts set forth in the Court's May 24, 2018, order are properly supported.[1] Nonetheless, to avoid contentious motion practice that would needlessly consume judicial resources, and to comply with the Court-imposed page limitation, the City responds only to certain facts in dispute, together with those the City suggests are improperly supported, as noted in n.1, *supra*.

Quintana and Haynes were responsible for planning and organizing the vigil. Ex. 5[2] (Quintana Decl.) at ¶ 5; Ex. 4 (Haynes Decl.) at ¶ 6.[3] Richard Edwards— a captain for the OPD at the time of the vigil and an active member of the faith community in Ocala—participated in the vigil in plain clothes as a private citizen—not an OPD officer. Ex. 54 (Edwards Decl.) at ¶¶ 2-3, 6; Ex. 3 (Graham Decl.) at ¶ 24 (affirming Edwards was off duty at the vigil).[4]

---

[1] For example, in its vacated opinion and order, the Court relied upon an affidavit submitted by Plaintiffs' counsel summarizing, in her own words, a description of certain events occurring at the vigil and attaching transcriptions of two statements by speakers at the vigil. The contents of this affidavit were not prepared based on first-hand knowledge. Instead, it was prepared after reviewing a video and audio recordings allegedly taken by one of the plaintiffs. Doc. 88, at 17 (citing Paige Decl. (Doc. 54-16) and Exs. A and B attached thereto) (Ex. 22), but the original video and audio recordings were never produced by Plaintiffs. Doc. 54-16, together with the attached exhibits, fail to comply with Fed. R. Evid. 1002 and are inadmissible. *See United States v. Flanders*, 752 F.3d 1317, 1336 ("The best evidence rule provides that the original documents must be produced to prove the content of any writing, recording or photograph. *United States v. Howard*, 953 F.2d 610, 612 n.1 (11th Cir. 1992) (citing Fed. R. Evid. 1002-06).")." Similarly, the Court noted that "in at least one photograph [produced by Plaintiffs], a uniformed officer appears to be participating in prayer while sitting on the edge of the stage." Doc. 88, at 17 (citing Doc. 54-19 at Page ID 1392). Upon zooming in, however, the officer is sitting on the edge of the stage *with her eyes open* and her hand pointing towards something. Neither she nor the other two women in the photo depict any posture of prayer (*i.e.*, holding hands or bowing of head).

[2] Plaintiffs submitted exhibits 1-53 in support of their motion for summary judgment (Doc. 145). Any exhibits submitted by Defendant City of Ocala in support of this motion are consecutively numbered and include exhibits 54-59.

[3] *See also* Ex. 34 (Doc. 54-32), at 2 (Edwards' email to Haynes and Quintana thanking them for helping with and allowing the prayer vigil to take place).

[4] In the vacated opinion and order, Edwards' activities relating to the vigil are discussed. *See* Doc. 88, at 15 and 20-21. It remains unclear how much of Edwards' activities, *i.e.*, emailing with Haynes and Quintana regarding a date for the vigil and helping coordinate details regarding the vigil, were conducted in his official capacity or individual capacity. Nonetheless, these activities would not have been out of the ordinary pursuant to OPD's custom and practice relating to public events

Chief Graham did not know ahead of time who would speak at the vigil or what the religious makeup of those leading the event would be. Ex. 3 (Graham Decl.) at ¶ 16. Chief Graham understood there would be members of various faiths present at the vigil. Ex. 56 (Doc. 52-8 - E-mail exchange b/t Graham and Tjaden). When a member of the atheist community reached out to the City, Chief Graham encouraged the member to contact the organizers of the event if he wished to speak or participate in planning the event. *Id*. The Mayor expressed his support for the vigil, but he had no involvement in—or even knowledge of—the plans or details of the event. Ex. 17 (Guinn Dep.) at Tr. 44; Ex. 15 (Guinn Int. Resp.) at No. 1.[5]

At the time of the vigil, all chaplains serving with the OPD were of the Christian faith, Doc. 88, at 9 (citing Graham Dep. (Doc. 54-10) at Tr. 157); however, Chief Graham had invited non-Christians to serve as chaplains. Ex. 16 (Graham Dep.) at Tr. 157-160 (testifying that he invited non-Christians to serve as chaplains and recalls having a Muslim and/or Mormon chaplain(s) serve with the police department over which he presided). Chief Graham did not instruct OPD chaplains to attend or participate in the vigil. Ex. 3 (Graham Decl.) at ¶¶ 19, 26.

---

held in the downtown square. It is undisputed that the OPD followed a nationally recognized method for fighting crime known as community policing which is accomplished through "community involvement" and "officer/community collaboration in identifying and solving crime and other problems." Ex.3 (Graham Decl.) at ¶¶ 2-4; Ex. 6 (OPD Directive outlining the principles of the OPD including "communication, collaboration and cooperation); Ex. 55 (Doc. 52-7 - DOJ Community Policing, at PAGE ID – DEF 0014637-38). It is also undisputed that it was customary for the OPD to remain apprised of and discuss upcoming public events taking place in the downtown square. Ex. 3 (Graham Decl.) at ¶ 26.

[5] *See also*, Ex. 3 (Graham Decl.) at ¶¶ 13-15; Ex. 4 (Haynes Decl.) at ¶ 10.

Only a few volunteer chaplains for the OPD actually attended the vigil. Ex. 13 (Doc. 54-10 – City Int. Resp. at No. 25(f)).

Testimony provided by Plaintiffs, as well as photos submitted in the record, show that several people led and spoke at the vigil, including a mixture of volunteer OPD chaplains, citizens, and even a child. *See* Ex. 19 (Porgal Dep.) at Tr. 40:10-23 (explaining that chaplains, as well as "a minister . . . a young man by the name of Trace, who was a young black gentleman, a child" and a "one Messianic Jewish gentleman with a shofar."); Ex. 4 (Haynes Decl.) at ¶ 11. No on-duty OPD employees were on stage at the vigil. Ex. 3 (Graham Decl.) at ¶ 25. And no OPD employees maintained control over who would lead or participate in the vigil or the content of any speech offered at the vigil. Ex. 5 (Quintana Decl.) at ¶ 10.

All Plaintiffs affirmed that they attended the vigil voluntarily, *i.e.*, because they wanted to. Ex. 12 (L. Hale Int. Resp.) at, No 12 ("I attended because I **wanted** to observe what happened . . . and my presence would be a form of protest") (emphasis added); *Id.*, Ex. 10 (Rojas Int. Resp.) at No. 12 ("I attended because I **wanted** to observe what happened") (emphasis added); *see also* Ex. 18 (Rojas Dep.) at Tr. 40:2-7 (affirming he was not coerced to attend). The record is completely devoid of any evidence of coercion. To the contrary, Porgal testified that Chief Graham has never refused her assistance and that if she ever needed his assistance in the future—even after her consistent protests of the vigil and subsequent filing of the lawsuit—she remained confident he would provide it. Ex. 58 (Porgal Dep.) at Tr. 55:7-56:9. Daniel Hale testified that there was no indication of any penalty for failure to attend or participate in the vigil. Ex. 57 (D. Hale Dep.)  at Tr. 65:19-

24. In fact, at the vigil, Chief Graham extended an invitation to Mr. Hale to volunteer with the OPD. *Id*. at 66:4-19. Lucinda Hale also spoke with Chief Graham at the vigil to express her opposition while standing beside an Ocala Atheist placard expressing protest to the vigil. Ex. 21 (L. Hale Dep.) at Tr. 37-38. At no time did Ms. Hale indicate that she felt coerced or pressured to attend or participate. *Id*. Finally, while Rojas asserts that "anyone present would have felt some pressure to participate and show approval [and] anyone expressing opposing views would have been publicly opposing the policy," see Doc. 88, at 19 (quoting from Rojas Int. Resp. (Doc. 52-12) at No. 14-15), Rojas testified that he spoke directly with Chief Graham at the vigil to express his opposing views. Ex. 18 (Rojas Dep.) at Tr. 21:7-22:14.

While Plaintiffs insist that the vigil was a Christian event, evidence presented demonstrates that individuals adhering to other faiths and/or no faith at all were encouraged to participate in the planning of the event and to attend. Plaintiffs presented no evidence that they, or anyone else adhering to different faiths, were denied the opportunity to participate and/or help lead the vigil.

## II.    Procedural History

Plaintiffs filed suit against the City in 2014 alleging that the City's connection with a prayer vigil violated the Establishment Clause. Both parties filed motions for summary judgment. On May 24, 2018, summary judgment was awarded to Plaintiffs. Doc. 88. The Court held that Plaintiffs had standing to sue and that the City violated the Establishment Clause based on, *inter alia*, *Lemon v. Kurtzman*, 403 U.S. 602 (1971). *Id*.

The City appealed and the Eleventh Circuit vacated summary judgment. *Rojas v. City of Ocala*, 40 F.4th 1347 (11th Cir. 2022). The Court made two essential rulings: (1) Hale has standing to sue (it did not consider whether Rojas does), *id*. at 1351, and (2) in light of *Lemon* being overruled in *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2427 (2022), this Court should apply on remand "the historical practices and understandings standard endorsed in *Kennedy*" in adjudicating Plaintiffs' Establishment Clause claim. *Rojas*, 40 F.4th at 1352.

The City filed a petition for a writ of certiorari with the Supreme Court asking it to address whether mere observation of religious messages is an injury sufficient to confer standing under Article III. The Court denied certiorari. *City of Ocala v. Rojas*, 143 S. Ct. 764 (2023). Justice Gorsuch wrote a statement respecting the denial of certiorari, *id*. at 764-765, and Justice Thomas dissented, *id*. at 765-768.

## III. Summary Judgment Standard

The standard for summary judgment is well-established. "A district court must grant summary judgment 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Atheists of Fla., Inc. v. City of Lakeland*, 713 F.3d 577, 589 (11th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). In making this assessment, the court "view[s] all facts and reasonable inferences drawn therefrom in the light most favorable to the non-moving party." *Id*. (cleaned up). "The principles governing summary judgment do not change when the parties file cross-motions for summary judgment." *T-Mobile S. LLC v. City of Jacksonville*, 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008).

## IV.    Plaintiffs Do Not Have Standing (Preserved for Appeal)

The Eleventh Circuit held that Plaintiff Hale has standing to sue. *Rojas*, 40 F.4th at 1351. As that ruling is presently the law of the case, and because there are no additional facts or subsequent intervening law for the City to present to the Court, the City cannot reargue at this juncture that Hale lacks standing. Nonetheless, for purposes of any potential appeal, the City continues to maintain that Plaintiffs do not have Article III standing to press their Establishment Clause claim.

## V.    *Kennedy* and the Overruling of *Lemon*

Pursuant to the Supreme Court's decision in *Lemon* and its progeny, courts have adjudicated Establishment Clause cases under a three-fold rubric: purpose, primary effect/endorsement, and entanglement. 403 U.S. at 612-613. This Court applied *Lemon* to the parties' previous motions for summary judgment. *Lemon*, however, has now been overruled. *See City of Ocala*, 40 F.4th at 1351 ("*Lemon* is dead").

As the Supreme Court explained in *Kennedy*, *Lemon*'s "'shortcomings'" became so "'apparent' that this Court long ago abandoned *Lemon*." *Kennedy*, 142 S. Ct. at 2427 (quoting *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2079–81 (2019)). *Kennedy* confirmed that the Establishment Clause does not "compel the government to purge from the public sphere anything an objective observer could reasonably infer endorses or partakes of the religious." *Id*. (cleaned up). A problem with the "reasonable observer" standard was that it created a "modified heckler's veto, in which . . . religious activity can be proscribed" based on "'perceptions'" or

"'discomfort.'" *Id*. (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 (2001)).

*Kennedy* held that "[i]n place of *Lemon* and the endorsement test, . . . the Establishment Clause must be interpreted by 'reference to historical practices and understandings' at the time of the founding." *Id*. at 2428 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2013)). This is now the case for all Establishment Clause cases, including those involving prayer. While the Supreme Court's decision in *Marsh v. Chambers*, 463 U.S. 783 (1983), was sometimes described as an "exception" to Establishment Clause jurisprudence, the Court clarified in *Town of Greece* that *Marsh* "must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation." 572 U.S. at 576. In other words, as *Kennedy* explains, "[a]n analysis focused on original meaning and history . . . has long represented the rule rather than some exception within the Court's Establishment Clause jurisprudence." 142 S. Ct. at 2428 (2022) (cleaned up).

Accordingly, in applying "original meaning and history" in the Establishment Clause context, "the line [courts] must draw between the permissible and the impermissible is one which accords with history and faithfully reflects the understanding of the Founding Fathers." *Id.* at 2428 (quoting *Town of Greece*, 572 U.S. at 577).

As the Fourth Circuit recently explained in a post-*Kennedy* decision:

[I]n Establishment Clause cases, the plaintiff has the burden of proving a set of facts that would have historically been understood as an establishment of religion. That requires proving both a set of facts, like in

all litigation, and proving that those facts align with a historically disfavored establishmentarian practice.

*Firewalker-Fields v. Lee*, 58 F.4th 104, 122 n.7 (4th Cir. 2023).

As explained herein, Plaintiffs cannot carry their burden as a matter of law. Viewing the facts in a light most favorable to Plaintiffs, the City did not violate the Establishment Clause and the City is entitled to summary judgment.

## VI.    The Original Understanding of the Establishment Clause

In *Kennedy*, the Court described what the Establishment Clause prohibits as an original and historical matter: (1) to "make a religious observance compulsory"; (2) to "coerce anyone to attend church"; or (3) to "force citizens to engage in 'a formal religious exercise.'" 142 S. Ct. at 2429 (citations omitted). The Court pointed out that "coercion along these lines was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Id*. [6]

To elucidate this point, *Kennedy* points to several sources, *id*. at n.5, including Justice Gorsuch's opinion in *Shurtleff v. City of Boston*, 142 S. Ct. 1583 (2022), where he notes that "telling traits" of an "establishment of religion" included: (1) government control "over the doctrine and personnel of the established church"; (2) mandatory attendance in the established church and punishment for those who disobeyed; (3) penalizing "dissenting churches and

---

[6] *See also Freedom from Religion Found., Inc. v. Concord Cmty. Schs*, 885 F.3d 1038, 1053 (7th Cir. 2018) (Easterbrook, J., concurring) ("It takes taxation or compulsory worship to establish a religion; some form of coercion is essential. This is the view of scholars who have investigated what the phrase 'establishment of religion' meant in the Eighteenth Century, when these words were adopted.") (citations omitted).

individuals for their religious exercise"; (4) restricting "political participation by dissenters"; (5), providing financial support for the established church, and (6) "government use of the established church to carry out certain civil functions." *Id*. at 1609 (Gorsuch, J., concurring in the judgment).[7]

As James Madison succinctly explained, the Establishment Clause addressed the fear that "one sect might obtain a pre-eminence, or two combine together, and establish a religion to which they would compel others to conform." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 183–84 (2012) (citation omitted).[8]

Plaintiffs evade this entire discussion from *Kennedy*. Because there are no facts in the record supporting anything like the coercion condemned by the Establishment Clause as originally understood and discussed by the Court in *Kennedy*, Plaintiffs' evasion is understandable.

While the Supreme Court has not settled "on what exactly qualifies as impermissible coercion in light of the original meaning of the Establishment Clause," Plaintiffs have come forward with no concrete evidence that they, or anyone else, were coerced or compelled to do anything to any degree. *Kennedy*,

---

[7] *Kennedy*, 142 S. Ct. at 2429, n.5, also points to Justice Scalia's dissent in *Lee*, 505 U.S. at 640-642, where Justice Scalia notes that "historical establishments of religion was coercion of religious orthodoxy and of financial support *by force of law and threat of penalty*." *Id*. at 640 (Scalia, J. dissenting) (emphasis original).

[8] "The real object of the [First] Amendment was . . . to prevent any national ecclesiastical establishment, which should give to an hierarchy the exclusive patronage of the national government." *Lynch v. Donnelly*, 465 U.S. 668 (1984) (quoting 3 J. Story, Commentaries on the Constitution of the United States 728 (1833)). For more on Joseph Story's comments on law and religion in early America, as well as other historical observations on the meaning of the Establishment Clause, *see Kondrat'Yev v. City of Pensacola*, 903 F.3d 1169, 1188-1190 (11th Cir. 2018) (Royal, J., sitting by designation, concurring in the judgment).

142 S. Ct. at 2429. Plaintiffs are adults, not impressionable school-aged children susceptible to peer pressure.[9] Nor was the vigil held in an environment where Plaintiffs had no choice but to observe religious content that caused them offense. They admit that they voluntarily went to the vigil and could have left whenever they chose. *See Lee*, 505 U.S. at 597 (contrasting an effectively mandatory school event with a government session "where adults are free to enter and leave with little comment and for any number of reasons").

Ocala exercised no level of coercion on Plaintiffs or anyone else to attend or participate in the vigil, leaving them with only one alleged injury: offense. But that is not enough to make out an Establishment Clause violation under the facts of this case. "People may take offense at all manner of religious as well as nonreligious messages, but **offense alone** does not in every case show a violation." *Id*. (emphasis added).[10]

## VII.   The History and Tradition of Public Prayer

"There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984). Our national history "is replete with official references to the value and invocation of Divine guidance in deliberations

---

[9] *See, e.g., Lee v. Weisman*, 505 U.S. 577, 592 (1992) (citing *Engel v. Vitale*, 370 U.S. 421 (1962) (noting that "prayer exercises in public schools carry a particular risk of indirect coercion" that is "pronounced")); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 296-97; 309-10 (2000) (noting the "imposition of coercion upon" students). For this reason, school prayer cases have no relevance.
[10] *See also Town of Greece*, 572 U.S. at 589 (plurality) ("Offense . . . does not equate to coercion. Adults often encounter speech they find disagreeable; and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views").

and pronouncements of the Founding Fathers and contemporary leaders." *Id*. at 675. Indeed, "religion permeates our history." *Edwards v. Aguillard*, 482 U.S. 578, 607 (1987) (Powell, J., concurring).

In *Marsh v. Chambers*, the Supreme Court noted that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." 463 U.S. at 786. Beginning in 1774, the Continental Congress "adopted the traditional procedure of opening its sessions with a prayer offered by a paid chaplain." *Id*. at 787 (citations omitted).[11] That practice continued after the birth of the nation. "The First Congress made it an early item of business to appoint and pay official chaplains, and both the House and Senate have maintained the office virtually uninterrupted since that time." *Town of Greece*, 572 U.S. at 575. "Clearly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment." *Marsh*, 463 U.S. at 788. Notably, in *Marsh* a clergyman of only one Christian denomination (Presbyterian) had been selected for 16 years and the prayers were in "the Judeo-Christian tradition." *Id*. at 793.

*Marsh*'s relevance to this case cannot be questioned. As then-Judge

---

[11] On December 11, 1776, the Continental Congress recommended "a day of solemn fasting and humiliation; to implore of Almighty God the forgiveness of the many sins prevailing among" us and "to beg the countenance and assistance of his Providence in the prosecution of the present just and necessary war." *Cont. Cong. no. 18a*, Library of Congress (last visited Aug. 2, 2023), https://tinyurl.com/ccpr1776 [https://lccn.loc.gov/90898015] (Congressional resolution for day of prayer and fasting). It noted that "it becomes all public Bodies, as well as private Persons, to reverence the Providence of GOD, and look up to him as the supreme Disposer of all Events, and the Arbiter of the Fate of Nations." *Id*.

Kavanaugh wrote in an Establishment Clause challenge to, *inter alia*, presidential inaugural prayers:

> This case concerns government-sponsored religious speech at public events outside of the public school setting. The Supreme Court's landmark ruling in *Marsh v. Chambers* sets forth the Court's approach to that issue.

*Newdow v. Roberts*, 603 F.3d 1002, 1017 (2010) (Kavanaugh, J., concurring in the judgment).

In addition to adopting prayer in the nation's highest legislative body (and paying chaplains to offer such prayers), on "[t]he day after the First Amendment was proposed, Congress urged President Washington to proclaim 'a day of public thanksgiving and prayer, to be observed by acknowledging with grateful hearts, the many and signal favours of Almighty God.'" *Lynch*, 465 U.S. at 675 n.2 (citation omitted). In response, Washington proclaimed November 26, 1789, a day of thanksgiving to "'offer[] our prayers and supplications to the Great Lord and Ruler of Nations, and beseech Him to pardon our national and other transgressions . . . .'" *Id.* (citation omitted). Such "forthrightly religious" Thanksgiving proclamations have been "issued by nearly every President since Washington." *Town of Greece*, 572 U.S. at 580 (citation omitted).

The same invocation of Divine guidance is true with respect to the inauguration of the President, the highest executive official in the land. "In his first inaugural address, after swearing his oath of office on a Bible, George Washington deliberately made a prayer a part of his first official act as President." *Lee*, 505 U.S. at 633 (Scalia, J., dissenting).

> It would be peculiarly improper to omit **in this first official act** my fervent supplications to that Almighty Being who rules over the universe, who presides in the councils of nations, and whose providential aids can supply every human defect, that His benediction may consecrate to the liberties and happiness of the people of the United States a Government instituted by themselves for these essential purposes.

*Id*. (citation omitted) (emphasis added). "Such supplications have been a characteristic feature of inaugural addresses ever since." *Id*.

At the 2021 inauguration of President Biden—a public event, organized by the federal government—a Catholic priest offered an opening prayer, quoting from the letter of St. James, the words of Pope Francis, and ending with the words, "To the glory of your name forever. Amen."[12] The benediction was offered by an Episcopalian minister, who closed his prayer with: "To Your glory, majesty, dominion, and power forever, hallelujah. Glory hallelujah, in the strong Name of our collective faith. Amen."[13]

Invoking the Divine during times of crisis and concern has been part and parcel of our country's longstanding practice of public civic piety and prayer as evidenced by and described in Presidential proclamations. *See, e.g.*, National Day of Prayer Proclamation, 62 Fed. Reg. 19663 (1997) (Noting that "[o]ur people have always believed in the power of prayer and have called upon the name of the lord through times of peace and war, hope and despair, prosperity and decline."); National Day of Prayer Proclamation, 63 Fed. Reg. 24383 (1998) (Noting that "we turn to [prayer] at moments of great joy or crisis in our public life as a Nation" and

---

[12] Congressional Record, Senate, Vol. 167, No. 12 (Jan. 21, 2021) at S77.
[13] *Id*. at S79.

describing prayer by Continental Congress, in President Washington's first inaugural address, and in President Franklin Roosevelt's first inaugural address); National Day of Prayer Proclamation, 27 Fed. Reg. 21559 (2002) ("Since our Nation's founding, Americans have turned to prayer for inspiration, strength, and guidance. In times of trial, we ask God for wisdom, courage, direction, and comfort...").[14]

At a "prayer vigil" for the victims of the Sandy Hook tragedy, President Obama invoked the blessings of God by praying, "May God bless and keep those we've lost in His heavenly place. May He grace those we still have with His holy comfort. And may He bless and watch over this community, and the United States of America." *Remarks by the President at Sandy Hook Interfaith Prayer Vigil*, Office of the Press Secretary of the United States (Dec. 16, 2012), https://tinyurl.com/obamapry.

On January 6, 2022, close to a hundred members of Congress gathered on the steps of the Capitol for a "prayer vigil" on the second anniversary of the riot on Capitol Hill. A bishop offered a prayer "asking for guidance for a 'traumatized' country." Elizabeth Elkind ET AL., *Nancy Pelosi leads prayer vigil to mark one year of January 6 Capitol Riot*, Daily Mail (January 7, 2022, 3:11 EDT) https://tinyurl.com/hill-prayer.

---

[14] The National Day of Prayer was codified in 1952. 36 U.S.C. § 119. Unlike events such as Memorial Day, 36 U.S.C. § 116; Flag Day 36 U.S.C. § 110; Patriot Day, 36 U.S.C. § 114 where the President is "requested" to issue a proclamation, that is not the case with the National Day of Prayer. For this event, and in keeping with the role prayer plays in our national culture, the President "shall" issue a proclamation. 36 U.S.C. § 119 ("The President shall issue each year. . ."). Establishment Clause challenges to the National Day of Prayer have failed. *See, e.g.*, *Freedom from Religion Found., Inc. v. Obama*, 641 F.3d 803, 806 (7th Cir. 2011).

Such supplications, moreover, are not limited to branches of the federal government, including federal courts that begin with the invocation, "God save the United States and this honorable Court"—a "prayer . . . deeply rooted in American history and tradition." *Newdow*, 603 F.3d at 1021 (Kavanaugh, J.).

On Nov. 14, 1793, in the wake of a devastating yellow fever epidemic, Thomas Mifflin, the governor of Pennsylvania, appointed "a Day of general Humiliation, Thanksgiving and Prayer," thanking "Almighty God" for putting "an end to the grievous calamity that recently afflicted the City of Philadelphia." Horace Wemyss Smith, *Life and Correspondence of the Rev. William Smith, D.D.*, 378 (1880), https://tinyurl.com/1793miff (quoting the proclamation issued by the governor).

In 1813, the governor of Massachusetts issued a proclamation of "public fasting, humiliation, and prayer," on account of the country being "involved in a calamitous and threatening war." Governor Caleb Strong, *A Proclamation for Day of Public Fasting, Humiliation, and Prayer*, Merrimack Intelligencer, Feb. 27, 1813, https://tinyurl.com/1813mass.

In 1881, several state governors issued prayer proclamations for the recovery of President Garfield.  Governor T.J. Churchill ET AL., *Prayers for the President*, Bluffton Weekly Chronicle, Sept. 8, 1881, https://tinyurl.com/garfieldpr. In 1890, the mayor of Louisville issued a proclamation designating a "Day of fasting and humiliation in memory of the awful cyclone." *A Day Of Fasting*, Daily Kentucky New Era, Apr. 4, 1990, https://tinyurl.com/lvillcyc.

16

At the end of World War II, on August 14, 1945, the City of Ocala's Mayor thanked "the King of the Universe," declared August 15, 1945 as "a day to set aside for special prayer and thanksgiving," and "urge[d] attendance at the special thanksgiving service Wednesday August 15, 10 a.m. at the civic center." Exhibit 59. This announcement and invitation was published in the Ocala Star Banner on August 14, 1945. *Id*.

More recently, in 1993, the mayor of Denver "organized an interdenominational Day of Prayer" on account of "several youth drive-by shootings a week." *Prayers against violence: Are they powerful or impractical?*, Harlan Daily Enterprise, Dec. 11, 1993, at 13, https://tinyurl.com/denverpray.

In 2001, just days after 9/11, the Mayor of Gadsden, Alabama, "organized" a "prayer vigil" at city hall. Beth Schepens, *Counselors helping local children, parents deal with tragedy*, The Gadsden Times, Sept. 13, 2001, at A7, https://tinyurl.com/gadsen911.

In 2020, elected officials in Louisiana hosted a "Call to Prayer" on the front steps of "Government Plaza" "to join them in prayer for victims of gun violence." *Elected officials to hold prayer vigil in response to gun violence*, Shreveport Times, Sept. 3, 2020, https://tinyurl.com/shrevepr. In 2021, "a long-planned Day of Prayer organized by Mayor Mike Blake" of Cocoa, Florida was held at city hall to pray for unity in the wake of the pandemic and a shooting that left two Cocoa teens dead. J.D. Gallop, *Cocoa city officials hold events Saturday aimed at unifying communities, families*, Florida Today, Feb. 25, 2021, https://tinyurl.com/cocoafla.

These instances exemplify the history and tradition of public prayer in our nation.

## VIII. The Vigil Reflects Our Nation's Tradition of Public Prayer

The challenged prayer vigil in this case falls squarely in line with our nation's longstanding history—on the national, state, and local levels—of offering supplications to the Divine in a time of trial.

Plaintiffs' argument that there is no history of "uniformed police personnel composing or leading prayers" misconstrues *Kennedy*'s "reference to historical practices and understandings." Pl. Br. at 7. What matters is not whether "the **specific** practice challenged" has a "very direct connection, via the First Congress, to the thinking of those who were responsible for framing the First Amendment." *Am. Legion*, 139 S. Ct. at 2088–89 (plurality) (emphasis added) (citing *Town of Greece*, 572 U.S. at 577). What matters is whether the challenged practice "on the whole reflects and embraces our tradition." *Town of Greece*, 572 U.S. at 585.

Analyzing "historical practices and understandings" therefore entails (1) understanding what the Establishment Clause forbids as originally understood, e.g., coercion in religious matters, and (2) a consideration of whether the challenged practice "accords with history and faithfully reflects the understanding of the Founding Fathers." *Kennedy*, 142 S. Ct. at 2428; *see, e.g., Am. Humanist Ass'n v. McCarty*, 851 F.3d 521, 527 (5th Cir. 2017) (rejecting challenge to school board's invocation policy even though "[s]chool-board prayer presumably does not date back to the Constitution's adoption"); *Doe v. United States*, 901 F.3d 1015, 1021 (8th Cir. 2018) (noting that even though "the specific practice of placing 'In God We

Trust' on U.S. money did not begin until 1864 and was not uniform across all currency until almost a century later . . . the practice comports with early understandings of the Establishment Clause as illuminated by the actions of the First Congress.").

In *American Legion v. American Humanist Association*, the Supreme Court did not hold that a large Latin cross World War I monument was constitutional because of evidence that at the time of the founding local governments erected crosses in honor of their war dead (indeed, there was no evidence cited by the Court that this was the case). 139 S. Ct. at 2087 (plurality). In addition to other features, the Court "look[ed] to history for guidance" and discussed, by way of example, "cases involving prayer before a legislative session." *Id*.[15]

If the First Congress's institution of legislative prayer can support the permanent display of a large cross, "undoubtedly a Christian symbol," *Am. Legion*, 139 S. Ct. at 2090, on public land, it more firmly supports the prayer vigil challenged here, especially where the City did not dictate the contents of any prayers, coerce anyone into participating, and where the only person associated with the City who prayed was a volunteer chaplain(s).

Similarly, in *Lynch v. Donnelly*, the Supreme Court did not hold that a nativity scene was constitutional because of evidence of governments erecting nativity scenes at the time of the founding. 465 U.S. at 676. It did so, in part, because

---

[15] In his concurrence in the judgment, joined by Justice Thomas, Justice Gorsuch explicitly agreed with the plurality's reliance on a historical approach (including legislative prayer) in demonstrating that "the monument before us is constitutional in light of the nation's traditions." *Am. Legion*, 139 S. Ct. at 2101–2102 (Gorsuch, J., concurring in the judgment) ("I agree with all this").

the "Government has long recognized—indeed it has subsidized—holidays with religious significance." *Id.* The Court also pointed to the national motto, the Pledge of Allegiance, Congressional chapels, as well as "countless other illustrations of the Government's acknowledgment of our religious heritage and governmental sponsorship of graphic manifestations of that heritage." *Id*. at 676-677.

In sum, under *Kennedy* and other cases, the issue is not whether officials at the time of the founding engaged in the very same activity that Plaintiffs challenge here. The issue is whether the vigil "accords with," "reflects," or "fits within the tradition" of legislative or governmental prayer. It surely does. "It is now well established that public, government-sponsored prayer has long enjoyed a place in American life." *Freedom from Religion Found., Inc. v. Mack*, 49 F.4th 941, 950 (5th Cir. 2022) (citing *Town of Greece*, 572 U.S. at 575)).

The vigil was not organized to pray for the sake of worship. It was organized by a minister (who also served as a volunteer police chaplain) and a community activist in response to a spree of shootings that resulted in injuries to two young children and an infant. There is no dispute that city officials encouraged the public to attend this event to bring the community together at a time of crisis.

There is also no dispute that at the event itself, approximately ten people were on the stage during the vigil, including a mixture of volunteer police chaplains and community leaders. The police chief and mayor attended the vigil, but neither of them addressed the crowd. Words of prayer and encouragement were given from the stage. Songs were also sung; although the record includes

mention of only one, "God Bless America." No on-duty, uniformed police officers nor city officials spoke or led prayer on the stage during the vigil.

The City "neither reviewed the prayers in advance of the [vigil] nor provided guidance as to their tone or content." *Town of Greece*, 572 U.S. at 571. No city official is responsible for how the attendees at the event responded (whether by saying "amen" or "hallelujah" in response) and whether the attendees were Christian or not, or religious or not. Indeed, the self-described atheist Plaintiffs attended the event themselves.

Contrary to Plaintiffs' arguments, there is nothing amiss about prayers at the vigil being directed to those who chose to attend the vigil. Pl. Br. 10-11. There was nothing captive about the audience. Participation at the vigil was voluntary, by those who "find these prayers meaningful and wish to join them," and "without denying the right to dissent by those who disagree." *Town of Greece*, 572 U.S. at 588 (Kennedy, J.). The reason the audience is a factor in cases such as *Town of Greece* is because the principal reason persons attend a town council meeting, for example, is to participate in or witness the legislative and ceremonial duties of the council, not to observe or participate in prayer.

Even still, in *Mack*, the Fifth Circuit upheld against an Establishment Clause challenge a Texas Justice of the Peace who opens his court with a ceremony that includes a prayer—despite the facts that the bailiff instructs the "audience members to stand and bow their heads during the prayer," and that some prayers have included "the audience in supplication," *e.g.*, "**we** come to you today to ask that you help **us**." 49 F.4th at 946 (emphasis in original). In addition, National Day

of Prayer Proclamations are aimed at the public at large (indeed, from the highest executive authority in the land), as well as prayers at the inaugurations of presidents. The religious affirmation of the national motto, "In God We Trust," is forthrightly and publicly stated on our national currency. If the prayers at the vigil were offered in the middle of a city council meeting, where non-religious attendees had no option but to hear them, this would be a different case.

Plaintiffs' assertion that "the City favors the evangelical flavor of Protestantism" is without merit. Pl. Br. at 12. How the private ministers chose to pray at the vigil was up to them.[17] Nothing in the record indicates that city officials screened which ministers would participate in the event to exclude anyone of any religion; nor did they screen what ministers would say. In fact, when a self-identified atheist contacted the OPD, Chief Graham offered to put him in contact with the minister organizing the event and encouraged the individual to participate, writing in his email "if you would like to say a few words I know that the minister that is organizing the event will assist you." Doc. 52-8 (Ex. 4). Absolutely no evidence was presented by Plaintiffs demonstrating that they, or anyone else, were prevented from helping plan or even speak at the vigil.

The Supreme Court has instructed that the "content of the prayer is not of concern to judges." *Town of Greece*, 572 U.S. at 581 (citation omitted). "Once it invites prayer into the public sphere, government must permit a prayer giver to

---

[17] Once the City opened the forum of the vigil to the ministers who wished to speak, it would have violated the First Amendment for the City to restrict their religious viewpoint. *See, e.g.*, *Shurtleff*, 142 S. Ct. at 1583 (city violated First Amendment in not allowing a private group to fly the Christian flag on a city-owned flagpole where other groups were permitted to fly flags of their choice).

address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian." *Id*. at 582.

Obviously, "[i]f the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion," such would not be permissible. *Id*. at 583. That is not the case here. Not only was the vigil a one-time event, Plaintiffs point to nothing in the record showing that the ministers denigrated anyone, threatened damnation, or preached conversion to any religious sect.

Prayer is undoubtedly a religious activity, as Plaintiffs say, Pl. Br. at 14—just like the prayers at issue in *Marsh*, *Town of Greece*, and *Kennedy*. But the City here did not "prescribe[] prayers to be recited," *id*.; compel or restrict "belief or disbelief," or any "expression in action of that belief or disbelief," *id* at 13; or "proscribe[] or prescribe[]" any tenet of religious faith, *id*.

Contrary to Plaintiffs' invocation of the "wall between church and state," Pl. Br. at 6 and 7, "[i]t has never been thought either possible or desirable to enforce a regime of total separation . . . ." *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 760 (1973).[18] Indeed, the Constitution does **not** "require complete separation of church and state." *Lynch*, 465 U.S. at 673. None of the actions of City officials—from its limited role in expressing support for the event to its limited role in the event itself—violated "[t]he clearest command of the Establishment Clause . . . that one religious denomination cannot be officially preferred over

---

[18] For a detailed discussion of Jefferson's wall metaphor, and its being "twisted out of historical context," *see Kondrat'Yev*, 903 F.3d at 1194–1196 (Royal, J.).

another." *Trump v. Hawaii*, 138 S. Ct. 2392, 2417 (2018) (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1981) (internal quotations omitted).

The City's suggestion that the vigil brought about the very ills the Framers intended to prevent with the Establishment Clause ("strife, division, discrimination, and coercion") falls flat. Pl. Br. at 15. There is no evidence in the record that the vigil was anything but a peaceful affair, even with protestors present. There is no evidence in the record that City officials intentionally excluded anyone of any faith (or no faith at all) from participating. There is no evidence that anyone, including Plaintiffs, was coerced—to any degree whatsoever—into participating in the vigil, altering their religious beliefs, or penalized for objecting to the vigil.

Plaintiffs point out that the vigil elicited "dozens of comments from citizens, both for and against" the event. Pl. Br. at 17. But citizens expressing opinions to their elected leaders regarding government action or inaction is hardly a unique phenomenon, and a heckler's veto is insufficient to demonstrate an Establishment Clause violation. *Kennedy*, 142 S. Ct. at 2427. In any case, negative comments made in emails and on Facebook about the vigil are a far cry from the "[t]orrents of blood" shed in efforts to establish a state religion. J. Madison, Memorial and Remonstrance Against Religious Assessments, reprinted in *Everson v. Bd. of Ed. of Ewing*, 330 U. S. 1, 69 (1947) (app. to dissent of Rutledge, J.).[19]

---

[19] During the crisis of the War of 1812, President James Madison issued a proclamation on July 23, 1813, stating: "in times of public calamity, such as that of the war . . . it is especially becoming that . . . the eyes of all be turned to that Almighty Power, in whose hand are the welfare and the destiny of nations." James Madison, Presidential Proclamation (July 23, 1813) https://founders.archives.gov/documents/Madison/03-06-02-0434.

Where the Establishment Clause is at issue, "the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow." *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 308 (1963) (Goldberg, J., concurring). Here, we have only the dimmest of shadows. The City's actions are consistent with the Establishment Clause because they did not "establish[ ] a religion or religious faith, or tend[ ] to do so." *Lynch*, 465 U.S. at 678.

In fact, the Supreme Court has refused to construe the Establishment Clause so as to "press the concept of separation of Church and state to . . . extremes" by invalidating "references to the Almighty that run through our laws, our public rituals, [and] our ceremonies." *Zorach v. Clauson*, 343 U.S. 306, 313 (1952). As Justice Kennedy put it, "[g]overnment policies of accommodation, acknowledgment, and support for religion are an accepted part of our political and cultural heritage," and "the Establishment Clause permits government some latitude in recognizing and accommodating the central role religion plays in our society." *City of Allegheny v. ACLU*, 492 U.S. 573, 657 (1989) (Kennedy, J., concurring in part and dissenting in part). "Any approach less sensitive to our heritage would border on latent hostility toward religion, as it would require government in all its multifaceted roles to acknowledge only the secular, to the exclusion and so to the detriment of the religious." *Id.*

## CONCLUSION

For the foregoing reasons, Defendant City of Ocala respectfully asks the Court to deny Plaintiffs' motion for summary judgment and to grant its cross-motion for summary judgment.

Respectfully submitted, this 15th day of August 2023,

<div style="margin-left: 40%;">

s/ Abigail Southerland
Abigail A. Southerland (*admitted pro hac vice*)
American Center for Law & Justice
625 Bakers Bridge Ave,
Suite 105-121
Franklin, TN 37067
Telephone: 800-296-4529
asoutherland@aclj.org

Geoffrey R. Surtees (*admitted pro hac vice*)
American Center for Law & Justice
P.O. Box 60
New Hope, KY  40052
Telephone: 502-549-7020
gsurtees@aclj.org

Patrick G. Gilligan, Esq.
Florida Bar No. 375454
Gilligan, Anderson & Phelan, P.A.
1531 SE 36th Avenue,
Ocala, FL 3447
Telephone: 352-867-7707
pgilligan@ocalalaw.com

*Counsel for Defendant*

</div>

## INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit 54 | Doc. 52-4 - Edwards Declaration |
| Exhibit 55 | Doc. 52-7 - DOJ Community Policing |
| Exhibit 56 | Doc. 52-8 – Email exchange b/t Graham and Tjaden |
| Exhibit 57 | Doc. 52-17 - Daniel Hale Deposition |
| Exhibit 58 | Doc. 52-19 - Porgal Deposition |
| Exhibit 59 | Declaration of Kent Guinn re August 14, 1945, newspaper article |

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2023, the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail.  Parties may access this filing through the Court's electronic filing system.

s/ Abigail A. Southerland
Abigail A. Southerland