## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

ART ROJAS and LUCINDA HALE,

     Plaintiffs,

                                       Case No. 5:14-cv-651-TJC-PRL

v.

CITY OF OCALA,

     Defendant.

_____

## **O R D E R**

### I.   **PROLOGUE**

This is a case about whether the City of Ocala violated the Establishment Clause of the First Amendment in the way it conducted a prayer vigil in the town square. In 2018, the Court ruled in favor of Plaintiffs, who are atheists. Rojas v. City of Ocala, 315 F. Supp. 2d 1256 (M.D. Fla. 2018). The Court's opinion and the parties' briefs all relied on the Lemon test (adopted in Lemon v. Kurtzman, 403 U.S. 602 (1971)) which was abrogated by Kennedy v. Bremerton Sch. Dist., 597 U.S. 507 (2022), while the appeal of the Court's decision was pending. Accordingly, the Eleventh Circuit vacated and remanded with instructions to apply the "historical practices and understandings" standard articulated in Kennedy. Rojas v. City of Ocala, 40 F.4th 1347, 1352 (11th Cir. 2022). In the meantime, the Chief of Police, Greg Graham, passed away; the Mayor of Ocala at the time left office; and the Prayer Vigil (which

occurred in 2014) has not been repeated. Thus, the Court inquired whether it would make sense to call it a day on this timeworn litigation. But the parties, both represented by lawyers who specialize in First Amendment religion cases, insist on going forward. And, as the Court previously awarded nominal damages, the case is not moot. <u>Uzuegbunam v. Preczewski</u>, 141 S. Ct. 792, 796 (2021).[1] So on we go.

The parties have now filed new briefs on cross-motions for summary judgment, Docs. 145–48, and the Court held oral argument on February 9, 2024, Doc. 154, the record of which is incorporated by reference.

This opinion is the Court's effort to address the impact of <u>Kennedy</u> on this case. Parts of this opinion repeat or resemble portions of the Court's prior opinion, but there are also revisions reflecting further briefing, argument, and legal developments.[2]

---

[1] There is also no indication in the Eleventh Circuit's decision that it viewed the case as moot.

[2] The only remaining defendant is the City of Ocala. <u>Rojas v. City of Ocala</u>, 40 F.4th 1347, 1349 n.1 (11th Cir. 2022). In earlier briefings, the City contended summary judgment was proper because there was no basis to find municipal liability. Doc. 52 at 24–27. This argument was addressed in the Court's prior opinion, has not been raised again, and is therefore not addressed here. Similarly, there is no discussion here about punitive damages because those claims have been dropped/abandoned.

2

## II.    INTRODUCTION

When the City of Ocala experienced a violent crime-spree in the late summer and early fall of 2014, its police department sought to curtail the violence using all available means. As part of those efforts, Chief of Police Kenneth Gregory "Greg" Graham met with members of Ocala's faith-based community to seek their assistance. What resulted was an invitation from Chief Graham to the community, promoted on the Ocala Police Department Facebook page and elsewhere, encouraging everyone's attendance at a "Community Prayer Vigil" on September 24, 2014, in the Downtown Square. Several atheists, including Plaintiff Lucinda Hale, contacted Chief Graham and Ocala's then-mayor, Reuben "Kent" Guinn, in advance of the Prayer Vigil, advising them of their concern that the City's promotion and sponsorship of a prayer vigil would violate the First Amendment. They were rebuffed, the Prayer Vigil took place, and this lawsuit followed.

## III.    UNDISPUTED FACTS

In September 2014, the Ocala Police Department pursued various means to try to apprehend individuals responsible for a shooting spree that left several children injured. Graham Dec. I[3] ¶¶ 5–6 (Doc. 52-1). The police knew who the

---

[3] As used herein, "Dec." is a citation to a declaration (Graham prepared two declarations, denoted here as "Dec. I" and "Dec. II"), "Depo." is a citation to a deposition, with citation to a page in a deposition transcript (using the Page

shooters were but could not persuade witnesses to come forward to testify. Graham Depo. at 21 (Doc. 54-10). These efforts included meeting with local NAACP leaders, who suggested to Chief Graham that the police reach out to the local faith-based community for help in convincing witnesses to cooperate. Graham Dec. I ¶ 7 (Doc. 52-1). Heeding that suggestion, Chief Graham held a meeting at the Ocala Police Department on September 17, 2014, and invited: Captain Richard Edwards, the District Commander of the area where most of the trouble was occurring; Officer Mary Williams, who assisted Captain Edwards with community events in the area; Captain Carmen Sirolli, who was in charge of the division investigating the shootings; Major Dennis Yonce, to whom Sirolli reported; Hugh Brockington, an Ocala Police Department Chaplain; Edwin Quintana, another Ocala Police Department Chaplain; and Narvella Haynes, a community activist who lived in the area where the crimes occurred and who had previously assisted the police with community outreach. Graham Depo. at 19–21 (Doc. 54-10). Chaplains Brockington and Quintana were invited because they were police chaplains. See id. at 20.

---

ID from the CM/ECF header; some of the transcripts are missing pages so the court reporter's page number and the CM/ECF header page are not always aligned); "Aff." is a citation to an affidavit; "Int. Resp." is a citation to an Interrogatory Response.

The purpose of the meeting was to develop ideas about how "to get the ministers in that area to lean on, talk to, encourage witnesses to come forward" so the police could hold the perpetrators accountable. Graham Depo. at 21 (Doc. 54-10). Chaplain Quintana suggested that a prayer vigil or similar event on Ocala's public Downtown Square might bring the faith-based community together to get the word out and encourage people to cooperate. Graham Dec. I ¶¶ 10–11 (Doc. 52-1); Graham Depo. at 23 (Doc. 54-10). Chief Graham "thought it was a great idea" and said, "Let's do it." Graham Depo. at 23 (Doc. 54-10). Chief Graham then left the meeting, and Chaplain Quintana and Ms. Haynes (with some assistance from Captain Edwards) began planning the vigil, creating a letter for Chief Graham's and Ms. Haynes' signatures that invited the community to participate in the Prayer Vigil.[4] Graham Dec. I ¶¶ 10–11

---

[4] On September 18 (the day after the meeting), Chief Graham sent an email to Captain Edwards and Quintana (but not Haynes) saying that due to feedback from ministers, Wednesday was not the best night for the Vigil, "[w]e are going to have the vigil on Thursday night instead of Wednesday." Doc. 54-21 (marked Ex. 5). By September 19, the Police Department was preparing for the vigil to occur on Wednesday, September 24. See Doc. 54-24 (marked Ex. 8) (9/19/2014 email from Ocala Police Department employee announcing the Prayer Vigil for September 24). Although Chief Graham and Chaplain Quintana signed declarations stating the Prayer Vigil occurred on September 25 (see Graham Dec. I ¶ 22 (Doc. 52-1); Quintana Dec. ¶ 9 (Doc. 52-3)), it appears they were simply mistaken. Contemporaneous news stories, emails, and social media postings in the record confirm the Prayer Vigil took place on Wednesday, September 24, 2014. See, e.g., Doc. 54-19 at Page ID 1389 (marked Ex. 3) (9/24/2014 social media posting with photos of the vigil); Doc. 54-72 at Page ID 1613, 1617 (marked Ex. 56) (9/24/2014 emails from reporters to the Ocala Police

(Doc. 52-1); Haynes Dec. ¶¶ 7, 9 (Doc. 52-2); Quintana Dec. ¶¶ 5−6 (Doc. 52-3). Chief Graham read the letter and directed an Ocala Police Department Sergeant to post it on the Ocala Police Department's Facebook page; Ms. Haynes and the Chaplains encouraged members of the community to attend the Prayer Vigil. Graham Dec. I ¶ 11 (Doc. 52-1); Graham Depo. at 31, 58 (Doc. 54-10); Graham's Int. Resp. Nos. 1−2 (Doc. 54-6); Haynes Dec. ¶ 8 (Doc. 52-2), Quintana Dec. ¶ 7 (Doc. 52-3). Chief Graham agreed that by posting the letter on the Ocala Police Department Facebook page, he was "promoting" the Prayer Vigil. Graham Depo. at 50 (Doc. 54-10).

Printed on Ocala Police Department letterhead (with the image of the Ocala Police Department badge, OCALA POLICE DEPARTMENT at top, and Department address and phone number at bottom), the text of the letter read:

> Blessings to all our citizens, specifically Pastors, Community Leaders, Parents and our precious youth.
>
> We are facing a crisis in the City of Ocala and Marion County that requires fervent prayer and your presence to show unity and help in this senseless crime spree that is affecting our communities.
>
> Within the last 30 days we have had numerous shootings that have resulted in two children and an infant being hit by bullets.
>
> Stray bullets do not have respect for addresses, social status, economic status, educational background, political status and the

---

Department referencing "tonight's" Prayer Vigil); Doc. 54-73 at Page ID 1624 (9/24/2014 9:08 p.m. story on Ocala.com about that evening's Prayer Vigil).

list goes on. But my point is none of us are exempt from stray bullets.

I am urging you all to please support a very important "Community Prayer Vigil" that will be held this coming Wednesday, September 24, 2014 at 6:30 pm to be held at our Downtown Square located in the heart of the City.

Please support peace and this appeal for unity on this very important "Community Prayer Vigil" coming this next Wednesday. We need you.

The letter was signed with "Blessings and Highest Regards" by Greg Graham, as Chief of Police, and Ms. Haynes. See Doc. 1, Ex. A. Here is an image of the letter:



## OCALA POLICE DEPARTMENT

Blessings to all our citizens, specifically Pastors, Community Leaders, Parents and our precious youth.

We are facing a crisis in the City of Ocala and Marion County that requires fervent prayer and your presence to show unity and help in this senseless crime spree that is affecting our communities.

Within the last 30 days we have had numerous shootings that have resulted in two children and an infant being hit by bullets.

Stray bullets do not have respect for addresses, social status, economic status, educational background, political status and the list goes on. But my point is none of us are exempt from stray bullets.

I am urging you all to please support a very important "Community Prayer Vigil" that will be held this coming Wednesday, September 24, 2014 at 6:30 pm to be held at our Downtown Square located in the heart of the City.

Please support peace and this appeal for unity on this very important "Community Prayer Vigil" coming this next Wednesday.  We need you.

Blessing and Highest Regards,

Greg Graham
Chief of Police

Narvella Haynes

402 S. PINE AVENUE • OCALA, FL 34471-1174 • (352) 369-7000

Ocala Police Department personnel created a separate flyer about the vigil which depicted a photo of the gazebo covered stage in the Downtown Square with an image of praying hands in one corner and the Ocala Police Department logo in the opposite corner, and the words "Community Prayer Vigil Wednesday, September 24, 2014 6:30 p.m. Ocala/Marion County is in

8

crisis! Help Stop The Violence! Join us downtown on the square." Doc. 54-22 at 7 (marked Ex. 6). Chief Graham's letter and an earlier version of the flyer (created before the Ocala Police Department logo was added) were sent to Ms. Haynes by Officer Williams on September 19. Doc. 54-23 (marked Ex. 7).[5] Chief Graham stated he was unaware of the existence of the flyer. Graham Dec. II ¶ 4 (Doc. 68-1).

Here is an image of the flyer:



_____

[5] It is unclear how the flyer was distributed to the public. See Rojas, 315 F. Supp. 2d at 1266, n.3.

Chaplain Quintana invited several local clergymen to participate in the vigil and sent an email to the Ocala Police Chaplains (copying Chief Graham)[6] telling them Chief Graham had asked Chaplain Quintana to ask all the Chaplains to be present at the vigil and to come wearing their Police Chaplain uniforms.[7] Quintana Dec. ¶¶ 7, 8 (Doc. 52-3); Doc. 54-26 (marked Ex. 10) (9/22/2014 email to Chaplains from Chaplain Quintana, copying Graham).

Soon after the vigil was advertised, several citizens, including some of the original plaintiffs, contacted Chief Graham and Mayor Guinn, expressing concern that a prayer vigil organized by a police department would violate the U.S. Constitution. See, e.g., Doc. 52-9 at 3–4 (9/20/2014 6:03 p.m. email); Doc. 54-51 at 2 (marked Ex. 35) (9/22/2014 5:14 p.m. email). Initially, Chief Graham's responses tended to take ownership of the Prayer Vigil, saying, for example, "I have no intention of canceling the event," Doc. 54-40 at 4 (marked Ex. 24)

---

[6] At his deposition, Chief Graham, appearing on his own behalf and as the City's 30(b)(6) representative, testified that he did not recall directing Quintana to have the Chaplains attend and to do so in uniform and thought it more likely that he simply agreed to Quintana's recommendation to do so. Graham Depo. at 13, 37–38 (Doc. 54-10). The City's Interrogatory Responses say the Ocala Police Department did not ask the Ocala Police Chaplains to have any involvement in the vigil but they did so of their own initiative. City Int. Resp. No. 8. (Doc. 54-5).

[7] Quintana's declaration states he "asked other police chaplains to attend the vigil and to wear their uniforms. I let Chief Graham know this was my intention, but he did not instruct that we be there or that wear our uniforms." Doc. 52-3, ¶ 8.

10

(9/22/2014 4:05 p.m. email), and "[t]his 'vigil' is not the only strategy that we [the Police Department] are employing to fight crime in Ocala" and explaining that the purpose of the vigil was for the Police Department to engage the faith-based community to help make the community safer. Doc. 52-9 at 3 (9/21/2014 2:43 p.m. email). As Chief Graham responded to one supporter who wrote to him with the subject line "Stand tall on prayer!":

> Thanks for the encouraging words. I have been getting quite a few responses from people, mostly from out of our area, who oppose this. I have no intention on calling this gathering off nor changing my personal belief on the power of prayer.
>
> Take care and I hope to see you on Wednesday.

Doc. 54-55 (marked Ex. 39) (9/22/2014 3:55 p.m. email).

Soon thereafter, however, Chief Graham began to distance himself and his Department from the vigil, responding that the vigil was a community event he could not stop and over which he had no control. For example, on September 23, 2014, he wrote to one citizen with whom he had been corresponding about the meaning of the Establishment Clause, "I think you are misunderstanding my role in this event. I am not leading the event, I am not speaking at the event, I will be in attendance at the event." Doc. 54-49 at 5 (marked Ex. 33-B) (9/23/2014 4:07 p.m. email). He further wrote that he knew the minister who was organizing it and could put the citizen in touch in case he wanted to attend "and say a few words." Id. To another citizen, he wrote:

11

I am not sure if I have been clear in any of my prior emails to you that this event tonight is a "Community Prayer Vigil" not an Ocala Police Department or City of Ocala Prayer Vigil and as such I have no say in whether it gets canceled or not. I have indicated to several others that I have no intent on canceling the event and should have expanded my thoughts. If I were to try and cancel this event I would be violating the Constitution by preventing people from gathering and exercising their right to free speech.

Doc. 54-40 at 6 (marked Ex. 24-C) (9/24/2014 2:48 p.m. email from Graham); see also Doc. 54-50 (marked Ex. 34) (9/24/2014 1:27 p.m. email from Graham) ("I am not attacking your rights as an American to freedom of religion, I am upholding others['] rights to express themselves . . . this is not a City of Ocala or Ocala Police Department Prayer Vigil, it is a Community Prayer Vigil and as such I have no say in canceling the event").

Although there is no evidence that Mayor Guinn was part of planning the Prayer Vigil, once he learned about it, he readily embraced it as a government-sponsored event, responding to a citizen's complaint about what the citizen perceived to be the Police Chief's endorsement of religion: "I think this is great. I'll be sure to praise him [Chief Graham] for it." Doc. 54-49 at 3 (marked Ex. 33) (9/19/2014 10:55 p.m. email from Mayor Guinn to citizen, copying Chief Graham). Mayor Guinn wrote to Chief Graham about the Prayer Vigil two days later, stating: "As I told you I think this is a great idea and have been responding to the atheist groups that are writing me about it. I put it on my calendar to be there," but telling Chief Graham that next time he does "things

12

like that" to let the Mayor know so he doesn't find out from his "church and . . . random emails." Doc. 54-25 at 2 (marked Ex. 9) (9/21/2014 12:33 p.m. email from Mayor Guinn to Chief Graham). The next day, Mayor Guinn wrote to a protesting citizen who had urged the Mayor to show leadership in addressing Chief Graham's violation of the First Amendment, saying,

> I'm proud to stand by my Chief and support him. <u>Times like this do test leadership and that's why we're leading the community in this Prayer Vigil.</u> Yes we have heard from folks like you who don't understand the constitution. We are doing absolutely nothing wrong.

Doc. 54-51 (marked Ex. 35) (9/22/2014 6:43 p.m. email from Mayor Guinn to citizen, copying Chief Graham) (emphasis added). Mayor Guinn responded to another citizen's concern about the Prayer Vigil:

> Thanks for your interest in our community. <u>There is nothing in the constitution to prohibit us from having this vigil. Not only are we not canceling it we are trying to promote it and have as many people as possible to [sic] join us.</u> We open every council meeting with a prayer. And we end the prayer in Jesus name we pray. Our city seal says "God be with us" and we pray that he is and us with him.

Doc. 54-44 at 2 (marked Ex. 28-A) (9/22/2014 10:24 a.m. email from Mayor Guinn to citizen, copying Chief Graham and a pastor and employee of Mayor Guinn's church ) (emphasis added); <u>see</u> Guinn Int. Resp. No. 19. (Doc. 54-7).

Even after the vigil, the Mayor continued to applaud the effort, appearing in media outlets to discuss this lawsuit and the vigil. <u>See</u> Doc. 61-1 (marked Ex. 64) (Fox News Insider article, "It's Happening to Me in My Community":

Atheists Sue Mayor Over Prayer Vigil, Nov. 29, 2014). And at his June 2016 deposition the Mayor maintained his position, as reflected in the following testimony:

> Q:   Can the police chief be allowed to make the public announcement on [Ocala Police Department] letterhead, stating that people should believe in God?
> A:   Yes.

> Guinn Depo. at 87 (Doc. 54-11).

> Q:   [A]s far as you're concerned, if the police chief wants to put out something on letterhead saying that you should believe in God or that you should believe in Jesus, that's fine?
> A:   He can do that.

> Id. at 90.

> Q:   So as far as you're concerned, they [the Ocala Police Department] could have another vigil such as that one next week if they wanted to?
> A:   Sure.
> Q:   And the chief could post another letter saying that there is something that requires fervent prayer in the city?
> A:   Yes.

> Id. at 134.[8]

---

[8] The City has also maintained this position in this case. In response to a hypothetical of very similar facts at the hearing, including that the Chief of Police put together a prayer vigil asking the community to come together as one effort to combat crime, and the Chief's staff plans the prayer vigil, which includes uniformed chaplains on stage speaking and/or praying, the City said this would be permissible and not a violation of the Establishment Clause. Doc. 155 at 31–33.

The Prayer Vigil became a matter of public debate in Ocala, with citizenry voicing opinions both for and against it on social media, in communications to Chief Graham and Mayor Guinn, and in local news outlets. For example, one person wrote on the Ocala Police Department's Facebook page: "why are the police asking us to pray? will they arrest us if we don't pray?" Doc. 54-18 at 4 (marked Ex. 2). Plaintiffs contacted counsel for The American Humanist Association (now representing plaintiffs here) who urged Chief Graham to remove the Prayer Vigil letter from the Ocala Police Department Facebook page on the grounds that it was an unconstitutional government endorsement of religion. Doc. 54-46 at 2 (marked Ex. 30-A) (9/21/2014 10:47 a.m. email from David Niose to Graham). Chief Graham responded that his efforts were upholding the rights of others to assemble and that taxpayer funds were used only to the minimal extent that Chief Graham wrote the letter and printed it on Department letterhead. Doc. 54-46 at 3 (marked Ex. 30-B) (9/21/2014 10:57 a.m. email from Chief Graham to Niose).

The day before the Prayer Vigil, Captain Edwards sent an email to Chief Graham, Chaplain Quintana and Ms. Haynes, copying an Ocala Police Department officer, asking whether they should secure an indoor location as an alternative in case of rain. Doc. 54-28 at 2 (marked Ex. 12). Chaplain Quintana's suggestion was that the vigil should take place on the Square regardless of the

15

weather: "Nothing should stop, hinder or prevent from [sic] fervent prayer," proposing they "[k]eep it to 15-20 minutes of PRAYER only." Id. at 3 (capitalization in original). In response, Captain Edwards stated "[w]e are a few making a decision for many . . . ." Id.[9] Captain Edwards sent an email to an Ocala Police Department Major on September 23, saying he would be "mentioning" the Prayer Vigil at an upcoming staff meeting, Doc. 54-29 (marked Ex. 13), and the following day he emailed an Ocala Police Department Captain to say he might not make it to a meeting because he was "working on getting this Prayer Vigil set up." Doc. 54-30 (marked Ex. 14).

---

[9] The City states

[i]t remains unclear how much of Edwards' activities, i.e., emailing with Haynes and Quintana regarding a date for the vigil and helping coordinate details regarding the vigil were conducted in his official capacity or individual capacity. Nonetheless, these activities would have not been out of the ordinary pursuant to Ocala Police Department's custom and practice relating to public events held in the downtown square. It is undisputed that the OPD followed a nationally recognized method for fighting crime known as community policing . . . .

Doc. 146 at 2–3, n.2. Captain Edwards' declaration states he attended meetings as an Ocala Police Department Captain to address the shooting spree. Doc. 52-4 ¶4. He understood the Prayer Vigil to be a community event which he attended as a private citizen. Id. Captain Edwards agreed to help with the Prayer Vigil by making meeting space available to the organizers. Id. ¶5. He does not claim this assistance was as a private citizen. See id.

The Prayer Vigil took place on September 24, 2014, in the Ocala Downtown Square, a public space where meetings, rallies, assemblies and other public and privately sponsored events occur. Graham Dec. I ¶ 22 (Doc. 52-1); see supra note 4. Chief Graham and Mayor Guinn both attended the Prayer Vigil, but neither addressed the crowd.[10] Graham Int. Resp. No. 1 (Doc. 54-6); Guinn Int. Resp. No. 15 (Doc. 54-7). Approximately ten people were on the stage during the Prayer Vigil, including four uniformed Ocala Police Chaplains, Quintana, Brockington, Gans, and Lenon; one off-duty Ocala Police Department employee not in uniform, Captain Edwards; and five faith and/or community leaders. Graham's Int. Resp. No. 3 (Doc. 54-6). Chief Graham said he did not know in advance what any speaker planned to say, but his recollection is that those who did speak either prayed or sang. Graham Dec. I ¶ 16 (Doc. 52-1); Graham Dec. II ¶ 5 (Doc. 68-1); Graham Depo. at 139–40 (Doc. 54-10). He did not hear any non-Christians speak at the Prayer Vigil and the crowd appeared to be predominately Christian. Graham Depo. at 96–99, 144–45 (Doc. 54-10). Mayor Guinn knew most of the Ocala Police Department Chaplains by name, but he had no recollection as to who spoke. Guinn Depo. at 27–28 (Doc. 54-11).

---

[10] In addition to Chief Graham, other uniformed police officers attended the Prayer Vigil to engage with the crowd and provide security, consistent with the Department's regular practice of having officers present at public downtown gatherings. Graham Dec. I ¶ 26 (Doc. 52-1).

Mayor Guinn estimated that 500–600 people attended the Prayer Vigil. Id. at 108. Chief Graham said the vigil lasted for about an hour and "[t]here were a lot of people there," "definitely more than 100." Graham Depo. at 139, 149 (Doc. 54-10).[11] Chief Graham spent his time "engaging people in the crowd, talking to them" and "attempt[ing] to enlist their help with the crime spree." Id. at 140; Graham Dec. I ¶ 21 (Doc. 52-1).

Plaintiff Lucinda Hale and Daniel Hale,[12] who lived in Marion County, had visited the Downtown Square on a number of previous occasions, such as to visit the farmer's market. L. Hale Depo. at 31 (Doc. 54-15). The Hales heard about the Prayer Vigil when someone told them about the Ocala Police Department Facebook posting, which they then viewed. D. Hale Depo. at 7 (Doc. 54-14); L. Hale Depo. at 9 (Doc. 54-15). The Facebook posting discussed the crisis of crime affecting citizens of Ocala and Marion County, and Ms. Hale agreed that crime creates a negative environment for all citizens, but she felt that the message inviting everyone to the Prayer Vigil did not include her or

---

[11] Plaintiffs' original brief suggested that if this was not a city-sponsored event, the organizer would have been required to seek a permit (which was not issued here), but the record is murky as to the permit requirements. See Graham Depo. at 70–74 (Doc. 54-10).

[12] Mr. Hale and Ms. Porgal, identified infra, were plaintiffs in this case before they died. Docs. 69, 72, 120, 121. Their uncontested sworn observations are relevant evidence about material facts which the Court may consider as part of the summary judgment record.

18

others who do not pray. L. Hale Depo. at 17−19 (Doc. 54-15). Mr. Hale engaged in email correspondence with the Mayor in advance of the vigil, expressing regret for the crime spree and applauding Chief Graham for his attempts to curb crime, but explaining that the vigil invitation violated the Establishment Clause and suggesting that the City promote a different rally encouraging people to come forward with ideas about how to stop crime. D. Hale Dep. at 17-18, 53 (Doc. 54-14, emails are Doc. 54-45).

The Hales attended the Prayer Vigil and described it as similar to a Christian tent revival. D. Hale Depo. at 29, 47−48 (Doc. 54-14); L. Hale Depo. at 22–23 (Doc. 54-15). Ms. Hale stated she was concerned about alleviating crime, which was the purported purpose of the Prayer Vigil, but felt unable to participate in any part of what actually transpired. L. Hale Int. Resp. No. 8 (Doc. 54-3). Mr. Hale did not observe any speaker encourage people to come forward with ideas about how to stop crime. D. Hale Depo. at 53 (Doc. 54-14). Mr. Hale recalled at least one speaker was introduced from the stage as an Ocala Police Department Chaplain. Id. at 43–44. He said he observed uniformed police officers participating in the Prayer Vigil by being part of a circle of people praying, bowing heads, and holding hands. Id. at 29–30. Mr. Hale spoke with Chief Graham at the vigil, and they discussed the possibility of Hale doing

volunteer work with the Ocala Police Department. Id. at 35, 54. Mr. Hale feels it is everyone's responsibility to better the community. Id. at 54.

Plaintiff Art Rojas, who lived and worked in Ocala, attended the Prayer Vigil, which he described as being "essentially a Christian revival" that was "not a comfortable place for non-believers" and caused anyone present to feel "some pressure to participate and show approval," lest they be seen as "publicly opposing the police." Rojas Int. Resp. Nos. 14, 15 (Doc. 54-1). Rojas said he attended the vigil to see if there was going to be a violation of the Establishment Clause. Rojas Depo. at 31 (Doc. 54-12). Rojas wished for his community to be more inclusive and hoped future events involving his government would include all of Ocala's citizens, not only Christians. Id. at 37. Rojas thought the Police Department should represent everyone, but by involving itself in the Prayer Vigil, it did not represent him. Id. at 25−26.

Frances Jean Porgal attended the vigil and, like Mr. Hale, recalled at least one speaker was introduced from the stage as an Ocala Police Department Chaplain. Porgal Depo. at 32 (Doc. 54-13). Ms. Porgal observed "[p]olice representatives spent no time discussing the crimes that had recently occurred," or "requesting assistance" from the community, or urging people to

come forward with information; instead, speakers prayed, preached, and sang.[13] Porgal Int. Resp. No. 8 (Doc. 54-2).

The day after the Prayer Vigil, congratulatory emails circulated within the Ocala Police Department, thanking Chief Graham, Captains, Officers, Chaplains, and Ms. Haynes for their efforts regarding the Prayer Vigil. See Doc. 54-32 (marked Ex. 16). Captain Edwards sent an email to Ms. Haynes, Chaplain Quintana, copying Chief Graham and Officer Williams, thanking everyone for helping and "allow[ing] the PRAYER VIGIL to take place[,]" remarking that "[t]here was opposition but Isaiah 54:17 says '**No weapon** that is **formed** against thee shall prosper; and every tongue that shall rise against thee in judgment thou shalt condemn.'" Id. at 2 (capitalization and emphais in original). Captain Edwards suggested a meeting to discuss the next steps including another possible vigil, and closed with, "'Romans 8:28 'And we know that **all things work together** for good to them that love God, to them who are the called according to his purpose.'" Id. at 2. Chaplain Quintana replied to Captain Edwards, saying "God bless you Captain for organizing" the Prayer Vigil, and

---

[13] Sometime after the vigil, Chief Graham told Ms. Porgal about an anti-bullying rally scheduled for the Downtown Square where the Prayer Vigil had occurred. Ms. Porgal and the Hales attended and participated. See D. Hale Depo. at 55 (Doc. 54-14); L. Hale Depo. at 31–32 (Doc. 54-15).

saying he (Chaplain Quintana) was honored that Captain Edwards invited him. Id. at 4.

Chief Graham testified when the Chaplains are in their police uniforms,[14] the public would perceive them as being connected with the Ocala Police Department. Graham Depo. at 165–66 (Doc. 54-10). "Ocala Police Department Chaplains are official members of the Ocala Police Department[,]" who are "appointed by the Chief of Police," and are "considered members of the staff of the Chief of Police in a support capacity and report directly to the Chief of Police."[15] Doc. 52-6 at 2 (marked Ex. 2). Chief Graham agreed that although it would be inappropriate for Ocala Police Chaplains to try to "convert" people in the course of their work for the Ocala Police Department, "participating in a Prayer Vigil" would be part of the official function of an Ocala Police Chaplain. Graham Depo. at 78–79 (Doc. 54-10).[16]

---

[14] The Ocala Police Chaplain uniform differs from the uniform of a sworn officer–the Chaplains wear white shirts instead of blue, the sleeves bear patches that say "CHAPLAIN" above the Ocala Police Department patch, and the Chaplains do not carry weapons. Quintana Dec. ¶ 9 (Doc. 52-3); Doc. 54-19 at Page ID 1386, 1389, 1394, 1396, 1401, 1402 (marked Ex. 3) (photos of uniformed sworn Ocala Police Officers and uniformed Ocala Police Chaplains).

[15] Chief Graham has the authority to terminate the Ocala Police Chaplains. Graham Depo. at 168 (Doc. 54-10). At the time of Prayer Vigil, all of the Ocala Police Department Chaplains were of the Christian faith. Id. at 157 (Doc. 54-10).

[16] In a later declaration, Chief Graham seems to clarify a portion of this

22

Although the Ocala Police Chaplains are volunteers, they are covered by worker's compensation when performing official Department duties. Doc. 52-6 at 2 (marked Ex. 2). The Ocala Police Department supplies and pays for the Chaplains' uniforms. City Int. Resp. No. 7 (Doc. 54-5). "[Chaplains] are issued Police Identifications in the form of an identification card with holder and badge[,]" id., are issued cell phones, and are authorized to drive Department vehicles.[17]  Ocala Police Department Police Chaplain Section Manual, 2010, and as reviewed 2015 (Doc. 54-74 at 23–24, 36–37 (marked Ex. 58)). The Chaplains have office space in the Ocala Police Department's building. Graham Depo. at 169 (Doc. 54-10).

––––––––––––––––––––

deposition testimony, saying:

> As I previously testified, I do not consider uniformed [Ocala Police Department] chaplains proselytizing to the general public to be part of their official departmental function. Nor is it part of chaplains' departmental function to lead general community religious events or activities, such as the Community Prayer Vigil at issue in this case, while in uniform.

Graham Dec. II ¶ 6 (Doc. 68-1).

[17] In Chaplain Quintana's declaration, he stated Chaplains do not wear "police badges," Doc. 52-3 ¶ 9, but the department directive and section manual both state that Chaplains are issued badges. See Doc. 52-6 at 2, Doc. 54-74 at 23, 36. In some Prayer Vigil photos, some Police Chaplains appear to be wearing badges. See Doc. 54-19 at Page ID 1386, 1389, 1390, 1394, 1396 (marked Ex. 3). According to the City's Interrogatory Responses, the Chaplains' badges identify the wearer as a Chaplain (as compared to a sworn officer), but that is not evident from the photos. See City's Int. Resp. No. 7 (Doc. 54-5).

Under the City of Ocala charter, the Mayor is the sole municipal official in authority over the Ocala Police Department and he recommends a chief of police nominee to the City Council, who appoints the chief. Guinn Aff. ¶ 3 (Doc. 53-1). Chief Graham testified he would have removed the Facebook posting if the Mayor had directed he do so. Graham Depo. at 161 (Doc. 54-10). Likewise, Mayor Guinn testified he had authority to order Chief Graham to remove the Facebook posting. Guinn Depo. at 54–55 (Doc. 54-11). Mayor Guinn also had authority to instruct that Ocala Police Department Chaplains not lead prayers at the Prayer Vigil or attend in Ocala Police Department Chaplain uniforms, but he did not consider doing that because he believed those actions were permitted under the Establishment Clause. Id.

Chief Graham testified going forward, he would not permit the Chaplains to participate in public events while wearing their Ocala Police Department uniforms if the event involved leading prayers, not because it was necessarily inappropriate, but to keep from getting sued. Graham Depo. at 164–68 (Doc. 54-10). Subsequent public prayer events have been held in Ocala, at least one of which was organized and sponsored by a church. Id. at 74; Doc. 54-76 at 5.

## IV.   STANDARD OF REVIEW

"A district court must grant summary judgment 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

24

to judgment as a matter of law.'" <u>Atheists of Fla., Inc. v. City of Lakeland</u>, 713 F.3d 577, 589 (11th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). In making this assessment, the court "view[s] all facts and reasonable inferences drawn therefrom in the light most favorable to the non-moving party." <u>Id.</u> (cleaned up). Conclusory allegations are insufficient to create a triable issue of fact. <u>Carter v. City of Melbourne</u>, 731 F.3d 1161, 1167 (11th Cir. 2013) (citation omitted). "Issues of fact are 'genuine' only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." <u>Atheists of Fla.</u>, 713 F.3d at 589 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)). "The principles governing summary judgment do not change when the parties file cross-motions for summary judgment." <u>T-Mobile S. LLC v. City of Jacksonville</u>, 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008).

## V.    DISCUSSION

### A.    Standing

The Eleventh Circuit decided there is standing for Plaintiff Lucinda Hale. <u>Rojas</u>, 40 F.4th at 1350-51. The City has reiterated arguments about standing to preserve the issue for appeal, Doc. 146 at 5–7, but standing is not further discussed.

25

**B.   Establishment Clause**

The Establishment Clause of the First Amendment provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The First Amendment "requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions, than it is to favor them." Everson v. Bd. of Ed. of Ewing TP, 330 U.S. 1, 18 (1947). The Establishment Clause has been recognized as protection against "sponsorship, financial support, and active involvement of the sovereign in religious activity." Walz v. Tax Comm'n of City of New York, 397 U.S. 664, 668 (1970). Still, "[i]n every Establishment Clause case, [the court] must reconcile the inescapable tension between the objective of preventing unnecessary intrusion of either the church or the state upon the other, and the reality that, as the [Supreme] Court has so often noted, total separation of the two is not possible." Lynch v. Donnelly, 465 U.S. 668, 672 (1984).

"The Establishment Clause . . . is not a precise, detailed provision in a legal code capable of ready application." Id. at 678. Thus, "Establishment Clause challenges are not decided by bright-line rules, but on a case-by-case basis with the result turning on the specific facts." Glassroth v. Moore, 335 F.3d

1282, 1288 (11th Cir. 2003); see also Selman v. Cobb Cty. Sch. Dist., 449 F.3d 1320, 1323 (11th Cir. 2006) ("Knowledge of the particular facts and specific circumstances is essential to a determination of whether the governmental acts in question are religiously neutral."). "The inquiry [as to whether the Establishment Clause is violated] remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed." Town of Greece. v. Galloway, 572 U.S. 565, 587 (2014) (plurality opinion). Under the Establishment Clause, "detail is key." McCreary Cnty. v. ACLU, 545 U.S. 844, 867 (2005) (citation omitted).

Incorporated through the Due Process Clause of the Fourteenth Amendment, the First Amendment "applies to state and municipal governments, state-created entities, and state and municipal employees." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1268 (11th Cir. 2004) (citations omitted).

### C.   Kennedy v. Bremerton

As directed by the Eleventh Circuit, the Court addresses Kennedy v. Bremerton. Kennedy's facts are far different from those here and to date, no decisions have considered Kennedy under facts more similar to ours. [18] Nevertheless, Kennedy holds lessons for this case.

---

[18] Even though several hundred cases have cited Kennedy, the Court has

In Kennedy, the plaintiff was a high school football coach, who routinely prayed after games at mid-field.[19] 597 U.S. at 512–15. Kennedy's prayers had occurred for years without any issue, but once the school district became aware of the prayers, it told Kennedy to stop. Id. at 515–18. Kennedy asked to continue his practice of after game, on-field prayers. Id. at 517. The district was willing to allow him to pray privately after the game, but not publicly at mid-field. Id. at 519. The district prohibited the on-field prayer because it thought Kennedy's act of praying while on duty[20] could be construed by a "reasonable observer" as

---

not identified any cases with similar facts as to whether government activity, short of coercion, is improper sponsorship of religion in violation of the Establishment Clause. Cf. Erie v. Hunter, 675 F. Supp. 3d 647, 650-51, 659 (M.D. La. 2023) (denying summary judgment because there was a fact dispute about forced church attendance in state psychiatric hospital); Mays v. Cabell Cnty. Bd. of Educ., NO. 3:22-cv-85, 2022 W.L. 17637616 at *1, 7-8 (S.D. W.Va. Dec. 13, 2022) (denying school board's motion to dismiss because amended complaint alleged favorable treatment of religion based on students being required to attend religious assembly).

[19] Kennedy also routinely conducted locker room prayers before games and gave after game motivational speeches with religious messages but stopped these practices when requested by the school district. Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 516 (2022). References to Kennedy's prayers in this opinion refer to the postgame, on-field prayers that resulted in discipline and not to other activities Kennedy voluntarily stopped.

[20] The Supreme Court found even though Kennedy's prayers took place within his office environment (the field of play), the prayers were not within the scope of his employment duties and occurred at a time when he and other coaches were expressly permitted to engage in personal activity, such as calling home. Id. at 530−31.

28

a government endorsement of prayer in violation of the Establishment Clause. Id. at 516−18, 520. Kennedy disobeyed the directive, continued to "pray[] quietly without his players," and was disciplined. Id. at 512−15, 525−26.

Kennedy filed suit alleging violation of his free exercise and free speech rights. Id. at 520−21. The Kennedy decision relied on finding: (1) there was no undue influence, much less coercion, for others to participate in Kennedy's prayers, id. at 519−20, 537−39; (2) Kennedy's prayers occurred when coaches were permitted to engage in private activities, id. at 513, 530−31; and (3) Kennedy's prayers occurred when students were engaged in other activities, such as singing the school fight song, id. at 519, 530, 538. The Supreme Court concluded (1) Kennedy's prayers were private speech, not government speech, even though they occurred while he was still on duty, id. at 527−30; and (2) the school district prohibition against Kennedy's prayers was hostile towards religion, not neutral, id. at 526, 541. Accordingly, the prohibition against Kennedy's on-field prayers violated his rights of free speech and free exercise of religion and was not necessary to avoid violation of the Establishment Clause. Id. at 543.

### D.    Applying the historical practices and understandings test

In abrogating the Lemon test in Kennedy, the Supreme Court directed that "the Establishment Clause . . . be interpreted by 'reference to historical

29

practices and understandings.'" Id. at 535 (citations omitted). Despite the different context of Kennedy, both parties here argue application of this historical practices and understandings test operates in their respective favor.

The City maintains the Prayer Vigil was permissible because it fits in with other historical examples dating back to George Washington of government and prayer being intertwined, including legislative prayer and proclamations of National Day of Prayer. Doc. 146 at 11−18.[21]

The City's examples of government historical involvement with prayer are distinguishable. In Town of Greece, the Supreme Court emphasized the context and settings of legislative prayer noting: "legislative prayer lends gravity to public business, reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a common aspiration to a just and peaceful society." 572 U.S. at 575 (plurality opinion). Unlike legislative prayer, the Prayer Vigil was directed at the public and asked for public participation. Cf., id. at 587−88 ("The analysis would be different if town board members directed the public to participate in the prayers . . . ."). Moreover, the Prayer

---

[21] A challenge to the Presidential proclamations of prayer failed, not because the proclamation was determined to be permissible, but because the Seventh Circuit Court of Appeals held that the plaintiffs lacked injury and therefore did not have standing. Freedom from Religion Found. v. Obama, 641 F.3d 803, 805 (7th Cir. 2011).

Vigil <u>was</u> the event, and dissimilar to legislative prayers because it did not involve prayers that were tangential to or meant to solemnize other public business.

Apart from legislative prayers, other examples cited by the City include when a government response to a crisis has involved prayer: President Obama's remarks at the Sandy Hook Interfaith Prayer Vigil (2012), a prayer vigil attended by congressional members on January 6, 2022 (the second anniversary of the Capitol Hill Riot), instances related to epidemics (in 1793), war (in 1813), natural disasters (in 1890), and others. Doc. 146 at 15−17. While these instances show prayer and prayer vigils as part of a response to crisis, none of them provide evidence of how much the government was involved in the conception, planning, and execution of the event, and whether there was a legal challenge to government involvement or participation, much less that the involvement was deemed permissible after a challenge.

Similarly, the City's claim about lack of control and lack of employee involvement falls short. <u>See</u> <u>id.</u> at 2–4; Doc. 148 at 1–3. The City is correct in claiming that at the Prayer Vigil itself, no uniformed, sworn officer participated. But this overlooks the attendance and participation of the Ocala Police Department Chaplains, in uniform and on stage, based on direction from Chief

Graham.[22] It overlooks the Ocala Police Department's employees and staff's involvement to conceive and plan the vigil. And the City entirely ignores the explicit leadership and support of Chief Graham and the Mayor concerning the Prayer Vigil. The involvement of Chief Graham, Mayor Guinn, Captain Edwards, the Chaplains, and others is further discussed infra.

Plaintiffs argue aspects of the Prayer Vigil were coercive. Doc. 147 at 3. They point to the letter announcing the Prayer Vigil (using the Ocala Police Department logo and letterhead, signed by Chief Graham, and posted on the Ocala Police Department Facebook page) and its language that the situation "requires fervent prayer and your presence." Plaintiffs contend the inherent authority of law enforcement allows the letter to be viewed as coercive.[23] Id. at 7. Mr. Rojas testified he felt pressure to participate or indicate approval of the Prayer Vigil activities. Nonetheless, all plaintiffs voluntarily attended the vigil and were allowed to protest. There is no evidence of efforts by the Ocala Police Department to require attendance by the public or to threaten consequences for failing to attend. Considering the totality of the circumstances and as a matter

---

[22] It is undisputed Chief Graham was aware of the directive for chaplains to attend in uniform, knew it had been attributed to him, and let the directive stand, even though he could have intervened, revised, or countermanded it.

[23] Several Facebook comments questioned what might happen if people did not participate or did not pray. See generally Doc. 54-18.

of law, the general public was not coerced as defined in First Amendment jurisprudence. See Kennedy, 597 U.S. at 537 (noting government may not require citizens to participate in church attendance or formal religious exercise) (citations omitted); cf. Torcaso v. Watkins, 367 U.S. 488, 495–96 (1961) (holding that a required oath of office declaring belief in existence of God violated the Establishment Clause).

In applying the Kennedy "historical practices and understandings" test, keep in mind that Kennedy itself was quite different. The underlying dispute in Kennedy arose from an individual act of prayer, occurring without any government assistance, and a government directive to not pray. Because Kennedy's prayers were private and he did not coerce anyone into praying with him, the school district's directive for him to not publicly pray violated his rights to free speech and free exercise of religion. Similarly, because Kennedy's prayers were as a private citizen and not coercive, allowing Kennedy to pray did not violate the Establishment Clause. Unlike Kennedy, this case does not involve alleged violations of free speech or free exercise rights of a private citizen. Rather, plaintiffs contend that the City's conception and support of the Prayer Vigil amounted to government sponsorship and violated the Establishment Clause.

To determine this, the Court will "look to the record of evidence showing the progression leading up to" the Prayer Vigil along with the event itself to determine if the City's actions violated the Establishment Clause. <u>McCreary</u>, 545 U.S. at 868. The government should not be a prime participant in religious debate or expression because "the Framers deemed religious establishment antithetical to the freedom of all." <u>Lee v. Weisman,</u> 505 U.S. 577, 591 (1992). "When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." <u>Engel v. Vitale</u>, 370 U.S. 421, 431 (1962).

The City argues it had a "limited role in expressing support for the event [and a] limited role in the event itself." Doc. 146 at 23. The City says it did not control the Prayer Vigil and any involvement of Ocala Police Department personnel at the Prayer Vigil were as private citizens, not City employees. However, the undisputed evidence says otherwise.[24]

---

[24] Two years after the Prayer Vigil occurred some participants–Chief Graham, Captain Edwards, Chaplain Quintana and Ms. Haynes–testified or provided declarations indicating minimal involvement of themselves or others. This evidence does not serve to dispute the contemporaneous evidence because it is conclusory and fails to acknowledge or explain the contemporaneous evidence about their involvement or why that involvement should be attributed to a private role even though work titles and work time were used, etc. <u>Cf.</u>, Haynes Dec. (Doc. 52-2) ¶ 9 (executed on September 15, 2016, claiming Chief Graham's only involvement was "signing and posting the letter to Facebook"

As information about the Prayer Vigil spread, the Mayor began receiving comments (both for and against) and readily accepted responsibility for the City's involvement and sponsorship of it. The Mayor responded to Ms. Hale using inclusive terms of "us" and "we," stating "[n]ot only are we not canceling it we are trying to promote it . . . ." Doc. 54-44 at 2. In another email, Mayor Guinn says "I'm proud to stand by my Chief and support him" and "that's why we're leading the community in this prayer vigil." Doc. 54-51 at 2. The Mayor's support was unequivocal and continued when he was deposed. As his testimony made clear, the Mayor thought it was acceptable for the police chief to use police

_____

without addressing or acknowledging other emails or communication involving Chief Graham, including the directive for chaplains to attend in their police uniform). Declarations from Haynes and Quintana both admit Captain Edwards was involved in planning and organizing the Prayer Vigil and fail to claim Captain Edwards was only involved as a private citizen. See Haynes Dec. ¶ 9 (Doc. 52-2) (Captain Edwards provided "some assistance" to organize the vigil); Quintana Dec. (Doc. 52-3) ¶¶ 5 (executed on September 16, 2016, stating Captain Edwards "also helped" to organize and plan the Prayer Vigil). Chaplain Quintana's declaration states "No Ocala Police Department employee (other than Richard Edwards who participated while off-duty and wearing plain clothes) determined or directed any aspect of the vigil, including who would lead or participate in the vigil, or the content of any speech at the vigil." Quintana Dec. (Doc. 52-3) ¶10. This statement, however, about the limited involvement of Captain Edwards, two years after the vigil, does not claim Captain Edwards did not provide assistance while on duty. Likewise, it does not acknowledge OPD activities such as approving the Facebook letter, posting the letter on the OPD Facebook page, use of the police letterhead and logo, or development and approval of the flyer with both praying hands and the OPD logo.

letterhead and communicate a need to believe in God, post a letter about requiring "fervent prayer," and for the City to host a prayer vigil.

The idea for the Prayer Vigil came from a meeting convened by Chief Graham, at the Ocala Police Department, with participants selected by Chief Graham, all of whom were Ocala Police Department employees or staff, except for a single community member.[25] It was conceived in Chief Graham's office, advertised, and completed through the actions of the Mayor, the Chief of Police, and the Ocala Police Department, including its employees and staff.

Once Chief Graham expressed his approval for the Prayer Vigil ("Let's do it"), Chaplain Quintana and Ms. Haynes left the meeting to put together a letter, which Chief Graham approved and signed along with Ms. Haynes. The letter was to the community from its Chief of Police. It used the Ocala Police Department logo in the shape of a badge. It was on Ocala Police Department letterhead, including the address and phone number for the Ocala Police Department. Chief Graham directed his staff to post the letter on the Ocala

---

[25] The single community member was Ms. Haynes. The other participants were Captain Edwards, as District Commander of the area where most of the trouble was occurring; Officer Mary Williams, who assisted Captain Edwards with community events in the area; Captain Carmen Sirolli, the Captain in charge of the division investigating the shootings; Major Dennis Yonce, the Major to whom Sirolli reported; and Chaplains Brockington and Quintana. Graham Depo. at 19–21 (Doc. 54-10).

Police Department Facebook page. Chief Graham admitted posting the letter was promoting the Prayer Vigil. In addition to the letter, the Ocala Police Department put together a flyer about the Prayer Vigil. The flyer is a picture of the town square, with praying hands in one corner and the Ocala Police Department logo in the opposite corner.

As information about the Prayer Vigil went out, compliments and criticism came in. The Mayor, chief executive of the City, was a consistent and enthusiastic supporter of both the Prayer Vigil and Chief Graham. The Mayor had authority to tell Chief Graham to cancel the Prayer Vigil, but he did not. Instead, more than once, the Mayor said he thought the Prayer Vigil was "great" and expressed praise for Chief Graham having the idea and the City's leadership of the Prayer Vigil. Even as criticism mounted, the Mayor's support did not waver. "Not only are we not canceling [the Prayer Vigil] we are trying to promote it and have as many people as possible to [sic] join us." Both before and after the Prayer Vigil, the Mayor thought the City's involvement in the Prayer Vigil itself was not only permissible but commendable.

Like Mayor Guinn, Chief Graham's early comments took responsibility and credit for the Prayer Vigil. Chief Graham sent multiple emails to citizens in reference to the Prayer Vigil using words such as "we" and "I," indicating his personal involvement. Chief Graham thanked one person for encouraging words

37

and said he had no intention to call the Prayer Vigil off. In another instance, Chief Graham flatly stated he had "no intention of canceling the event." When Chief Graham thought a date change for the Prayer Vigil was needed, he emailed other Ocala Police Department employees and staff and did not include the community activist or anyone not affiliated with the Ocala Police Department. When Chief Graham received feedback about the Prayer Vigil, he personally responded. There is no evidence he ever directed the compliments or complaints to anyone else, and he did not tell the Mayor someone else was responsible for the Prayer Vigil.

Chief Graham's later comments tended to minimize his involvement with or control over with the Prayer Vigil, but even as Chief Graham began to say his control or involvement was minimal, his employees and staff were actively planning it. Captain Edwards confirmed he and Chaplain Quintana were making decisions about the Prayer Vigil, with input from Chief Graham and Ms. Haynes.

Chief Graham had authority to cancel the Prayer Vigil, but he did not. Chief Graham had authority to direct the Chaplains to not participate in the Prayer Vigil in uniform, but he did not. Chief Graham had authority to tell his employees they could not work on the Prayer Vigil during work hours, but he did not. The Ocala Police Department took affirmative steps to plan and

promote the Prayer Vigil and associate the City with it. The record lacks evidence that someone not affiliated with the Ocala Police Department was in control.

Captain Edwards was involved with the Prayer Vigil in his role as an Ocala police officer. See Doc. 146 at 2–3, n.4. Captain Edwards communicated his enthusiastic support for the Prayer Vigil on multiple occasions. One of his emails included scripture verses about withstanding opposition to the vigil. In his declaration, Captain Edwards said he offered to assist the Prayer Vigil by making meeting space available to the organizers, but his involvement was not limited to that. Indeed, Captain Edwards identified himself as one of the decision makers for the Prayer Vigil. Captain Edwards said he might have to miss a work meeting because he was planning the vigil. Captain Edwards was involved in considering an alternate plan in case of rain. After the Prayer Vigil, Captain Edwards emailed Ms. Haynes and Chaplain Quintana, copying Chief Graham and Officer Williams, expressing gratitude to "all who helped and allowed the PRAYER VIGIL to take place" and wanting to discuss next steps based on the "many request[s] to continue this sort of thing." Doc. 54-32 at 2. Chaplain Quintana responds, "God bless you Captain for organizing this event and I am honored you invited me." Id. at 4.

39

Even though many emails to plan the Prayer Vigil included Ms. Haynes, there are also multiple planning emails exclusively among various City personnel. For example, Chief Graham's email about needing to change the date for the Prayer Vigil is only sent to Captain Edwards and Chaplain Quintana. Doc. 54-21. An email about the flyer with praying hands is from Tina Brito, Certified Law Enforcement Analyst, and only sent to Captain Edwards. Doc. 54-22. The record does not contain any instruction to Captain Edwards, any Chaplain, or any other Ocala Police Department personnel to separate their official duties from any individual and private support of the Prayer Vigil.

While Ms. Haynes was involved in planning the Prayer Vigil, there is no evidence she controlled it. To the contrary, she responded to Captain Edwards, including Chief Graham, Chaplain Quintana, and Officer Williams–all Ocala Police Department personnel–and thanked "the Chief and staff" of the Ocala Police Department for "launching into action to make sure [the Prayer Vigil] happened." Doc. 54-32 at 2. Apart from Ms. Haynes' involvement, the record shows that the Ocala Police Department's employees and staff planned and implemented the Prayer Vigil as part of their duties — regardless of whether they were paid or not.

Thus, there is no evidence to support the City's argument that the Ocala Police Department employees and staff did not plan the vigil. The undisputed

40

evidence chronicles the Mayor's and Chief's direct support of and involvement with the vigil. The City effectively admits Captain Edwards was involved with the Prayer Vigil but characterizes his participation either as community policing or as that of a private citizen. This fails to explain the many actions Captain Edwards performed while on duty that he labeled as decision making. Similarly, the City does not address the involvement of other Ocala Police Department employees. Instead, it argues that the planning work by the Chaplains cannot be attributed to the City because they are volunteers, and therefore their activities were done as private citizens.

This downplays, even ignores, pertinent portions of the record. Chaplain Quintana was one of two Ocala Police Department Chaplains invited by Chief Graham to the meeting that birthed the Prayer Vigil. While Chaplains are unpaid, they are not typical volunteers. Chaplains are "official members of the Ocala Police Department" and "considered members of the staff of the Chief of Police . . . ." Doc 52-6 at 2. Chaplains are covered by worker's compensation, have office space at the Police Department, are issued police badges, receive uniforms (which they wore to the Prayer Vigil), and are subject to the authority of the Police Chief, who appoints them. Chaplain Quintana sent an email to other Chaplains, copying Chief Graham, stating "Chief Graham asked me to contact all our chaplains" asking them to be present at the vigil and "[Chief

Graham] also asked to please be Dressed Up in the Official Chaplains Uniform (White Shirt)."

At the Prayer Vigil itself, five of the ten people on stage were affiliated with the Ocala Police Department. Four were Ocala Police Department Chaplains in their uniforms,[26] in compliance with the direction from Chief Graham through Chaplain Quintana's email. The fifth was Captain Edwards, off duty and not in uniform.[27] Even if some of the Chaplains' or Captain Edwards' actions occurred in their roles as private citizens, there is ample evidence of activity by Ocala Police Department's paid and unpaid personnel to sponsor, plan, and support the Prayer Vigil.

The City argues "Quintana and Haynes were responsible for planning and organizing the vigil," citing their declarations and the email from Captain Edwards "thanking them for helping with and allowing the prayer vigil to take place." Doc. 146 at 2, n.3. The City does not explain why Chaplain Quintana's email thanking Captain Edwards as the organizer or why the email from Ms.

---

[26] See supra n.2.

[27] It is not clear whether Captain Edwards gave remarks stating he was a sworn officer with the Ocala Police Department. See Doc. 54-31 at 2 (marked Ex. 15), which appears to be a draft of Captain Edwards' remarks (sent to himself), in which he greets the crowd, explains he is there in many capacities, including as a police officer and a child of God, and, like the audience, is calling on God through prayer, hoping to end senseless shooting and violence in the city.

42

Haynes thanking Chief Graham and his staff for making the Prayer Vigil happen does not evidence official government action. The City does not cite any evidence that the Chaplains' planning efforts for the vigil were as private citizens as opposed to their "staff" and "official" roles. Nor does the City argue it did not provide support to the Prayer Vigil through use of "our chaplains." See e.g. Graham Depo. at 20 (Doc. 54-10); Doc. 54-26 at 2; Doc. 54-35 at 3. The City fails to address various statements of ownership from Chief Graham ("I have no intention of calling off this gathering") and Mayor Guinn ("that's why we're leading the community in this prayer vigil"), even if later statements are more measured.

Based on the undisputed facts, the City's involvement in conceiving, organizing, and implementing the Prayer Vigil is government sponsorship of a religious event. The content of the Facebook letter on Ocala Police Department letterhead (describing a community crisis that "requires fervent prayer and your presence"), and the flyer confirm this. See Holloman, 370 F.3d at 1286; Gilfillan v. City of Philadelphia, 637 F.2d 924, 924, 930−31 (3d Cir. 1980) (finding city's expenditures to create platform from which the Pope would celebrate a Mass and deliver a sermon to over 1,000,000 people had religious effect, notwithstanding that the Pope would be celebrating Mass and delivering a sermon even if city had not provided the platform); Hewett v. City of King, 29

43

F. Supp. 3d 584, 635 (M.D.N.C. 2014) (finding mayor's delivery in his official capacity of religious messages at privately sponsored annual public commemorative events which featured Christian prayer practices had effect of City endorsement of Christianity); see also Milwaukee Deputy Sheriffs' Ass'n v. Clarke, 588 F.3d 523, 528−29 (7th Cir. 2009) (finding sheriff's invitation to religious group to speak at mandatory employee meetings gave appearance of state endorsement of religion in violation of Establishment Clause); cf. Am. Atheists, Inc. v. Port Auth. of N.Y. & N.J., 760 F.3d 227, 243−44 (2d Cir. 2014) (finding reasonable observer would know that Ground Zero Cross held such historical significance to the story of the 9/11 recovery that its inclusion with hundreds of other artifacts at government museum had effect of ensuring historical completeness and not of promoting religion).

The conclusion that the City's activities amount to sponsorship in violation of the Establishment Clause is consistent with other cases. Those decisions turn on the degree to which a government entity or official initiated, organized, facilitated, promoted, provided space for, paid for, supervised, participated in, regulated, censored, led, endorsed, encouraged, or otherwise controlled the activity.[28] See Doe v. Village of Crestwood, 917 F.2d 1476, 1479

---

[28] This list of factors is not intended to be exclusive.

(7th Cir. 1990) (government entity or official initiated, promoted, and provided space for the activity); McCreary, 545 U.S. at 869 (government entity or official initiated the activity); Marrero-Mendez v. Calixto-Rodriguez, 830 F.3d 38, 45 (1st Cir. 2016) (government entity or official initiated, and participated in the activity); Newman v. City of East Point, 181 F. Supp. 2d 1374, 1376, 1380 (N.D. Ga. 2002) (government entity or official organized, promoted, provided space for, paid for, and endorsed the activity); Holloman, 370 F.3d at 1287−88 (government entity or official facilitated, supervised, participated in, led, endorsed, and encouraged the activity); Santa Fe Ind. Sch. Dist. v. Doe, 530 U.S. 290, 308, 310 (2000) (government entity or official supervised and encouraged the activity); Adler v. Duval Cnty. Sch. Bd., 250 F.3d 1330, 1333, 1337, 1341 (11th Cir. 2001) (government entity or official regulated, censored, or otherwise controlled the activity).

One case concluding there was sponsorship (but not relying on Lemon) is Doe v. Village of Crestwood, 917 F.2d 1476 (7th Cir. 1990).[29] A city employee

---

[29] A similar case that does rely on Lemon is Newman v. City of East Point, 181 F. Supp. 2d 1374 (N.D. Ga. 2002). Plaintiffs sought to enjoin the city and mayor from holding the mayor's annual prayer breakfast. Id. at 1380. The city argued it was not promoting or endorsing the event, but it was privately paid for and was not going to be held on city property. Id. at 1376. Plaintiffs demonstrated that city resources had previously been used to organize, promote, and pay for the mayor's prayer breakfast. Id. at 1380. Evidence included a letter from the mayor on city letterhead promoting the event and soliciting donations; mayor's request for reimbursements related to the prayer

was also a member of a club involved with an annual village-sponsored Italian festival in a public park and invited a Roman Catholic priest to deliver a Mass during the festival. <u>Id.</u> at 1477−78. Reviewing the district court's injunction to stop the Mass, the Seventh Circuit noted, "everything turns on who is putting on this mass." <u>Id.</u> at 1479. Looking at the slim record available on the emergency motion for stay, the court considered that a city employee selected and recruited the priest, and advertisements and other publicity for the event referred to "us" and "our" (meaning the village) and did not mention that anyone other than the village was sponsoring the Mass. <u>Id.</u> From this, the Seventh Circuit determined that the record supported the district court's finding that the Mass was sponsored by the government in violation of the Establishment Clause. <u>Id.</u>

To paraphrase <u>Lee</u>, the good faith intentions of the City are not the issue here. <u>Lee</u>, 505 U.S. at 588−89. Without the City's actions—from the Mayor on down—there would not have been a Prayer Vigil. And the City's support of the Prayer Vigil favored a religious viewpoint. While the Prayer Vigil was geared

_____

breakfast; and mention of the event in a city-produced community flyer about other city-led events. <u>Id.</u> The court determined plaintiffs' showing was sufficient to secure an injunction prohibiting the city and the mayor in her official capacity from organizing, advertising, promoting, or endorsing the breakfast or using city resources to do so, but the court denied plaintiffs' requests to enjoin the mayor's prayer breakfast from taking place at all and to enjoin the mayor or city officials from attending. <u>Id.</u> at 1381−82.

46

towards Christianity,[30] there is some evidence that it was not limited to any one faith. See Doc. 146 at 22; see also Docs. 54-41 at 4, 54-42 at 3, 5 (emails from Chief Graham denying vigil is limited to a particular religion). But that thin layer of neutrality is not enough to avoid an Establishment Clause violation. Government cannot prefer religion over non-religion or atheism. Everson v. Bd. of Ed. of Ewing TP., 330 U.S. 1, 18 (1947); see Sch. Dist. of Abington Twp., PA v. Schempp, 374 U.S. 203, 218–225 (1963) (citing Zorach v. Clauson, 343 U.S. 314 (1952)).

Similarly, Chief Graham's offer to connect an objector, Paul Tjaden, with organizers if Tjaden wanted to speak at the vigil, Doc. 52-8, is not comparable to neutrality demonstrated by rotating responsibilities for an opening prayer or invocation at government events. See Doc. 146 at 22. As previously discussed, legislative prayer has a different purpose: to solemnize and prepare for the main event of government business. Trying to achieve neutrality towards religion by inviting an atheist to speak at an event whose only purpose is prayer fails to treat the secular viewpoint with the same level of respect being provided to religious prayer.

---

[30] Attendees included various Christian denominations, including Rabbi Baruch Greenstein, identified by Jean Porgal as a Messianic Christian. See Doc. 54-13 at 46-47.

47

As <u>Kennedy</u> commands, the Court bases its decision on a "historically sensitive understanding of the Establishment Clause," <u>Kennedy</u>, 597 U.S. at 537, and comes to this conclusion: where government action amounts to sponsorship of or favoritism towards a religious belief system, it violates the Establishment Clause. That is what happened here.

## VI.   CONCLUSION

It is tempting to simply say this decade-old event was conceived with good intent by persons of good will and that no real harm was done. But the Establishment Clause of the First Amendment serves as a bulwark against government sponsorship or endorsement of religion. The Court's role is to give effect to its protections. And, there was a ready alternative.

If individuals or religious groups had organized a prayer vigil and gathered in the Downtown Square in the City of Ocala to pray for an end to violent crime (even with law enforcement attending), the First Amendment to the United States Constitution would have protected the "Free Exercise" of their religion. But because the City conceived, organized, promoted, and conducted the Prayer Vigil, it violated the Establishment Clause of the First Amendment.

The Court is granting the Plaintiffs' motion for summary judgment and denying the City's cross-motion.[31]

Accordingly, it is hereby

ORDERED:

1.    The City of Ocala's Motion for Summary Judgment (Doc. 146) is **DENIED**.

2.    Plaintiffs' Motion for Summary Judgment (Doc. 145) is **GRANTED**.

3.    The Court will award each plaintiff one dollar ($1.00) in nominal damages.

4.    As the prevailing parties, the Court will also be considering an award of attorneys' fees and costs in plaintiffs' favor under 42 U.S.C. § 1988. No later than **July 26, 2024**, plaintiffs shall file a motion for attorneys' fees and costs.[32] Assuming it opposes the motion, no later than **September 6, 2024**, the City of Ocala shall file its response.

---

[31] Both parties agreed that the record is fully developed and that a trial of the matter would serve no purpose.

[32] Because Plaintiff's entitlement of attorney's fees is governed by § 1988, the Court directs that Plaintiffs' motion address both entitlement and amount of fees. Cf. Local Rule 7.01.

5.    The Clerk is directed to withhold entry of judgment until the Court has resolved plaintiffs' request for attorneys' fees and costs.


**DONE AND ORDERED** in Jacksonville, Florida the 26th day of June, 2024.



TIMOTHY J. CORRIGAN
United States District Judge


ddw
Copies:

Counsel of record